UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ELOY ROJAS MAMANI, et al.,

                 Plaintiffs,

vs.                                           Case No. 07-22459-CIV-COHN

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

                 Defendant.
_____/

ELOY ROJAS MAMANI, et al.,

                 Plaintiffs,

vs.                                           Case No. 08-21063-CIV-COHN

GONZALO DANIEL SÁNCHEZ DE LOZADA
SÁNCHEZ BUSTAMANTE,

                 Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' JOINT MOTION TO DISMISS

**THIS CAUSE** is before the Court on Defendants' Joint Motion to Dismiss

Plaintiffs' Second Amended Consolidated Complaint [DE 183 in Case No. 07-22459 and

DE 167 in Case No. 08-21063] ("Motion").  The Court has carefully reviewed the Motion,

Plaintiffs' Response and Defendants' Reply thereto, and is otherwise duly advised in the

premises.  For the reasons below, Defendants' Motion is granted in part and denied in

part.

## I. INTRODUCTION

This consolidated case concerns the Bolivian government's alleged massacre of

its own civilians during a period of civil unrest in Bolivia in 2003.  Plaintiffs—nine

Bolivian residents and citizens—are the relatives of eight Bolivian civilians allegedly

deliberately killed by Bolivian soldiers in Bolivia.[1]  The crux of Plaintiffs' claims is that two former high-ranking Bolivian government officials—the former President, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("Defendant Lozada"), and the former Minister of Defense, José Carlos Sánchez Berzaín ("Defendant Berzaín")—masterminded the violent military campaign that led to Plaintiffs' relatives' deaths, all in an effort to quell public opposition to their unpopular political agenda.  Plaintiffs thus seek to hold Defendants personally liable for compensatory and punitive damages under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 Note, and state law.

Defendants now move to dismiss Plaintiffs' Second Amended Consolidated Complaint ("Complaint") in its entirety.  First, Defendants argue that Plaintiffs' ATS claims for "extrajudicial killings" and "crimes against humanity" are barred by the Supreme Court's opinion in Kiobel v. Royal Dutch Petroleum, Co., 133 S. Ct. 1659 (2013) because all the alleged relevant conduct occurred in Bolivia.  Second, Defendants contend that Plaintiffs' TVPA claims for "extrajudicial killings" fail to overcome the Act's exhaustion-of-local-remedies requirement and thus should also be dismissed.  Third, Defendants maintain that—even if Plaintiffs' claims survive these initial challenges—the underlying factual allegations fail to state a plausible claim under

---

[1] Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani sue on behalf of their daughter, Marlene Nancy Rojas Ramos.  Plaintiff Sonia Espejo Villalobos sues on behalf of her husband, Lucio Santos Gandarillas Ayala.  Plaintiff Hernán Apaza Cutipa sues on behalf of his sister, Roxana Apaza Cutipa.  Plaintiff Teófilo Baltazar Cerro sues on behalf of his wife, Teodosia Morales Mamani.  Plaintiff Juana Valencia de Carvajal sues on behalf of her husband, Marcelino Carvajal Lucero.  Plaintiff Hermógenes Bernabé Callizaya sues on behalf of his father, Jacinto Bernabé Roque.  Plaintiff Gonzalo Mamani Aguilar sues on behalf of his father, Arturo Mamani Mamani.  Plaintiff Felicidad Rosa Huanca Quispe sues on behalf of her father, Raúl Ramón Huanca Márquez.

either the ATS or the TVPA.  Fourth and finally, Defendants urge the Court to decline supplemental jurisdiction over Plaintiffs' state-law claims for "wrongful death" because they involve "novel or complex issues" of Bolivian law.

## II. FACTUAL BACKGROUND[2]

### A.  The "Water War"

The tale of this case, as Plaintiffs tell it, begins in December 1999 during the so-called "Water War" in Bolivia.  Compl. ¶ 29.[3]  At that time, the Bolivian government faced widespread protests against its decision to privatize the water supply in a region of Bolivia.  Id.  To quash the public opposition, the government used force against the protestors, leading to several deaths and hundreds of injuries.  Id.  As a result of escalating protests over the violence, the government ultimately abandoned its privatization project.  Id.

### B.  The "Gas War"

Several years later, in June 2002, Defendant Lozada was elected to a second term as President of Bolivia with 22% of the vote.[4]  Id. ¶ 32.  He initially appointed Defendant Berzaín as Minister of the Presidency.  Id.  One of their administration's objectives was to export Bolivia's natural gas to the United States and Mexico through Chile—another widely unpopular idea.  Id. ¶¶ 33-34.  Both Defendants anticipated that

---

[2] This background is derived from the non-conclusory factual allegations in the Complaint, which the Court accepts as true and construes in the light most favorable to Plaintiffs in reviewing Defendants' Motion.  World Holdings, LLC v. Fed. Republic of Germany, 701 F.3d 641, 649 (11th Cir. 2012) (citation omitted).

[3] All docket citations in this Order refer to Case No. 07-22459-CIV-COHN.

[4] Defendant Lozada previously served as President from August 1993 to August 1997.  Compl. ¶ 13.

this goal, like the prior administration's attempt to privatize the water supply, would likely trigger widespread public protests.  Id. ¶ 34.

That is why before taking office Defendants met and discussed "a plan to systematically use unlawful, lethal force against civilians" to quash and deter public opposition to their political agenda.  Id. ¶ 30.  In 2001, for instance, Defendants met with members of their political party to strategize as to how they could avoid another "Water War."  Id.  They discussed using "overwhelming force" to quell protests.  Id.  Defendant Berzaín, for his part, proposed using "highly trained military troops from Beni in the east of Bolivia, who would be willing and able to kill large numbers of civilians."  Id.  In his estimation, "they would have to kill 2,000 or 3,000 people."  Id.  Defendant Lozada "explicitly agreed" with him.  Id.

After assuming power in August 2002, Defendants continued to strategize with their political and military colleagues about the need to kill civilians to overcome opposition to their plans.  Id. ¶ 31; see also ¶¶ 50, 71, 78, 80-81, 83-85, 93, 95, 100-02, 108, 125-26, 130.  Defendants also began laying the foundation to implement their strategy.  Id. ¶ 35.  Defendant Lozada appointed a new Army Commander, who issued a secret "Manual on the Use of Force."  Id. ¶¶ 36-37.  By its own terms, the Manual was prepared because Bolivia was "in a constant state of convulsion and social conflict and the Army, in order to carry out its constitutionally mandated mission, must be charged with maintaining legally constituted rule of law."  Manual on the Use of Force [DE 183-3] at 2.[5]  To this end, the Manual prescribed, among other things, the circumstances under

---

[5] As a general rule, courts may not consider anything beyond the four corners of the complaint and any documents attached thereto in reviewing a motion to dismiss. Financial Sec. Assur., Inc. v. Stephens, Inc., 500 F. 3d 1276, 1284 (11th Cir. 2007). There is an exception, however, "in cases in which a plaintiff refers to a document in its

in the military could use "force" in response to "acts of vandalism, crimes, roadblocks, marches, demonstrations, etc. carried out by subversive criminals." Id. at 13.

Defendant Lozada then promulgated a two-page secret "Republic Plan." Compl. ¶ 38. Its mission was to engage the military "in support operations to ensure the stability of the Republic, on orders, in their jurisdiction, in order to guarantee the rule of law and the exercise of constitutional rights." Republic Plan [DE 183-4] at 1. To achieve this mission, the Republic Plan instructed the military to apply "Principles of Mass and Shock"[6] to, among other things, control civil disturbances, support the national police, and remove roadblocks.[7] Id.

### 1. Defendants' Plan in Action

Several protests began around Bolivia in early 2003. Compl. ¶¶ 42-46. But instead of pursuing peaceful solutions, Defendants deployed the military to defeat the protests with force, resulting in about 40 deaths and over 200 injuries. Id. On February 13, 2003, for instance, military sharpshooters shot and killed a bricklayer working on a roof, as well as the nurse who went to assist him, before shooting a doctor wearing a

---

complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." Id. (citations omitted). This is such a case.

[6] Plaintiffs explain, and Defendants do not dispute, that "Principles of Mass and Shock" are war tactics that call for the "application of the maximum combat force . . . to obtain superiority over the enemy." Response at 6.

[7] While Plaintiffs allege that the Republic Plan explicitly authorized the military "to shoot and kill unarmed civilians on sight, independent of any legitimate law enforcement needs," Compl. ¶ 38, this allegation contradicts the Republic Plan's text. The Court, therefore, does not accept this specific allegation as true in reviewing Defendants' Motion. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). As explained below in footnote 25, however, the Republic Plan's text in general does not necessarily contradict (and thus does not control over) Plaintiffs' larger theory of this case.

Red Cross vest who tried to treat them both.  Id. ¶ 46.  In response to public outrage

over the violence, Defendant Berzaín and others resigned from the Cabinet.  Id. ¶ 47.

Over the following months, numerous people inside and outside the government

warned Defendant Lozada that the use of force against protestors was unlawful and

would lead to many deaths.  Id. ¶ 48.  They urged him to employ non-lethal responses

instead; for example, Ricardo Calla, a Bolivian anthropologist, specifically warned

Defendant Lozada that he was about to "taint his hands with blood," and that his "trigger

happy" associates would lead to a massacre if he continued to give them power.  Id.

But Defendant Lozada was unmoved.  Id. ¶ 50.  Instead, Defendants and other

government officials once again debated how many Bolivians would have to die to

suppress popular movements.  Id.  Defendant Berzaín surmised that "999 deaths were

not enough, but that 1,000 would be sufficient."  Id.

In August 2003, Defendant Lozada officially brought Defendant Berzaín back into

his Cabinet as the Minister of Defense.[8]  Id. ¶ 55.  The next month, farmers, union

members, and students began peaceful protests around the country, asserting various

demands.  Id. ¶ 56.  Yet again the government refused to negotiate.  Id.  Rather, on

September 9, 2003, Defendant Berzaín set up a "war room" to direct responses to the

growing protests.  Id. ¶ 57.  Two days later, the Commander in Chief of the Armed

Forces declared a "Red Alert" in Bolivia—the equivalent of a state of war in which the

---

[8] As the President and Minister of Defense, Defendants were the highest commanders of (and had the ultimate authority over) the Bolivian military.  Compl. ¶ 36.

military is authorized to shoot and kill "enemy combatants." Id. ¶ 58.  No actual "enemy combatants," however, were present in Bolivia at that time.[9] Id. ¶ 79.

### a. Warisata

By mid-September, protestors had blocked the road to Sorata, a small town several hours from Bolivia's capital city of La Paz.  Id. ¶¶ 58, 62.  The roadblock stranded many people, including foreign tourists.  Id. ¶ 62.  In response, Defendant Berzaín, acting pursuant to Defendant Lozada's orders, directed the military to clear the road and rescue the foreign tourists.  Id. ¶ 63.  Defendants remained in telephone contact throughout the ensuing military operation.  Id. ¶ 65.

Early on the morning of September 20, a military convoy heading to the roadblock in Sorata entered the town of Warisata.  Id. ¶ 66.  While there, soldiers shot and beat villagers even though no one was shooting at the soldiers.  Id.  The convoy then continued on to Sorata, arriving at the roadblock around the same time as a helicopter carrying Defendant Berzaín.  Id. ¶ 67.  As a crowd gathered, Defendant Berzaín shouted, "Get those Indians off the roads or I'm going to put a bullet in them." Id.  After loading the tourists onto buses, the convoy then headed back to Warisata, shooting at and killing several civilians as they ran for safety.  Id. ¶ 69.  Around 3:00 p.m., a second military contingent entered Warisata and began shooting in all directions.  Id. ¶ 70.  Two policemen were injured, and one soldier was killed.  Id.

Around 4:00 p.m., Defendants ordered the military "to take Warisata."  Id. ¶ 71. Defendant Lozada signed a written order dictated by Defendant Berzaín, directing the

---

[9] According to Plaintiffs, at all relevant times, Defendants repeatedly justified their use of military force against civilians by knowingly making the false claim that the government was facing an organized armed rebellion supported by foreign organizations.  See, e.g., Compl. ¶¶ 41, 52, 72, 84.

military to use "necessary force" to restore order "[i]n light of the grave aggression by a guerilla group against the forces of public order in Warisata." Id. ¶ 72. Defendants knew at that time, however, that their claim of an insurgency was false. Id. ¶ 79.

Multiple Special Forces units participated in "taking" Warisata that afternoon, including units that Defendant Lozada had under his direct command. Id. ¶ 74. Soldiers were ordered to use lethal munitions and to shoot "at anything that moved." Id. ¶ 73. When eight-year-old Marlene Nancy Rojas Ramos moved to look out a window in her home, far from the site of any protests, a sharpshooter fatally shot her from a distance of about 75 yards. Id. ¶ 75. No other bullets hit the house either before or after the shooting. Id.

At a Cabinet meeting that evening—and after hearing a report on that day's military operations—Defendant Lozada took full responsibility for the violence. Id. ¶ 80. Vice-President Carlos Mesa, for his part, criticized the civilian deaths and urged Defendants to negotiate with the protestors instead of using force. Id ¶ 81. But Defendants refused. Id. Instead, during a meeting the following day, they agreed to falsely blame the violence on "subversives." Id. ¶ 83. They also agreed that the military would take additional actions against "subversion" to obtain "military control" over certain areas in Bolivia. Id. Defendant Berzaín said that he would take full responsibility for the operations. Id.

Triggered in part by the violence in Warisata, more protests began around the country. Id. ¶¶ 86, 89. The protestors demanded an end to both the violence and the government's plan to export Bolivia's natural gas. Id. ¶ 86. But the government instead responded by deploying more troops. Id. ¶¶ 89, 91-92. In early October 2003,

government officials and community leaders pleaded with Defendant Lozada to resolve the escalating protests peacefully.  Id. ¶ 90.  Yet again he refused.  Id.  Instead, he instructed Defendant Berzaín not to "lower his arms" against the protesters, assuring him he had full presidential support.  Id. ¶ 93.  So when the governor of La Paz later negotiated a truce with the protesters, Defendant Lozada became livid, rejected the truce, and refused to cease military operations.  Id. ¶ 88.  Defendant Berzaín, in turn, told business and military leaders that "there will be deaths, but there will also be gasoline."  Id. ¶ 95.

On October 11, 2003, several religious leaders met with Defendant Lozada and volunteered to act as peacemakers.  Id. ¶ 102.  Defendant Lozada's message for the protesters was: "if they want dialogue for gas, they'll have dialogue, but if they want war for the gas, they'll have war, and we will shoot all the violent people in El Alto."  Id.  Continuing to rely on a knowingly false justification that Bolivia was rife with insurgents, Defendant Lozada then issued two directives authorizing the military to combat "subversion" in El Alto and La Paz.  Id. ¶ 108.

### b. El Alto

In accordance with those directives, the military conducted operations in El Alto on October 12, 2003, during which officers ordered soldiers to shoot civilians.  Id. ¶¶ 104-11.  Soldiers thus marched through residential neighborhoods, firing at people without warning.  Id. ¶ 111.  Thirty individuals died that day, including four of Plaintiffs' relatives even though none were involved in any demonstration or posed any threat.  Id. ¶ 104.

On one side of the city, far from any protests, thirty-nine-year-old and pregnant Teodosia Morales Mamani was visiting her sister's home.  Id. ¶ 112.  Several family members looked out the window inside the home and saw soldiers marching down the street, yelling at people looking out of their windows: "What are you looking at?  I'll kill you!" and "Shoot them, damn it!"  Id.  Morales was sitting next to that window when a soldier fired at the apartment.  Id. ¶ 113.  The bullet hit Morales in the abdomen, killing her and her unborn child.  Id.  A soldier also fatally shot nineteen-year-old Roxana Apaza Cutipa while she was on the roof of her house, far from any protests.  Id. ¶ 115.  Another soldier fatally shot fifty-nine-year-old Marcelino Carvajal Lucero from a distance of 19 yards as he went to close a window in his house.  Id. ¶ 116.  Across the city near the gas plant, a soldier fatally shot Lucio Santos Gandarillas Ayala as he ran for cover.  Id. ¶ 120.

Later that day, Vice President Carlos Mesa told Defendant Lozada, "These deaths are going to bury you."  Id. ¶ 125.  Defendant Lozada replied, "I'm too old to change."  Id.  That evening, Defendant Berzaín told military leaders that they were bound to obey orders from Defendant Lozada, who was responsible for the military's actions.  Id. ¶ 126.

### c. South of La Paz

On October 13, 2003, the military conducted operations in an area south of La Paz to prevent protestors from entering the capital.  Id. ¶ 131.  Soldiers were ordered to "shoot at any head that you see."  Id. ¶ 136.  They did as ordered but eventually ran out of ammunition.  Id. ¶ 137.  Defendant Berzaín then flew into the area in a helicopter, ordering soldiers in the helicopter to shoot at people below on the ground.  Id.  The

helicopter circled the area twice, firing at civilians.  Id.  It then landed to offload

ammunition for the soldiers.  Id.  The soldiers then resumed shooting with renewed

intensity.  Id.  At some point that morning, one soldier was killed by a sharpshooter.  Id.

¶ 135.

Soldiers were then ordered to chase unarmed civilians into the hills with gunfire.

Id. ¶ 138.  They killed seven civilians over the next several hours, including three of

Plaintiffs' relatives.  Id.  A soldier fatally shot Jacinto Bernabé Roque as he tried to hide

in the hills.  Id. ¶ 140.  Similarly, Arturo Mamani Mamani was also in the hills when a

soldier fatally shot him.  Id. ¶ 141.  Later that afternoon, as the convoy moved through a

nearby village, the soldiers continued to shoot at unarmed civilians.  Id. ¶ 144.  A solider

fatally shot Raúl Ramón Huanca Márquez as he tried to take cover behind a building.

Id. ¶ 145.

### 2. Defendants Flee to the United States

During the military operations in September and October 2003, Bolivian soldiers

killed 58 people, including women and children, and injured over 400 others.  Id. ¶ 6.  In

light of the mounting civilian death toll, various government officials, including Vice

President Carlos Mesa, denounced Defendants' policies.  Id. ¶¶ 146-47.  Vice President

Carlos Mesa stated that he could not return to the government because "the defense of

ethical principles, a moral vision, and a basic concept of the defense of life, prevent me

from returning to be part of the current government of the nation."  Id.  ¶ 159.  The

mayor of La Paz, for his part, said that "a death machine has been installed in the

government, and only the resignation of the head of state can stop it."  Id. ¶ 149.  But

Defendant Lozada appeared on television and said that he would not resign; instead, he

falsely claimed that Bolivia was "threatened by a massive subversive project, organized and financed by foreign sources in order to destroy Bolivian democracy."  Id. ¶ 148.

On October 15, 2003, Defendant Berzaín commended the military for strictly following Defendants' orders.  Id. ¶ 156.  Two days later, however, the United States Embassy withdrew its support for Defendant Lozada and his government.  Id. ¶ 164.  He resigned later that day.  Id.  Both Defendants then fled to the United States, where they currently reside.[10]  Id. ¶¶ 13-15, 164.

**III. PROCEDURAL HISTORY**

Plaintiffs initially sued Defendant Berzaín in this District but sued Defendant Lozada in the District of Maryland.  The District of Maryland subsequently transferred its case to this Court, which consolidated the two cases for pretrial purposes.  Plaintiffs then filed a seven-count consolidated complaint against Defendants for (1) extrajudicial killings under the TVPA and ATS; (2) crimes against humanity and (3) violation of the rights to life, liberty and security of person and freedom of assembly and association under the ATS; and (4) wrongful death, (5) intentional infliction of emotional distress, (6) negligent infliction of emotional distress, and (7) negligence under state law.  See DE 77.  Defendants moved to dismiss.  See DE 81.

---

[10] In their Motion, Defendants paint a different portrait of the facts, relying on documents incorporated by reference in the Complaint as well as additional documents attached to their Motion (such as Department of State Reports, State Department Communications, Department of Defense Rules, and certain media materials).  Defendants also filed a motion asking the Court to take judicial notice of these additional documents.  See DE 184.  The Court, however, did not consider or rely upon the additional documents submitted by Defendants in ruling on their Motion (except for the ones incorporated by reference in the Complaint).  That said, even if the Court had taken judicial notice of the additional documents, they would not have altered the Court's conclusion herein because a veritable dispute exists as to the factual circumstances of this case.  The Court, therefore, denies Defendants' motion for judicial notice as moot.

This Court—per then-District Judge Adalberto Jordan—issued two separate orders on Defendants' motion.  In the first order, the Court dismissed without prejudice Plaintiffs' TVPA claims for failure to exhaust "adequate and available" remedies in Bolivia.  <u>See</u> DE 124.  In the second order, the Court rejected Defendants' jurisdictional challenges under the political question doctrine, the act-of-state doctrine, and head-of-state immunity.  <u>See</u> DE 135.  It also found that Plaintiffs had stated plausible claims for extrajudicial killings and crimes against humanity under the ATS, but had not done so for their remaining ATS claims.  <u>Id.</u> at 21-34.  The Court further found that Plaintiffs' wrongful death claims were timely, but rejected the remaining state-law claims as barred by the Bolivian statute of limitations.  <u>Id.</u> at 34-39.

As relevant here, Defendants were then granted leave to pursue an interlocutory appeal of the legal sufficiency of Plaintiffs' ATS claims.  This Court stayed these proceedings pending the outcome.  In the end, the Eleventh Circuit reversed and remanded with instructions to dismiss, holding that Plaintiffs had not alleged facts sufficient to state a plausible claim under the ATS.  <u>See</u> <u>Mamani v. Berzaín</u>, 654 F.3d 1148 (11th Cir. 2011).

On remand, this Court stayed further proceedings pending the Supreme Court's opinion in <u>Kiobel v. Royal Dutch Petroleum, Co.</u>, 133 S. Ct. 1659 (2013).  After <u>Kiobel</u> was decided on April 17, 2013, the Court lifted the stay and granted Plaintiffs leave to amend.  Plaintiffs then filed the four-count Complaint that is presently before the Court, asserting claims for extrajudicial killings under the ATS (Count I) and the TVPA (Count II), crimes against humanity under the ATS (Count III), and wrongful death (Count IV)

under state law.  Defendants now challenge the Complaint on both jurisdictional and substantive grounds under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).

## IV. LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

Defendants move to dismiss Plaintiffs' TVPA claims for failure to exhaust local remedies.  The Court reviews this aspect of Defendants' Motion as a jurisdictional challenge under Rule 12(b)(1).  See Mohammed v. Rumsfeld, 649 F.3d 762, 775 (D.C. Cir. 2011) ("[W]e view the failure to exhaust administrative remedies as jurisdictional."); see also Escarria-Montano v. U.S., 797 F. Supp. 2d 21, 22 (D.D.C. 2011) (granting motion to dismiss TVPA claims for failure to exhaust local remedies under Rule 12(b)(1)).  Jurisdictional challenges may be either "facial" or "factual."  Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009) (citation omitted).  A "facial" challenge is "based solely on the allegations in the complaint."  Id. A "factual" challenge, on the other hand, permits courts to "consider extrinsic evidence." Id.  In doing so, courts are "free to weigh the facts and [are] not constrained to view them in light most favorable to [the plaintiff]."  Id.

Additionally, Defendants also move to dismiss Plaintiffs' ATS claims for lack of subject-matter jurisdiction.  In reviewing this aspect of Defendants' Motion, the Court merges "Rule 12(b)(1) scrutiny with that of Rule 12(b)(6)" to determine whether Plaintiffs have stated a plausible claim.  Best Med. Belgium, Inc. v. Kingdom of Belgium, 913 F. Supp. 2d 230, 236 (E.D. Va. 2012).  If Plaintiffs fail to state a plausible claim under the ATS, then the Court lacks subject-matter jurisdiction.  Id.; see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1269 (11th Cir. 2009) (affirming dismissal of ATS claims for

14

lack of subject-matter jurisdiction because plaintiffs failed to state plausible claim),

abrogated on other grounds by Mohamad v. Palestinian Auth., 132 S. Ct. 1702 (2012).

### B.  Federal Rule of Civil Procedure 12(b)(6)

To state a plausible claim for relief, Plaintiffs' Complaint must contain sufficient non-conclusory factual allegations to allow the Court "to draw the reasonable inference that [Defendants are] liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 554, 556 (2007)).  This requires "more than a sheer possibility" that Defendants have "acted unlawfully."  Id.  While Plaintiffs need not include "'detailed factual allegations,'" they must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Id. (quoting Twombly, 550 U.S. at 555).  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### V. DISCUSSION

#### A. The Alien Tort Statute

The First Congress enacted the ATS as part of the Judiciary Act of 1789.  The ATS vests "original jurisdiction" in federal district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Here, Plaintiffs claim that Defendants violated the law of nations by orchestrating extrajudicial killings and crimes against humanity as part of a violent military campaign designed to quell public opposition to their political agenda in Bolivia.  Defendants, however, argue that the Court lacks subject-matter jurisdiction

over Plaintiffs' ATS claims under the Supreme Court's opinion in <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 133 S. Ct. 1659 (2013), because all the relevant conduct occurred in Bolivia.  After careful consideration, the Court agrees with Defendants.

In <u>Kiobel</u>, a group of Nigerians residing in the United States brought ATS claims against foreign corporations for allegedly aiding and abetting the Nigerian government in violating the law of nations in Nigeria.  133 S. Ct. at 1662-63.  At issue was "whether and under what circumstances courts may recognize a cause of action under the [ATS], for violations of the law of nations occurring within the territory of a sovereign other than the United States."  <u>Id.</u> at 1662.  After examining the historical and jurisprudential context of the statute, the Supreme Court held that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption."[11]  <u>Id.</u> at 1669.  The presumption applies, in part, because it "guards against our courts triggering . . . serious foreign policy consequences, and instead

---

[11] The presumption against extraterritoriality is a "canon of statutory interpretation" that provides "'[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'"  <u>Kiobel</u>, 133 S. Ct. at 1664 (quoting <u>Morrison v. Nat'l Australia Bank, Ltd.</u>, 130 S. Ct. 2869, 2878 (2010)).  That canon "reflects the 'presumption that United States law governs domestically but does not rule the world.'"  <u>Id.</u> (quoting <u>Microsoft Corp. v. AT & T Corp.</u>, 550 U.S. 437, 454 (2007)).  It also "'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'"  <u>Id.</u> (quoting <u>EEOC v. Arabian Am. Oil Co.</u>, 499 U.S. 244, 248 (1991)).  As the Supreme Court explained:

> For us to run interference in . . . a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed.  It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain.  The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches.

<u>Id.</u> (citation and internal quotation marks omitted).

defers such decisions, quite appropriately, to the political branches." Id.  Applying the presumption to the Nigerians' ATS claims, the Supreme Court concluded that their claims were barred because "all the relevant conduct took place outside the United States." Id.  Yet the Supreme Court also left the proverbial door ajar, recognizing that some ATS "claims [may] touch and concern the territory of the United States . . . with sufficient force" to displace the presumption against extraterritoriality.[12]  Id.

Following Kiobel, courts have consistently rejected ATS claims where all the relevant conduct occurred abroad.  See Daimler AG v. Bauman, 134 S. Ct. 746, 750-51, 762-63 (2014) (explaining that ATS claims based on conduct "occurring entirely outside the United States" were rendered "infirm" by Kiobel); see also Balintulo v. Daimler AG, 727 F.3d 174, 189 (2d Cir. 2013) (interpreting Kiobel as "bright-line" barring ATS claims based on entirely extraterritorial conduct); Ben-Haim v. Neeman, 543 Fed. App'x 152, 155 (3d Cir. Nov. 4, 2013) (affirming dismissal of ATS claims because alleged tortious conduct "took place in Israel") (per curiam); Kaplan v. Cent. Bank of Islamic Republic of Iran, 961 F. Supp. 2d 185, 205 (D.D.C. 2013) (barring ATS claims based on "actions that took place in Israel and Lebanon"); Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 71 (D.D.C. 2013) (dismissing ATS claims where alleged tortious conduct "occurred entirely within the sovereign territory of Iran"); Chen Gang v. Zhao Zhizhen, No. 04-cv-1146-RNC, 2013 WL 5313411, at *3 (D. Conn. Sept. 20, 2013) (dismissing ATS case as "paradigmatic 'foreign cubed' case" involving "foreign defendant, foreign plaintiff, and exclusively foreign conduct," because parties were present in China and all

---

[12] The Nigerians' claims did not displace the presumption because their only connection to the United States was the defendants' domestic corporate presence.  Kiobel, 133 S. Ct. at 1669.  "[A]nd it would reach too far to say that mere corporate presence suffices." Id.

relevant conduct occurred in China); <u>Tymoshenko v. Firtash</u>, No. 11-cv-2794 (KMW), 2013 WL 4564646, at *4 (S.D.N.Y. Aug. 28, 2013) (dismissing ATS claims as "impermissibly extraterritorial" where plaintiffs were foreigners, defendant was foreign corporation, and alleged tortious conduct occurred on foreign soil); <u>Muntslag v. Beerens</u>, No. 12-cv-07168 (TPG), 2013 WL 4519669, at *3 (S.D.N.Y. Aug. 26, 2013) ("Simply put, the conduct plaintiff alleges clearly occurred overseas and it is therefore not covered by the ATS."); <u>Adhikari v. Daoud & Partners</u>, No. 09-cv-1237, 2013 WL 4511354, at *7 (S.D. Tex. Aug. 23, 2013) ("Since all relevant conduct by [the defendants] occurred outside of the United States, summary judgment on Plaintiffs' ATS claim must be granted for [the defendants]."); <u>Hua Chen v. Honghui Shi</u>, No. 09-cv-8920 (RJS), 2013 WL 3963735, at *7 (S.D.N.Y. Aug. 1, 2013) (dismissing ATS claims brought by members of Falun Gong movement residing in United States against Chinese government official because "all of the abuses took place in China").

A few courts, on the other hand, have sustained ATS claims as "touching and concerning" the United States with "sufficient force" to displace the <u>Kiobel</u> presumption, but only in cases where at least some—if not a substantial portion—of the relevant conduct occurred domestically.  <u>See</u> <u>Sexual Minorities Uganda v. Lively</u>, 960 F. Supp. 2d 304 (D. Mass. 2013); <u>Mwani v. Laden</u>, 947 F. Supp. 2d 1 (D.D.C. 2013); <u>Du Daobin v. Cisco Sys., Inc.</u>, ___ F.3d ___, 2014 WL 769095 (D. Md. Feb. 24, 2014); <u>Krishanti v. Rajaratnam</u>, No. 2:09-cv-05395 (JLL)(JAD), 2014 WL 1669873 (D.N.J. Apr. 28, 2014). For example, the <u>Lively</u> court concluded that the presumption against extraterritoriality was displaced because (1) not only was the defendant an American citizen residing in Massachusetts, but (2) his alleged tortious conduct also occurred "to a substantial

degree within the United States, over many years, with only infrequent actual visits to Uganda."  960 F. Supp. 2d at 321-23.  Likewise, the <u>Mwani</u> court reached the same conclusion because the defendants' alleged terrorist attack "1) was plotted in part within the United States, and 2) was directed at a United States Embassy and its employees."  947 F. Supp. 2d at 5.  The <u>Du Daobin</u> court similarly assumed, without deciding, that the plaintiffs' claims overcame the presumption against extraterritoriality because (1) the defendant was an American company with offices nationwide, and (2) the alleged conduct "took place predominantly, if not entirely, within the United States."  2014 WL 769095 at *9.  Lastly, the <u>Krishanti</u> court also found that subject-matter jurisdiction existed under the ATS because the plaintiffs were suing American citizens "for their alleged actions that occurred in the United States."  2014 WL 1669873 at *11.

Unlike those cases, however, none of the alleged tortious conduct in this case occurred in this country.  Indeed, all the relevant conduct took place thousands of miles away in Bolivia.  According to the Complaint, Defendants were citizens and residents of Bolivia at the time that they allegedly planned and executed the violent military campaign that led to the shooting deaths of Plaintiffs' relatives in Bolivia.  Nowhere do Plaintiffs allege—let alone suggest—that any part of the campaign was planned or executed in the United States, much less directed at the United States, its employees, or its citizens.  The circumstances of this case, therefore, are nothing like the circumstances in <u>Lively</u>, <u>Mwani</u>, <u>Du Daobin</u>, and <u>Krishanti</u> that the courts deemed sufficient to displace the presumption against extraterritoriality.  In fact, it was not until *after* all the alleged tortious conduct occurred—when Defendants fled to the United States—that this case could even first be said to "touch" or "concern" our nation.

Even so, Plaintiffs insist that the purportedly "unique" circumstances of this case are sufficient to displace the Kiobel presumption—namely, "a suit against U.S. permanent residents, who cannot face trial elsewhere, where the foreign state has supported litigation in the United States."[13]  Response at 18.  Having carefully considered these circumstances in light of the growing body of post-Kiobel case law, however, the Court cannot agree.

Many courts have found in the wake of Kiobel that a defendant's presence or residence in the United States at the time of the litigation—whether as a corporate entity or natural person—does *not* displace the Kiobel presumption.[14]  See Balintulo, 727 F.3d

---

[13] The Court notes that a minority in Kiobel opined that ATS jurisdiction should exist where "the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind."  133 S. Ct. at 1671 (Breyer, J., concurring).  But that opinion is not binding.

[14] Plaintiffs cite only one case where a defendant's residence in the United States, standing alone, was sufficient to displace the Kiobel presumption.  See Ahmed v. Magan, No. 10-cv-00342, 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013), report and recommendation adopted, 2013 WL 5493032 (S.D. Ohio Oct. 2, 2013).  In Magan, the plaintiff, a Somali citizen, brought ATS claims against a fellow Somali citizen residing in the United States for egregious conduct occurring entirely in Somalia.  2013 WL 4479077 at *1-4.  After the defendant's counsel withdrew, the defendant stopped defending himself in the lawsuit.  Id. at *1.  The district court subsequently granted the plaintiff's unopposed motion for summary judgment on liability, and referred the case to a magistrate judge for a report and recommendation on damages.  Id.  In the report, the magistrate judge concluded that, because the defendant had not moved to dismiss the plaintiff's claims or opposed the motion for summary judgment, he had "waived any merits argument he may have raised based on the Kiobel decision."  Id. at *2.  Without elaborating further, the magistrate judge then found that because the defendant was "a permanent resident of the United States, the presumption of [sic] against extraterritoriality has been overcome."  Id.  The magistrate judge also specifically advised that failure to object to the report "will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court."  Id. at *7.  Consequently, when the defendant failed to object, the district court summarily adopted the report.  Magan, 2013 WL 5493032 at *1.  Given these circumstances, the Court agrees with Defendants that it is difficult "to attach any

at 189-90 (concluding that "if all the relevant conduct occurred abroad, that is simply the end of the matter," even when "the defendants are American nationals"); see also Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 49 (2d Cir. 2014) (reversing ATS judgment against Bangladeshi citizen with U.S. permanent resident status because "all the relevant conduct" occurred in Bangladesh); Al Shimari v. CACI Intern., Inc., 951 F. Supp. 2d 857, 858 (E.D. Va. 2013) (dismissing ATS claims against United States military government contractor headquartered in Virginia because alleged tortious conduct "occurred exclusively in Iraq"); Sikhs for Justice Inc. v. Indian Nat'l Congress Party, ___ F. Supp. 2d ___, 2014 WL 1683798, at *10 (S.D.N.Y. Apr. 25, 2014) (concluding that Kiobel presumption was not displaced even though defendant conducted ongoing business in United States, established subsidiary here "as a safe harbor to escape justice," and continued to direct its "campaign of terror" at "those plaintiffs who have sought refuge in the United States") (internal quotation marks omitted); Adhikari, 2013 WL 4522354 at *7 (granting summary judgment for corporate defendants on ATS claims even though they were U.S. nationals because "mere corporate presence" was insufficient); Mwangi v. Bush, No. 12-373-KKC, 2013 WL 3155018, at *4 (E.D. Ky. June 18, 2013) (dismissing pro se plaintiff's ATS claims against former President George H. W. Bush and his family because all relevant conduct occurred in Kenya); Ahmed-Al-Khalifa v. Queen Elizabeth, II, No. 13-cv-103-RS-CJK, 2013 WL 2242459, at *1 (N.D. Fla. May 21, 2013) (dismissing plaintiff's ATS claims against President Barack Obama, among others, "because the violations at issue

---

meaningful weight to the magistrate judge's opinion, which made no effort to come to grips with the relevant language in Kiobel (much less the post-Kiobel case law rejecting claims against individuals in the United States)."  Reply at 5.

all occurred outside of the United States, and the South African apartheid does not

'touch' or 'concern' the United States in such a way that would overcome the ATS's

presumption against extraterritoriality").  And, at least one court has held that a foreign

government's support of the litigation is insufficient to defeat the <u>Kiobel</u> presumption,

even when the defendant is present in the United States.  For instance, in <u>Balintulo</u>, the

corporate defendants were present in the United States, and the South African

government supported the litigation in the Southern District of New York.  727 F.3d at

184-89.  Yet the Second Circuit still held that the plaintiffs' ATS claims were barred

because all the relevant conduct occurred abroad.  <u>Id.</u> at 190-92.

The same is true here.  Although Defendants reside in the United States and the

Bolivian government supports this litigation (an unsurprising fact given that the current

administration is led by Defendant Lozada's longtime political opponent), Plaintiffs have

not alleged that any relevant conduct took place in the United States.  Rather, like

<u>Balintulo</u> and the bevy of post-<u>Kiobel</u> cases cited above, all the relevant conduct

underlying Plaintiffs' ATS claims occurred on foreign soil.  The Court, therefore, lacks

subject-matter jurisdiction over them.[15]

---

[15] The Court is also unpersuaded by Plaintiffs' policy arguments—to wit, that dismissal
of their ATS claims would render the United States a "safe haven" for human rights
violators and negatively impact the United States' foreign relations with Bolivia.  These
policy arguments are similar to the ones the Second Circuit rejected in <u>Balintulo</u>.  There,
the plaintiffs argued that <u>Kiobel</u> did not bar their ATS claims "because of the compelling
American interests in supporting the struggle against apartheid in South Africa."
<u>Balintulo</u>, 727 F.3d at 191.  But the Second Circuit was not swayed by the plaintiffs'
"case-specific policy arguments," explaining that "[i]n *all* cases, . . . the ATS does not
permit claims based on illegal conduct that occurred entirely in the territory of another
sovereign."  <u>Id.</u> at 191-92.

### B.  The Torture Victim Protection Act

Defendants next challenge Plaintiffs' claims for extrajudicial killings under the TVPA.  Congress enacted the TVPA in 1992 in response to our nation's obligations under the United Nations' Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.  See S. Rep. 102-249, at 3 (1991).  According to the Senate Report to the TVPA, those obligations included adopting measures to ensure that "torturers and death squads . . . no longer have a safe haven in the United States" and instead "are held legally accountable for their acts."  Id.; see also 134 Cong. Rec. H9692-02, 1988 WL 177020 (Oct. 5, 1988) (remarks of Rep. Rodino) (The TVPA will "send a message" to government officials worldwide "that coming to the United States will not provide them with an escape from civil accountability for their violations of the international law of human rights. . . .  [N]o matter where the official torturer runs, he can not hide.").

To this end, § 2(a) of the TVPA creates a federal cause of action against anyone who, under authority or color of law of any foreign nation, subjects an individual to torture or extrajudicial killing.  28 U.S.C. § 1350 Note, § 2(a).  Section 2(b), for its part, establishes an affirmative defense of "exhaustion of remedies."  Id. § 2(b); see also Jean v. Dorelien, 431 F.3d 776, 781 (11th Cir. 2005) (exhaustion requirement is "affirmative defense").  Specifically, § 2(b) provides that "[a] court shall decline to hear a [TVPA] claim . . . if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  § 1350 Note, § 2(b).

The burden of proving an exhaustion-of-local-remedies defense is on the defendant, and it is a "substantial" one.[16]  <u>Jean</u>, 431 F.3d at 781 (citations omitted).

In this case, Defendants raise two exhaustion-of-local-remedies arguments. Defendants first argue that Plaintiffs have already been "adequately" compensated in Bolivia under two different governmental schemes—namely, the 2003 Humanitarian Assistance Agreement; and the 2008 Law for the Victims of the Events of February, September, and October 2003 (also known as "Law No. 3955")—and thus Plaintiffs are precluded from bringing their TVPA claims.  Failing that, Defendants next contend that Plaintiffs' claims still should be dismissed because Plaintiffs have not yet exhausted all "adequate and available" remedies in Bolivia.  Each argument is examined in turn below.

---

[16] As the Eleventh Circuit emphasized, the Senate Report to the TVPA specifically stated:

> "*[T]he committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.*
>
> More specifically, . . . [the exhaustion requirement] should be informed by general principles of international law. The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use.  Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant."

<u>Jean</u>, 431 F.3d at 781-82 (quoting S. Rep. No. 102-249, at 9-10 (1991)) (citations omitted).

## 1. Plaintiffs' prior recoveries from the Bolivian government do not preclude their TVPA claims against Defendants

Before discussing the merits of Defendants' first argument, a little history is necessary.  In 2009, this Court—per Judge Jordan—dismissed Plaintiffs' TVPA claims without prejudice for failure to exhaust "adequate and available" remedies in Bolivia. Rojas Mamani v. Sánchez Berzaín, 636 F. Supp. 2d 1326, 1332 (S.D. Fla. 2009).  At that time, Plaintiffs had already received B$60,000 (Bolivianos) from the Bolivian government for "humanitarian assistance compensation" and "emergency and funeral expenses" under the 2003 Humanitarian Assistance Agreement.[17]  Id. at 1329 (internal quotation marks omitted).  That sum was "equivalent to USD $7,180.90, or almost 8 times the 2003 annual average per capita income" in Bolivia.  Id.  But at the same time, Plaintiffs had *not* sought compensation from the Bolivian government under Law No. 3955, which was passed in 2008 to provide "the heirs of each deceased person a payment equal to 250 'national minimum salaries,' as well as free public university educations to obtain bachelors' degrees."[18]  Id. (citation omitted).  That sum was equivalent to USD $19,905.56, or roughly 14-15 times the 2008 annual average per capita income in Bolivia.  Id. at 1330-31.  The Court, therefore, dismissed Plaintiffs'

---

[17] The Bolivian government passed the Humanitarian Assistance Agreement in November 2003 "to provide compensation to the 'widows and legitimate heirs' of those who were killed during the so-called 'Gas War' in September and October of 2003." Rojas Mamani, 636 F. Supp. 2d at 1329.  The compensation, however, was not determined on an individual basis and did not waive any rights Plaintiffs had to "seek compensation through other available means and from the persons responsible."  Id. (citation and internal quotation marks omitted).

[18] Like the 2003 Humanitarian Assistance Agreement, Law No. 3955 did "'not release those individuals who have been identified as perpetrators or persons responsible before Bolivian or foreign authorities . . . from liability for criminal, civil, or any other nature of responsibility for the events [in question].'"  Rojas Mamani, 636 F. Supp. 2d at 1329-30 (citations omitted).

TVPA claims without prejudice to renew once Plaintiffs had exhausted their remedies under Law No. 3955.  Id. at 1331-32.  In reaching this conclusion, however, the Court was careful not to express a "view on what preclusive effect, if any, such compensation—when combined with the 2003 payments—may have on [Plaintiffs'] TVPA claims."  Id. at 1333.

Because Plaintiffs have since exhausted their remedies under Law No. 3955, that question is now ripe before the Court.  To answer it, the Court looks to the TVPA's text and its legislative history, as well as general principles of international and United States law.  See Barrueto v. Larios, 291 F. Supp. 2d 1360, 1365-66 (S.D. Fla. 2003) (stating that the exhaustion requirement "'should be informed by general principles of international law'" as well as "'common-law principles of exhaustion as applied by courts in the United States'" (quoting S. Rep. No. 102-249, at 9-10 (1991))).  Turning first to the TVPA's text, § 2(a) creates specific *individual* liability for damages; to be clear, it provides that "[a]n *individual* who, under actual or apparent authority, or color of law, of any foreign nation" subjects someone "to extrajudicial killing shall, in a civil action, be *liable for damages*."  § 1350 Note, § 2(a) (emphases added).  The goal of the statute on its face, then, is to redress specific individuals' wrongdoings by ensuring that their actions have legal consequences—to wit, that they literally "pay the price" for their wrongs.  This reading of the statute, moreover, comports with the congressional intent behind the TVPA of ensuring that human rights violators do not have a "safe haven" in this country and instead "are held legally accountable for their acts."  S. Rep. 102-249, at 3 (1991); see also W. Castro, The New Federal Common Law of Tort Remedies for Violations of International Law, 37 Rutgers L.J. 635, 660 (Spring 2006) ("The principle of

exhaustion might be interpreted as barring a remedy rather than requiring exhaustion, but such an interpretation would be a flat contradiction of the statutory language and the sparse legislative history in the Senate.").  Construing § 2(b) against this backdrop, the Court concludes that the exhaustion-of-local-remedies requirement does not have any preclusive effect under the circumstances of this case; rather, it is merely a procedural hurdle that Plaintiffs must clear before seeking relief under the TVPA.[19]  See Gozlon–Peretz v. United States, 498 U.S. 395, 407 (1991) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (citation and internal quotation marks omitted)

Customary international law also compels this conclusion.  The international exhaustion-of-local-remedies rule prescribes that before resorting to an international court, "the State where the violation occurred should have an opportunity to redress it by its own means, within the framework of its own domestic legal system."  Interhandel (Switzerland v. United States), 1959 I.C.J. 6, 27 (March 1959).  Here, however, it does not appear that Bolivia will have the opportunity to specifically redress Defendants' alleged human rights violations within its own judicial system anytime soon, if at all. This is because, according to the parties, Defendants must first be criminally convicted in Bolivia before Plaintiffs can bring a civil suit against them in Bolivian court.  See Verástegui Decl. [DE 191-5] ¶¶ 6, 19.  Yet Defendants had the wherewithal to flee

---

[19] Any concern about a plaintiff using the TVPA to pursue a double recovery from a defendant—e.g., obtaining and recovering on a foreign judgment against a defendant, and then seeking to obtain a second judgment against that defendant under the TVPA—is assuaged by the incorporation of res judicata principles into the statute.  See S. Rep. No. 102-249, at 10 (1991) ("In such a case, the usual principles of res judicata apply.").

Bolivia, there is no indication that they intend to return, and Bolivian law prohibits criminal prosecutions in absentia.  Id.  In other words, unless Defendants are extradited or voluntarily return to their homeland, Bolivia will not have any meaningful opportunity to redress *their* alleged human rights violations.  Rather, as things stand, the United States appears to be the only forum where Plaintiffs may seek to hold Defendants liable for their alleged wrongs.

In addition to customary international law, general principles of United States law also compel the conclusion that Plaintiffs' prior recoveries from the Bolivian government do not preclude their TVPA claims against Defendants.  For instance, the traditional concept of exhausting remedies typically does *not* preclude judicial relief, but rather postpones it until the prescribed alternative remedy has been exhausted.  See, e.g., Woodford v. Ngo, 548 U.S. 81, 88-89 (2006) ("The doctrine [of exhaustion of administrative remedies] provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.") (citations and internal quotation marks omitted); Castro supra, at 660 ("A citation in the Senate Report indicates that the TVPA's exhaustion requirement is intended to be analogous to the traditional concept of exhausting administrative remedies, which of course does not result in a complete bar.") (footnote omitted).  Furthermore, under the "collateral-source rule," any compensation that a plaintiff receives for his or her loss from a collateral source is not credited against the defendant's liability for damages resulting from his wrongful act.  Restatement (Second) of Torts § 920A(2) (1979); see, e.g., Manderson v. Chet Morrison Contractors, Inc., 666 F.3d 373, 381 (5th Cir. 2012) ("'The collateral-source rule . . . bars a tortfeasor from reducing the quantum of

damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the *tortfeasor.*'") (citation omitted); <u>Westchester Specialty Ins. Servs., Inc. v. U.S. Fire Ins. Co.</u>, 119 F.3d 1505, 1513 n.13 (11th Cir. 1997) ("In tort cases, Georgia's collateral source rule prevents the reduction of a party's liability by payments or benefits that the injured party received from collateral sources."); <u>Robert E. Owen & Assocs., Inc. v. Gyongyosi</u>, 433 So. 2d 1023, 1025 (Fla. 4th DCA 2003) ("The law appears well settled in Florida that a tortfeasor may not avail himself of payments from collateral sources such as . . . social legislation benefits.") (citations omitted).  This rule ensures not only that victims are compensated for their losses, but also that wrongdoers are held accountable for their harmful actions.  <u>See</u> 74 Am. Jur. 2d <u>Torts</u> § 2 (2014) (American tort compensation system serves to shift the loss to responsible parties and deter wrongful conduct). Applying this principle here, it would be absurd to conclude that Defendants could avoid liability for their alleged wrongs merely because the Bolivian government saw fit to render some humanitarian assistance to Plaintiffs.  To do so would, in effect, inappropriately shift the benefit of the Bolivian government's payments from Plaintiffs to Defendants.  <u>See</u> <u>Craig v. Y & Y Snacks, Inc.</u>, 721 F.2d 77, 83 (3d Cir. 1983) ("There is no reason why the benefit [from a collateral source] should be shifted to the defendant, thereby depriving the plaintiff of the advantage it confers.") (citation omitted).  This, the Court declines to do.

In sum, because the TVPA was enacted to ensure that human rights violators do not have a "safe haven" in our country and instead "are held legally accountable," S. Rep. 102-249, at 3 (1991), and because principles of both international and United

States law compel the conclusion that Plaintiffs' claims are not barred in this instance, the Court concludes that Plaintiffs' prior recoveries from the Bolivian government—even if arguably "adequate" compensation for their losses—do not preclude them from seeking to hold Defendants liable under the TVPA.

### 2. Defendants have not met their "substantial" burden of proving the availability of additional adequate remedies in Bolivia

Defendants next contend that Plaintiffs' TVPA claims should be dismissed because Plaintiffs purportedly have *other* "adequate and available" remedies in Bolivia that they have not yet exhausted.  Specifically, Defendants contend that Plaintiffs may pursue civil lawsuits in Bolivia against seven of Defendants' subordinates convicted in Bolivia in 2011 of the "crime of genocide through mass killings" in connection with the tragic events in 2003.  Compl. ¶¶ 166-70.  As the Court previously observed, because these individuals have been criminally convicted, they are now amenable to civil suit in Bolivia.

Attempting to meet their "substantial" burden of proving the availability of additional adequate remedies in Bolivia, see Jean, 431 F.3d at 781, Defendants point to various media reports purportedly showing that "at least *some* of those injured and the legal representatives of at least *some* of the injured have filed a civil action" in Bolivia. Motion at 28 (emphases added).  As an initial matter, the Court doubts that media reports, standing alone, are sufficient to satisfy Defendants' substantial burden.  But even if mere media reports were sufficient, none indicate which of the nine Plaintiffs, if any, have the right to pursue civil actions against the seven subordinates.  Nor do the media reports indicate whether such civil suits could result in enforceable judgments against anyone—much less these Defendants.  The Court thus doubts whether such

civil actions are, in fact, additional "adequate and available" remedies in Bolivia.

Resolving this doubt in Plaintiffs' favor, the Court declines Defendants' invitation to once

again dismiss Plaintiffs' TVPA claims for failure to exhaust additional remedies in

Bolivia.  See Enahoro v. Abubakar, 408 F.3d 877, 892 (7th Cir. 2005) (Cudahy, J.,

dissenting) ("[T]o the extent that there is any doubt . . . , both Congress and

international tribunals have mandated that . . . doubts [about exhaustion of remedies are

to] be resolved in favor of the plaintiffs."); cf. In re Wal-Mart Wage & Hour Emp't

Practices Litig., 490 F. Supp. 2d 1091, 1119 (D. Nev. 2007) (stating that doubts about

whether legal remedy is adequate "should be resolved in favor of the equitable

jurisdiction") (citation and internal quotation marks omitted).

### C.  Legal Sufficiency of Plaintiffs' Claims for Extrajudicial Killings

Having determined that the TVPA's exhaustion-of-local-remedies requirement

does not impede Plaintiffs' TVPA claims for extrajudicial killings, the Court now turns to

Defendants' contention that the claims are legally insufficient.  The TVPA defines an

"extrajudicial killing" as "a deliberate killing not authorized by a previous judgment

pronounced by a regularly constituted court affording all the judicial guarantees which

are recognized as indispensable by civilized peoples."  28 U.S.C. § 1305 Note, § 3(a).

In Mamani v. Berzaín, 654 F.3d 1148 (11th Cir. 2011), the Eleventh Circuit

reversed this Court's denial of Defendants' prior motion to dismiss Plaintiffs' claims for

extrajudicial killings.[20]  Specifically, the fatal flaw in Plaintiffs' prior formulation of their

claims was the lack of factual allegations sufficient to plausibly suggest that their

---

[20] Although the Eleventh Circuit reviewed the legal sufficiency of Plaintiffs' claims for
extrajudicial killings under the ATS (and not the TVPA), it relied on the TVPA's definition
of "extrajudicial killing" for guidance.  Mamani, 654 F.3d at 1154.  Its holding thus
applies to Plaintiffs' TVPA claims.

relatives' deaths had been "'deliberate' in the sense of being undertaken with studied consideration and purpose." Id. at 1155. Rather, each of their relatives' deaths "could plausibly have been the result of precipitate shootings during an ongoing civil uprising." Id. Each death, for instance, was just as "compatible with accidental or negligent shooting (including mistakenly identifying a target as a person who did not pose a threat to others)" as with an extrajudicial killing. Id. The Eleventh Circuit therefore concluded that Plaintiffs had not pled "facts sufficient to show that anyone—especially *these defendants*, in their capacity as high-level officials—committed extrajudicial killings." Id.

Defendants contend that Plaintiffs' new formulation of their claims fares no better. They argue that the Complaint does not cure any of the pleading defects identified by the Eleventh Circuit and thus still fails to state plausible claims for extrajudicial killings. Plaintiffs, obviously, disagree. To resolve this debate and determine whether Plaintiffs' claims are legally sufficient, the Court follows the Eleventh Circuit's two-step approach in Mamani: (1) do the non-conclusory factual allegations in the Complaint plausibly suggest that Plaintiffs' relatives' deaths were extrajudicial killings; and (2) if so, do they also plausibly suggest that Defendants are secondarily liable for the killings?

### 1. Plaintiffs have alleged facts plausibly suggesting that their relatives' deaths were extrajudicial killings

To begin, Plaintiffs allege that eight-year-old Marlene Nancy Rojas Ramos was killed on September 20, 2003, during military operations in Warisata. According to Plaintiffs, Defendants ordered the military "to take Warisata" as part of their campaign to quell public opposition to their political agenda. Plaintiffs allege that soldiers were

ordered to shoot "at anything that moved."[21]  Plaintiffs further allege that Marlene was on the second floor of her home that afternoon, far from any protests, when she moved to look out a window.  At that time, a sharpshooter fatally shot her from a distance of about 75 yards.  No other bullets hit the house either before or after the shooting.  Construing these allegations in Plaintiffs' favor, the Court finds that they give rise to a reasonable inference that the sharpshooter saw Marlene "move" and deliberately killed her.

The same goes for the deaths of Roxana Apaza Cutipa, Marcelino Carvajal Lucero, Santos Gandarillas Ayala, and Teodosia Morales Mamani—four of Plaintiffs' family members killed on October 12, 2003, during military operations in El Alto.  According to the Complaint, soldiers swept through the city shooting at unarmed civilians.  In particular, Plaintiffs allege that thirty-nine-year-old and pregnant Teodosia Morales Mamani was inside her sister's home when several family members looked out the window.  They saw soldiers marching down the street and yelling at people looking out of windows: "What are you looking at?  I'll kill you!" and "Shoot them, damn it!"  Morales was sitting next to the window when a soldier fired at the apartment, killing Morales and her unborn child.  Similarly, when fifty-nine-year-old Marcelino Carvajal Lucero went to close a window in his house, a soldier fatally shot him from a distance of about 19 yards.  In addition, Plaintiffs allege that nineteen-year-old Roxana Apaza

---

[21] Defendants argue that Plaintiffs' use of the passive voice in pleading this "order" and others is significant at this stage of the proceedings.  Motion at 32, n.16.  But the Court is not persuaded.  Viewing such allegations and the Complaint as a whole in the light most favorable to Plaintiffs, as required, it is reasonable to infer that these orders stemmed from Defendants' directives to use lethal force, which were repeatedly disseminated down the chain of command.  See, e.g., Compl. ¶¶ 30, 31, 36, 50, 63, 68, 71, 78, 80-81, 83-85, 93, 95-96, 106-08, 125-26, 130.

Cutipa was on the roof of her house, far from any protests, when a soldier fatally shot her.  Plaintiffs also allege that a soldier fatally shot Lucio Santos Gandarillas Ayala as he ran for cover.  Viewing these allegations and the Complaint as a whole in the light most favorable to Plaintiffs, the Court finds that they plausibly suggest that these killings were deliberate.

The same is true of the deaths of Jacinto Bernabé Roque, Arturo Mamani Mamani, and Raúl Ramón Huanca Márquez—three of Plaintiffs' relatives killed on October 13, 2003, during military operations near La Paz.  According to the Complaint, soldiers were ordered to "shoot at any head that you see."  Plaintiffs allege that soldiers chased unarmed civilians into the surrounding hillside with gunfire.  Specifically, Plaintiffs allege that sixty-one-year-old Jacinto Bernabé Roque was trying to hide in the hills when a soldier fatally shot him.  Plaintiffs similarly allege that forty-two-year-old Arturo Mamani Mamani was also in the hills when a soldier fatally shot him.  Later that same day, as the military moved through a nearby village, Plaintiffs further allege that a soldier fatally shot Raúl Ramón Huanca Márquez as he tried to take cover behind a building.  Viewing these allegations and the Complaint as a whole in the light most favorable to Plaintiffs, the Court finds that they plausibly suggest that these killings were also deliberate.

### 2. Plaintiffs have alleged facts plausibly suggesting that Defendants are secondarily liable under the doctrine of command responsibility

Having concluded that the Complaint plausibly suggests that Plaintiffs' relatives' deaths were extrajudicial killings, the Court next considers whether it also plausibly suggests that Defendants are secondarily liable for the killings under the doctrine of

"command responsibility."[22]  This doctrine "makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met."[23]  Ford v. Garcia, 289 F.3d 1283, 1286 (11th Cir. 2002).  Those elements are: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes."  Id.  This doctrine applies

---

[22] Plaintiffs also allege that Defendants are vicariously liable under agency and conspiracy theories.  However, because the Complaint meets the standard for command responsibility, the Court need not address Plaintiffs' other theories at this time.

[23] According to the Senate Report to the TVPA:

> [A] higher official need not have personally performed or ordered the abuses in order to be held liable.  Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.  In Forti v. Suarez Mason, the court found Suarez Mason liable as Commander of the First Army Corps under the theory that the alleged acts of torture and summary execution were committed by personnel under his command "acting pursuant to a 'policy, pattern and practice' of the First Army Corps."  Suarez Mason, [672 F. Supp. 1531, 1537-38 (N.D. Cal. 1987)].  Thus, although Suarez Mason was not accused of directly torturing or murdering anyone, he was found civilly liable for those acts which were committed by officers under his command about which he was aware and which he did nothing to prevent.

> Similarly, in In re Yamashita, 327 U.S. 1 (1946), the Supreme Court held a general of the Imperial Japanese Army responsible for a pervasive pattern of war crimes committed by his officers when he knew or should have known that they were going on but failed to prevent or punish them.  Such "command responsibility" is shown by evidence of a pervasive pattern and practice of torture, summary execution or disappearances.

S. Rep. 102-249, at 9 (1991) (footnotes omitted).

not only in "wartime," but also in "peacetime."  Hilao v. Estate of Marcos, 103 F.3d 767,

777 (9th Cir. 1996).

### a. Superior-Subordinate Relationship

To establish the "superior-subordinate relationship" element, Plaintiffs must

allege facts plausibly suggesting that Defendants had "effective control" over the

Bolivian soldiers who killed Plaintiffs' relatives.  Ford, 289 F.3d at 1290.  This concept of

"effective control" includes "a material ability to prevent or punish criminal conduct,"

regardless of how that control is exercised.  Id. (citation and internal quotation marks

omitted).  Effective control, for instance, may be "*de facto* or *de jure*."  Id. at 1291

(citation omitted).  Where a commander has "*de jure* authority" over the perpetrators of

the underlying crime, such authority is "*prima facie* evidence of effective control."  Id.

(citation omitted).

In this case, Plaintiffs allege that Defendants were the President and Minister of

Defense of Bolivia at the time of Plaintiffs' relatives' deaths.  As the President and

Minister of Defense, Defendants were the highest commanders of the Bolivian military.

As the highest commanders of the Bolivian military, Defendants had ultimate authority

over the military, including the Bolivian soldiers who killed Plaintiffs' relatives.  At the

motion-to-dismiss stage, these allegations plausibly suggest that Defendants had, at a

minimum, *de jure* authority over the soldiers who fired the fatal shots.  Because *de jure*

authority is *prima facie* evidence of "effective control," it is sufficient to establish the

requisite "superior-subordinate relationship."  See id.; cf. Doe v. Qi, 349 F. Supp. 2d

1258, 1231-32 (N.D. Cal. 2004) (superior-subordinate relationship was established

where one defendant had supervisory authority over perpetrators, and another

defendant "played a major policy-making and supervisory role in the policies and practices that were carried out") (internal quotation marks omitted); Forti v. Suarez-Mason, 672 F. Supp. 1531, 1537-38 (N.D. Cal. 1987) (concluding that military general could be held liable for his subordinates' brutal actions because he "held the highest position of authority" and "authorized, approved, directed and ratified" the brutality) (citations and internal quotation marks omitted), superseded by statute on other grounds as stated in Papa v. United States, 281 F.3d 1004 (9th Cir. 2002).

### b. Knowledge

To establish the knowledge element of command responsibility, Plaintiffs must allege facts plausibly suggesting that Defendants "knew or should have known, owing to the circumstances at the time," that their soldiers "had committed, were committing, or planned to commit" extrajudicial killings. Ford, 289 F.3d at 1288. Here, the gist of Plaintiffs' allegations is that—even before taking office—Defendants met and discussed a plan to use lethal force to quell public opposition to their political agenda.[24] They explicitly agreed at that time that thousands of Bolivians would have to die. After assuming power, Defendants continued to strategize about the need to kill Bolivian civilians to pave the way for their governmental goals. In furtherance of their plan, Defendants then issued a series of decrees authorizing the military to use force against

---

[24] While the Eleventh Circuit previously deemed the unsupported allegation that Defendants "met with military leaders . . . to plan widespread attacks . . . against protestors" to be a legal conclusion rather than a factual allegation, Mamani, 654 F. 3d at 1153, the Court finds that Plaintiffs have cured the conclusory nature of that allegation. To be sure, Plaintiffs' new Complaint is rife with detailed factual allegations—beyond what the federal pleading standard requires, see Twombly, 556 U.S. at 679—as to when specific communications or meetings took place, who was involved, and what was communicated or transpired. See, e.g., Compl. ¶¶ 30, 31, 50, 71, 78, 80-81, 83-85, 93, 95-96, 100-02, 106-08, 125-26, 130.

roadblocks, marches, and demonstrations.[25]  See Manual on the Use of Force [DE 183-3] at 13 (authorizing use of force against "acts of vandalism, crimes, roadblocks, marches, demonstrations, etc. carried out by subversive criminals"); see also Republic Plan [DE 183-4] at 1 (directing army to "apply Principles of Mass and Shock" to remove roadblocks and control civil disturbances).  Defendants closely supervised the ensuing military operations, staying in frequent contact with each other and other military commanders, and receiving regular and contemporaneous reports.  During those operations, Bolivian soldiers killed many Bolivian civilians, including Plaintiffs' family members.  When people both inside and outside the government urged Defendants to end the violence and pursue peaceful solutions, they refused.  Instead, Defendants praised the military for following their orders and took full responsibility for its actions.

These allegations, viewed in the light most favorable to Plaintiffs, are sufficient to plausibly suggest that Defendants knew or should have known, owing to the circumstances at the time, that their soldiers were committing extrajudicial killings.  See, e.g., Lizarbe v. Rondon, 642 F. Supp. 2d 473, 491 (D. Md. 2009) (defendant had requisite knowledge of his troops' alleged atrocities where he attended meeting about

---

[25] It is true that these decrees—the Manual on the Use of Force and the Republic Plan—also espoused human rights principles.  But that does not mean, as Defendants insist, that their texts necessarily contradict (and thus control over) the allegations in the Complaint.  Plaintiffs' case theory is that Defendants orchestrated a violent military campaign to quash public opposition to their political agenda.  That Defendants may have tried to conceal or legitimize their campaign by authorizing it via decrees containing both militant and human rights principles does not mean that Plaintiffs' case theory is negated.  As the old adage goes, actions speak louder than words.  See, e.g., Xuncax v. Gramajo, 886 F. Supp. 162, 171-73 (D. Mass. 1995) (human rights violator defended his actions of "ordering and directing the implementation of a program of persecution and oppression" that resulted in "brutal and barbarous practices" as "involving the use of flexible and humanitarian tactics") (internal quotation marks omitted).

operations, oversaw firing on villagers and burning of homes, and set up blockade of

escape routes); Qi, 349 F. Supp. 2d at 1332-33 (defendants had requisite knowledge of

their subordinates' alleged human rights violations where "repression and abuse were

widespread, pervasive, and widely reported," and both defendants "actively encouraged

and incited the crackdown" on victims); Xuncax, 886 F. Supp. at 173 (defendant had

requisite knowledge where "[w]hen confronted with the murder of innocent civilians by

soldiers under his command," defendant did not deny facts but instead said actions

were "appropriate") (internal quotation marks omitted).

### c. Failure to Act

To establish the failure-to-act element of command responsibility, Plaintiffs must

allege facts plausibly suggesting that Defendants "failed to prevent" the extrajudicial

killings or "failed to punish" the soldiers afterwards.  Ford, 289 F.3d at 1288.  According

to the Complaint, not only did Defendants direct the violent military campaign that led to

Plaintiffs' relatives' deaths, but they also repeatedly ignored pleas to find peaceful

solutions to the protests in the face of a mounting civilian death toll.  Instead of

investigating or punishing the death of the eight-year-old girl in Warisata, for example,

Defendants praised the military for its operations and accepted full responsibility for the

resulting violence.  They then authorized further military operations in El Alto and south

of La Paz, resulting in even more civilian deaths.  Viewing these allegations and the

Complaint as a whole in Plaintiffs' favor, they are sufficient to plausibly suggest that, at

a minimum, Defendants failed to prevent Plaintiffs' relatives' deaths.  See Qi, 349 F.

Supp. 2d at 1333-34 (defendants failed to prevent alleged abuses where they "actively

encouraged and incited the repression").

At bottom, because the Complaint's factual allegations plausibly suggest that

Plaintiffs' relatives' deaths were extrajudicial killings for which Defendants are

secondarily liable under the doctrine of command responsibility, the Court finds that

Plaintiffs have stated claims under the TVPA.  Cf. Arce v. Garcia, 434 F.3d 1254, 1259

(11th Cir. 2006) (affirming judgment holding Minister of Defense and Director General of

El Salvador National Guard liable for torture committed by their soldiers under the

command responsibility doctrine); Paul v. Avril, 901 F. Supp. 330, 335 (S.D. Fla. 1994)

(finding military ruler personally liable for "systematic pattern of egregious human rights

abuses" carried out "under his instructions, authority, and control").

### D.  Plaintiffs' State-Law Claims

Finally, the Court must decide whether to exercise supplemental jurisdiction over

Plaintiffs' state-law claims for wrongful death.  See 28 U.S.C. § 1367(a).  At this

juncture, Plaintiffs insist that their state-law claims "arise under Bolivian law" because

"this Court has already determined that the claims are governed by Bolivian law."

Response at 50.  In response, Defendants argue that assuming Bolivian law applies,

Plaintiffs' wrongful death claims raise numerous "novel or complex" issues of foreign law

and thus the Court should decline to exercise supplemental jurisdiction.  Reply at 25.

An example of a "novel or complex" issue, in Defendants' view, is "whether government

officials responding to a civil uprising may be held liable for actions of an individual

member of the military" under Bolivian law.  Id.  Beyond these bare assertions, however,

Defendants do not cite (and the Court is unaware of) any record evidence supporting

Defendants' contention that applying Bolivian law to Plaintiffs' state-law claims would

involve "novel or complex" issues.  Cf. Romero v. Drummond Co. Inc., 552 F. 3d 1303,

1318 (11th Cir. 2008) (affirming decision to decline supplemental jurisdiction over plaintiffs' Colombian-law claims because "the district court was unable to reconcile conflicting translations of Colombian legal precedents, to navigate the complexities of the parties' submissions, or to discern . . . the Colombian law requisites for a wrongful death claim") (internal quotation marks omitted).  Without adequate record support, the Court declines Defendants' invitation to forgo exercising supplemental jurisdiction over Plaintiffs' state-law claims on the ground that they involve "novel or complex" issues of Bolivian law.

## VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Joint Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint [DE 183 in Case No. 07-22459 and DE 167 in Case No. 08-21063] is **GRANTED in part and DENIED in part**.  Plaintiffs' claims for extrajudicial killings (Count I) and crimes against humanity (Count III) under the Alien Tort Statute are **DISMISSED** for lack of subject-matter jurisdiction.

It is hereby further **ORDERED AND ADJUDGED** that Defendants' Motion for Judicial Notice of Documents Incorporated in the Complaint and Other Documents  [DE 184 in Case No. 07-22459 and DE 168 in Case No. 08-21063] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of May, 2014.

_James I. Cohn_
JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF.

41