# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### (Ft. Lauderdale Division)

### Case Nos. 07-22459 & 08-21063 (COHN/SELTZER)

| | |
|---|---|
| ELOY ROJAS MAMANI, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| GONZALO DANIEL SÁNCHEZ DE LOZADA SÁNCHEZ BUSTAMANTE, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| JOSÉ CARLOS SÁNCHEZ BERZAÍN, | ) |
| | ) |
| Defendant. | ) |

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS[1]

Defendants Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante and José Carlos Sánchez Berzaín ("Sánchez de Lozada" and "Berzaín" or, collectively, "Defendants") oppose the Motions to Compel Documents Responsive to Plaintiffs' First Set of Requests for Production of Documents to Defendants filed by Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Teófilo Baltazar Cerro, Juana Valencia de Carvajal,

---

[1] This a joint opposition to Plaintiffs' two Motions to Compel filed as to each Defendant, as the majority of the disputed Requests for Production are identical across Defendants. *See* Pls.' Mot. to Compel Production of Documents to Def. Sánchez de Lozada, Dkt. 244, No. 08-21063; Pls.' Mot. to Compel Production of Documents to Def. Berzaín, Dkt. 263, No. 07-22459. Unless otherwise stated, arguments contained herein apply to both Defendants and both Motions to Compel. To the extent there are differences in the Requests and arguments for each Defendant, Defendants will make that clear.

Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca Quispe ("Plaintiffs").

## I.      BACKGROUND

This discovery dispute represents the first time the parties have substantively appeared before Your Honor in this case.  Plaintiffs have attempted to frame the case through a statement of facts.  Below, Defendants provide a separate statement of facts to help identify the relevant claims and defenses.  The parties' differences about the events aside, there can be no disagreement that the operative issues involve disputed facts as to what occurred in Bolivia in 2003 and not thereafter. Plaintiffs' discovery requests to which Defendants object impermissibly seek discovery into events that occurred years, and even more than a decade later.

### A.      Statement of Facts

Plaintiffs demand irrelevant and disproportionate discovery based on an implausible story: that a democratically-elected government ordered the killing of peaceful, unarmed civilians in September and October 2003—just so the government could sell natural gas to the United States. More reliable sources—including the U.S. State Department, the Organization of American States, and Bolivian prosecutors—describe what really happened.  Those sources conclude that "the military and police acted with restraint and with force commensurate to the threat posed by protestors."  FOIA-012.[2]  The civilian deaths were a tragedy.  But anyone looking for someone to blame should look no farther than Bolivia's current President, Evo Morales, and its notorious union leader,  Felipe Quispe.   Those  leaders,  with  support  from  the  Bolivian  coca  growers  and

---

[2] Documents with the FOIA prefix were produced by the State Department in response to FOIA requests from Defendants, and include official, contemporaneous reports of the events as they were unfolding.  The cited documents also include other publicly-available government documents.  All cited documents have been produced to Plaintiffs and can be made available to the Court if requested.

governments of Venezuela and Cuba, orchestrated the violent protests that not only caused deaths of civilians, soldiers, and police officers, but also resulted in Bolivia's President being overthrown and the U.S. Ambassador being kicked out of the country.

In December 2002, Bolivia's democratically-elected President, Gonzalo Sánchez de Lozada, announced that his government would continue a U.S.-funded coca eradication program to restore Bolivia's reputation and end its massive exportation of illegal cocaine. Morales demanded that the government end the eradication program and issued this public threat: "if the government maintains its intransigent position, we'll paralyze this nation until the government is forced out of office." DEF-0000193.

Two months later, armed protestors, including police units, fired hand guns and assault rifles at military personnel stationed in front of the Presidential Palace. DEF-0000084. Sharpshooters fired shots at the Presidential Palace while President Sánchez de Lozada was inside. An infantry captain stationed on the Palace roof died after being struck with a bullet; another soldier died from a bullet to the head as he attempted to rescue the captain from the roof. DEF-0000085. After a lengthy investigation, the Organization of American States ("OAS") found that "[t]he life of the President of Bolivia was indeed in danger, as was the stability of Bolivian institutions and democracy in this country." DEF-0000087. The OAS also found that the Bolivian "armed forces acted to defend democracy and the rule of law against an attack by police, and their response was controlled and proportional, the large number of victims notwithstanding." DEF-0000087.

The opposition forces escalated the violence in September 2003 when armed campesinos led by Quispe blocked major roads and held about 80 foreign tourists and 800 Bolivian nationals hostage in the town of Sorata. FOIA-026. After negotiations failed, the Bolivian government

rescued the hostages by bringing them out of Sorata in buses escorted by a military convoy.  The

convoy came under attack as "peasants carrying old Mauser rifles ambushed the security forces

and convoy at Warisata.  Five campesinos and two soldiers were killed.  At least one of the buses

carrying tourists reportedly was hit by rifle fire."  FOIA-034.  After the rescue, "[a]n angry crowd

later burned Sorata's mayor's office, the sub-prefecture, the police station and a hotel."  FOIA-

026.  The U.S. State Department estimated that the Warisata ambush was carried out by 150 people

firing from the surrounding hills, "some armed with 7.62 mm FN FALs, .30 caliber Mauser rifles

and .22 caliber rifles."  FOIA-027.

Quispe publicly bragged about the violence, stating in a public radio interview "that he

gave the order to fire on soldiers."  FOIA-229.  By contrast, President Sánchez de Lozada "publicly

appealed for dialogue," *id.*, and "exhorted all parties to join in the Church-sponsored dialogue

known as the 'National Encounter.'"  FOIA-026.  Unfortunately, "the Church had given up on the

[National Encounter]," FOIA-186, "principally because the opposition has no interest in

negotiations."  FOIA-254.

Instead of negotiating, Morales was busy "trying to establish a Cuba-Venezuela-Bolivia

axis for the purpose of revolution."  FOIA-192.  In October 2003, Morales and Quispe

implemented "the opposition's 'Plan Tourniquet' designed to starve the capital city into

submission or to its widespread use of dynamite and other deadly weapons against civilian targets."

FOIA-033.  Heavily armed protestors blocked all routes into the city of La Paz over the weekend

of October 11 to 12, 2003.  FOIA-042, 054.  As a result, "La Paz remains virtually cut off from

the rest of the country by the mob's application of El Alto's tourniquet [and] . . . is experiencing

shortages of fuel and some food items due to the disturbances."  FOIA-042.  "*Hospitals reported*

*that three premature infants had died because oxygen was not available*."  FOIA-054 (emphasis added).

In view of this situation, on October 11, 2003, President Sánchez de Lozada and his cabinet issued Supreme Decree No. 27209 to "declare a national emergency in order to safeguard the security and normal operation of the country's economic activities."  The Supreme Decree ordered "the Armed Forces of the Nation . . . to assume control of shipments in tanker trucks and other vehicles and to secure storage facilities, pipelines, service stations, and all types of infrastructure needed to ensure regular distribution and supply of liquid fuels to the people of the Department of La Paz."  The National Armed Forces were instructed "to immediately mobilize and use the necessary force to restore order and respect for the Rule of Law in the various parts of the Country."

That weekend, "[v]iolent confrontations, and most of the casualties, took place when security forces tried to bring fuel supplies into the surrounded city, and attempted to prevent more demonstrators from reaching El Alto."  FOIA-035.  "[S]ecurity forces first exhausted non-lethal means against the El Alto crowds that prevented desperately needed food and fuel from being delivered to the hostage capital, [but] protestors used dynamite against people and property."  FOIA-033.  "[W]hen demonstrators attacked convoys bringing fuel and other supplies to La Paz, government forces returned fire."  FOIA-011.  As the State Department described the situation in El Alto:

> There were numerous violent encounters between the protestors and security forces over the weekend, with increasing levels of violence (with the protestors now bringing dynamite and guns to bear). . . Local residents fear looting, and the *danger of misdirected fire coming through windows or walls is a real threat for even those who stay home*.  There are also reports of physical threats against citizens who do not join the protests.

FOIA-043-44 (emphasis added).

President Sánchez de Lozada "pleaded for the opposition to talk instead of protest violently. He called for them to attend a dialogue to be held the afternoon of October 13." FOIA-043. He "made major concessions to the opposition," FOIA-0059, stating that "he and the coalition would hold a referendum on the natural gas issue, modify the existing hydrocarbon law, and look at creating a constituent assembly." FOIA-059. But the opposition "categorically rejected" them, FOIA-067, "stat[ing] that nothing short of the President's resignation would end the demonstrations." FOIA-059. Thus, as the U.S. State Department concluded, the "opposition leaders used the proposed sale of natural gas to foreign markets as a pretext to spark violent street action" and to overthrow President Sánchez de Lozada's government. FOIA-032, 088.

On October 17, 2003, to restore peace and safety to La Paz, President Sánchez de Lozada and his cabinet, including Minister Berzaín, resigned under protest. Both men left Bolivia for the United States. The United States Government issued a statement of support: "We regret the circumstances including the loss of life that led to ex-President Sánchez de Lozada's resignation. We commend ex-President Sánchez de Lozada for his commitment to democracy and to the well being of his country." State Dep't Press Statement, Resignation of President Sánchez de Lozada (Oct. 18, 2003). Predictably, Morales immediately "began calling for [President Sánchez de Lozada] to be prevented from leaving the country and put on trial for the killings in the recent confrontations and other unspecified crimes." FOIA-089. Morales became President on December 18, 2005 after engineering further uprisings to eliminate the two presidents who followed President Sánchez de Lozada. President Morales remains in office today after rewriting the Bolivian Constitution to allow himself to serve multiple terms. Under his direction, Bolivia has pursued criminal charges against every living former President. Meanwhile, every single protestor was given immunity from prosecution, and the three Bolivian prosecutors who found "no

evidence of the existence of any order to engage in . . . criminal conduct," were summarily fired and replaced.

In 2009, the Bolivian Supreme Court tried and convicted seven individuals from the military, police, and government.  The trial was, to quote Bob Dylan in *Hurricane*, a "pig-circus."  The U.S. State Department found that "the government did not conduct a full and fair investigation, but absolved civilians of all liability for their role in the unrest."  U.S. Dep't of State, Country Reports on Human Rights Practices, Bolivia 2 (2005).  It further reported that the Morales government has "systematically trampled and subjugated the courts, violating the principle of separation of powers."  U.S. Dep't of State, Country Reports on Human Rights Practices, Bolivia 5 (2006)

### B.      Procedural History

On December 19, 2016, Plaintiffs served each Defendant with their First Set of Requests for Production of Documents, each of which included 40 Requests for Production.  On February 14, 2017, Defendants served Plaintiffs with their initial Responses and Objections, and Defendants provided their first production on February 16.  The parties met and conferred several times subsequently in an effort to resolve Defendants' objections to certain Requests and other matters.  During those meet-and-confers, Defendants agreed to forego a number of objections.  On April 29, Defendants served Plaintiffs with Amended Responses and Objections, which explained Defendants were withholding documents for a few Requests that Plaintiffs refused to narrow during the meet-and-confer process.  As to these few Requests, Defendants offered further attempts at compromise.  Plaintiffs did not respond to these Amended Responses and Objections and instead filed the present motion.

The parties have also been addressing discovery on a variety of other fronts.  On March 31, 2017, Defendants submitted to Plaintiffs proposed search terms to apply to Defendants'

electronically stored information ("ESI").  On April 14, Plaintiffs responded with more than 300 proposed search terms.  Defendants ran those terms through their ESI, which hit on 96% of the documents.  The parties met and conferred on those terms, agreed on the use of almost 250 terms, and Defendants are currently reviewing ESI based on documents that hit upon those agreed upon terms.  The parties have also worked cooperatively to schedule depositions, and over ten depositions are currently on the calendar for June and July.

## II.    ARGUMENT

Plaintiffs' motions to compel ask this Court to compel the production of broad categories of documents that are inconsistent with Federal Rule of Civil Procedure 26, as amended in 2015. Rule 26 now permits discovery that it is "relevant" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  "The recently amended Rule 26(b)(1) of the Federal Rules of Civil Procedure 'crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *In re Takata Airbag Prods. Liab. Litig.*, Nos. 14-24009-CV, 15-20664-CV, 2016 WL 1460143, at *2 (S.D. Fla. Mar. 1, 2016) (quoting Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary 6).  Proportionality requires an evaluation of "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Defendants have produced (and agreed to produce) numerous categories of documents, but object to producing documents that are irrelevant or disproportionate to the needs of this case.  The Court should deny Plaintiffs' motions.

### A.    Defendants' Proposed Temporal Scope Discovery Limitations Are Reasonable.

Plaintiffs misconstrue Defendants position on setting date parameters for discoverable documents in this case.  Defendants proposed September 19, 2007—when the first complaints

were filed in this case—as a way to limit the temporal scope of discovery.  But Defendants made

clear that this default date would not apply if a request called for information that required a

broader scope, such as Requests 9, 10, 11, 12, 38, and 39.[3]  Defendants have not, as Plaintiff

contend, "failed to allege *any* basis for withholding *all* documents created in the last ten years."

Pls.' Sánchez de Lozada Mem. 5; Pls.' Berzaín Mem. 4.

As Defendants have explained, limiting the temporal scope of discovery is beneficial and

efficient to both parties.  After all, searching responsive documents over a nearly fifteen year

period is unduly burdensome and wholly disproportionate to the needs of this case.  This case

concerns, exclusively, events that occurred in 2003.  As a general matter, documents post-dating

the filing of the complaints, which already post-date the relevant timeframe by four years, will not

help either party prove or disprove any events that happened in 2003.  Indeed, this Court has

imposed similar temporal limitations in a similar situation.  *See Solyom v. World Wide Child Care

Corp.*, No. 14-80241-CIV, 2015 WL 1886274, at *2 (S.D. Fla. Apr. 16, 2015) (Seltzer, Mag. J.).

In *Solyom*, this Court found Plaintiff's document requests to be "overbroad in temporal scope"

where the Plaintiff sought "documents generated almost a decade before [the events at issue], as

well as documents generated years" thereafter, and therefore limited the requests to the five-year

timeframe pled in the complaint.  Here, too, the considerable burden of searching and identifying

records throughout an additional ten-year period far outweighs the slim chance that there will be

relevant, responsive documents to discover.  *See, e.g.*, *Henderson v. Holiday CVS, L.L.C.*, 269

F.R.D. 682, 689 (S.D. Fla. 2010) ("Plaintiffs' contention that [b]ecause the requests seek to

discover facts relevant to Defendant's affirmative defense . . . , 'any responsive documents . . . are

---

[3] For those Requests, Defendants agree to produce documents through October 4, 2016, the date when the Court lifted the stay in this case after the Eleventh Circuit Court of Appeals remanded the case back to the District Court.

discoverable, regardless of the date of the documents or location from which such documents originate' is rejected as unreasonable. . . . [T]he Court believes that a time period of five (5) years prior to the case being filed is the most reasonable time period under the facts and circumstances presented in this case." (citation omitted)).   There are some Requests for which post-2007 documents may be relevant, and Defendants identified such requests in good faith.[4]   However, for other requests, "the discovery [in that period] has no possible bearing on the claims and defenses in this case." *A.R. v. Dudek*, No. 12-60460-CIV, 2016 WL 3753705, at \*1 (S.D. Fla. Feb. 18, 2016).

To that end, Defendants advocate imposing common-sense date restrictions on the available universe of documents.

### B.     Plaintiffs' Requests for Agreements Ask for Documents That Defendants Do Not Possess, or Are Not Relevant or Privileged.

<u>Request No. 1</u>

Plaintiffs seek documents "relating to any agreement" between the two Defendants, including "any agreements to indemnify or pay the costs of this litigation or Berzaín's asylum application; joint defense agreements; liability-sharing agreements; common-interest agreements; remuneration agreements; compensation agreements; or any agreements to share information."[5]

Defendants have conveyed, repeatedly, that Defendant Berzaín's retainer agreements with United States counsel contain responsive language, and Defendant Berzaín has been prepared to

---

[4] Decl. Edward A. Woods Suppl. Pls.' Mot. & Not. Mot. to Compel Produc. Docs. to Def. Sánchez de Lozada ("Woods Sánchez de Lozada Decl."), Dkt. 244, No. 08-21063 (Ex. I) 3 ("Def. Sánchez de Lozada's Am. Resp."); Decl. Edward A. Woods Suppl. Pls.' Mot. & Not. Mot. to Compel Produc. Docs. to Def. Berzaín ("Woods Berzaín Decl."), Dkt. 263, No. 07-22459 (Ex. I) 3 ("Def. Berzaín's Am. Resp.").

[5] Woods Sánchez de Lozada Decl., (Ex. A) 4 ("Pls.' Sánchez de Lozada Request"); Woods Berzaín Decl., (Ex. A) 4 ("Pls.' Berzaín Request").

produce—and as of today *did* produce—these documents.  *See* Def. Sánchez de Lozada's Am. Resp. 3; "Def. Berzaín's Am. Resp. 3.[6]  Plaintiffs have not indicated why such agreements are relevant to their claims or defenses,[7] especially given Defendant Sánchez de Lozada has already testified at his deposition to this effect.  *See* Sánchez de Lozada Dep. Tr., May 14, 2015, 287:22-288:3.[8]  Nevertheless, pursuant to an agreement with counsel reached over several meet-and-confer calls, Defendants have been willing to produce these agreements with any privileged and nonresponsive information redacted.  *See* Def. Sánchez de Lozada's Am. Resp. 5; Def. Berzaín's Am. Resp. 5.

Plaintiffs' Request with respect to other types of agreements between Defendants also fails. At Defendant Sánchez de Lozada's deposition, Plaintiffs specifically asked him whether he had

---

[6] Defendants specified that "unless otherwise stated" in each specific Response, Defendants are "not withholding any responsive documents on the basis of any objections unrelated to privilege, with the necessary caveat that the search the search has been reasonably limited to those places where documents responsive to requests to which Defendant does not object may be located." Def. Sánchez de Lozada's Am. Resp. 3; Def. Berzaín's Am. Resp. 3.   Further, it specified that "after the parties finalize search terms to apply to Defendants' ESI, Defendant[s] will supplement [their] objections and responses as necessary."  Def. Sánchez de Lozada's Am. Resp. 3; Def. Berzaín's Am. Resp. 3.

[7] After all, with regard to joint defense agreements generally, the very case cited by Plaintiffs makes clear that such agreements are only relevant, and thus discoverable, to the extent that they contain more than "boilerplate joint defense terms."  *Biovail Labs. Int'l SRL v. Watson Pharm., Inc.*, No. 10-20526-CIV, 2010 WL 3447187, at *2 (S.D. Fla. Aug. 30, 2010).  Moreover, as another case cited by Plaintiffs explains, even then such information would be protected by the attorney-client privilege and work product doctrine.  *Jeld-Wen, Inc. v. Nebula Glasslam Int'l, Inc.*, No. 07-22326CIV-DIMITROU, 2008 WL 756455, at *11 (S.D. Fla. Mar. 11, 2008) (ordering, with regard to agreement serving multiple purposes, production of portions that pertained to prior settlement but not joint defense portions, which contained attorney work product).

[8] "Q. Okay. And we did discuss yesterday the fact that you are, and I believe you testified you're paying legal fees for [Berzaín]. I just have one follow-up on that. Are you - are you paying all of his legal fees? A. Not all of his legal fees. I'm paying them related to this matter exclusively."

"any other agreements with Carlos Sanchez Berzaín" aside from their oral joint defense agreement, to which Sánchez de Lozada responded, "I do not."  *See id.* at 288:10-14.  This remains the case.

To that end, and as they have made clear to Plaintiffs, Defendants have not identified any responsive documents beyond the language in the retainer agreements.

### C.      Defendants Are Not Withholding Any Information Responsive to the Requests Regarding Transfer of Funds or Assets Between Defendants.

**Request No. 3**

Plaintiffs take a similar course with respect to their third Request, which calls for the production of all documents "relating to any transfer or funds or other assets or business interests" between Defendants.  Pls.' Lozada Request 5; Pls.' Berzaín Request 4.  Again, Defendants have conveyed in their response, and in the meet-and-confer calls, that they are not withholding any responsive documents.

On its face, Defendants' Response does not offer Plaintiffs simply an agreement "to limit the Request to retainer agreements."  Pls.' Sánchez de Lozada Mem. 8; Pls.' Berzaín Mem. 8.  On the contrary, Defendants' Responses specify that the retainer agreements are responsive to the Request and relevant, non-privileged portions will be produced.  *See* Def. Sánchez de Lozada's Am. Resp. 5; Def. Berzaín's Am. Resp. 5.

Because Defendants did not state otherwise in their Response, it is clear from Defendants' prefatory language in their Responses that they are "not withholding any responsive documents . . . with the necessary caveat that the search has been reasonably limited to those places where documents responsive to requests to which Defendant does not object may be located."  Def. Sánchez de Lozada's Am. Resp. 3; Def. Berzaín's Am. Resp. 3.  (And as with Request 1, Defendants have also made this point specifically during meet-and-confer calls.)

**D.      Requests for Information Relating to the Trial of Responsibilities Are Overbroad, Irrelevant, and Disproportionate to the Needs of the Case.**

Plaintiffs move to compel production of broad categories of documents relating to the Trial of Responsibilities, which took place in Bolivia in 2009, and in which various former government officials faced trial for charges relating to the events of September and October 2003.  As a preliminary matter, those proceedings were politically motivated and lacked the most basic procedural safeguards.  *See, e.g.*, DOS Statement, Feb. 23, 2005 (U.S. State Department acknowledged that the charges against Defendants "appear[ed] to be politically motivated").[9] Although Defendants were initially charged in that case, as Plaintiffs note Bolivian law does not permit trials in absentia, and the United States denied extradition requests for Defendants to stand trial.  *See* Pls.' Sánchez de Lozada Mem. 3 n.1; Pls.' Berzaín Mem. 3 n.1.  In a 2006 State Department cable, David Greenlee, the former U.S. ambassador to Bolivia, explained the U.S.'s position on extraditing Defendants as follows:

> [S]ending the former president to a foreordained conviction in a political show trial goes manifestly against our interests in seeing justice served.

DEF-0004000.

---

[9] *See also, e.g.*, DEF-0000453-86 (Prosecutors Report, July 28, 2004) (after 10-month-long investigation three Bolivian prosecutors commissioned to investigate events issued report finding likely criminal liability on the part of civilian protesters, and as to the military found "no evidence of the existence of any order to engage in said criminal conduct"); DEF-0000523-27 (Letter from Prosecutors to Inter-American Commission on Human Rights, Sept. 1, 2004) (two months later those prosecutors filed complaint with the Inter-American Commission on Human Rights regarding their report being thrown out and becoming targets of political persecution "because our report failed to present the conclusions that would have been politically expedient for the government"); U.S. Dep't of State, Country Reports on Human Rights Practices, Bolivia 2 (2005) (U.S. State Department found "the government did not conduct a full and fair investigation, but absolved civilians of all liability for their role in the unrest.").

The present litigation is not a trial about the Trial of Responsibilities. It is a trial about what occurred in 2003 in Bolivia. Plaintiffs' Requests, which seek information concerning how the Trial of Responsibilities was conducted in Bolivia, should be denied.

**Request No. 4**

Plaintiffs seek "[a]ll Documents relating to any agreement with, or transfer of funds to, any person who attended and/or monitored the Trial and reported or otherwise communicated about the Trial to you or on your behalf." Pls.' Lozada Request 4; Pls.' Berzaín Request 4. It was Defendants' understanding that all parties agreed the term "You" does not include Bolivian counsel, for this Request and all others. Accordingly, Defendants explained they are *not* withholding any non-privileged documents in response to this Request. Plaintiffs now seek to compel Defendants to undertake a comprehensive search for responsive documents from their Bolivian counsel, and to compel a privilege log. Both requests should be denied.[10]

As an initial matter, Plaintiffs do not explain how documents relating to persons who monitored the Trial of Responsibilities on behalf of Defendants have any bearing on the present litigation. Nor could they. Whether Defendants received reports from persons acting on their behalf at the Trial of Responsibilities has no bearing on the underlying events that are at issue in this litigation, *i.e.*, what happened in Bolivia in September and October of 2003.

Moreover, compelling discovery from the parties' Bolivian counsel would be extremely complicated, unduly burdensome, and disproportionate to the needs of this case.[11] Plaintiffs

---

[10] Defendants incorporate herein their arguments regarding the relevance of this type of discovery in the first instance, as purported impeachment evidence or related to a potential predecessor-in-interest evidentiary argument, which appear in the following section regarding Request No. 5.

[11] This argument against discovery of documents in the possession of parties' Bolivian counsel applies equally to all other requests.

cannot unilaterally change the definition of "You" to encompass actions taken by Defendants' Bolivian counsel while not undertaking reciprocal obligations to collect ESI from their Bolivian attorneys.  Indeed, a search of Plaintiffs' Bolivian attorneys' documents would likely yield a large volume of responsive documents to Defendants' pending discovery requests, let alone those that Defendants would serve regarding the Trial of Responsibilities should the Court allow this type of discovery to proceed.  For example, one of Plaintiffs' many Bolivian attorneys, Rogelio Mayta, appears to have maintained a website from 2006 to 2012 entitled juiciogoniya.org.bo, or "Try Goni Now" ("Goni" is a nickname for Defendant Sanchez de Lozada).  *See* https://web.archive.org/web/*/www.juiciogoniya.org.bo (archiving snapshots of the website from 2006 to 2012).  Mr. Mayta also wrote an entire book regarding Plaintiffs, the Trial of Responsibilities, and the underlying events.  *See* Marcelo Bracamonte, Pamela Delgadillo & Rogelio Mayta, Hacer Justicia: Argumentos de las víctimas en el juicio por la masacre de septiembre y octubre de 2003 en Bolivia (2011).  Opening the door to discovery from both sides' foreign attorneys would open a veritable Pandora's box that would severely impede rather than advance this case.

Plaintiffs' unsupported demand for a privilege log with regard to communications between Defendants and Bolivian counsel concerning the Trial of Responsibilities is also improper and should also be denied.  The Local Rules clearly provide that parties need not log privileged communications and documents made "after commencement of the action."  S.D. Fla. L.R. 26.1(e)(2)(C); *see also FTC v. Grolier Inc.*, 462 U.S. 19, 25 (1983) ("[T]he literal language of [Rule 26(b)(3)] protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.").  Indeed, as Plaintiffs noted, the parties "stipulated that, in accordance with the local rules, neither party would be required to create a privilege log

for documents created after the commencement of litigation." *See* Pls.' Sánchez de Lozada Mem. 4; Pls.' Berzaín Mem. 4.  The Trial of Responsibilities did not begin until 2009, well after the commencement of this litigation on September 19, 2007.  Accordingly, any privileged communications with counsel regarding those Bolivian proceedings—which would necessarily overlap with information relevant to these proceedings—need not be logged, for Plaintiffs and Defendants alike.

**<u>Request No. 5</u>**

Request No. 5 seeks even more broadly from each Defendant "[a]ll documents relating to communications from October 17, 2003 to the present between you and any person prosecuted at the Trial, any witness testifying at the Trial, or any legal representative of a defendant or witness at the Trial, including any transfer of funds or other assets or business interests to you or on your behalf, directly or indirectly, to any person prosecuted by, any witness testifying at, or any legal representative of a defendant or witness at the Trial."  Pls.' Lozada Request 5; Pls.' Berzaín Request 4-5.  Despite the various deficiencies with this Request, Defendants offered to "produc[e] documents relating to interaction with witnesses at the Trial of Responsibilities, if any, who will testify in the current proceedings."  Def. Sánchez de Lozada's Am. Resp. 6; Def. Berzaín's Am. Resp. 6.  Plaintiffs have rejected this compromise, and moved to compel.

To begin, blanket requests for all documents with all the participants in this foreign proceeding are facially overbroad and disproportionate to the needs of this case, and should be wholly rejected.  *See, e.g.*, *Houston Specialty Ins. v. Titleworks of Sw. Fla., Inc.*, No. 2:15-cv-219-FtM-29MRM, 2016 WL 7155799, at *1 (M.D. Fla. Aug. 19, 2016) (denying motion to compel as to those requests seeking "all" documents without further limitations as "facially overbroad").  Moreover, the relevance of the broad categories of documents sought is tenuous at best.  Plaintiffs

do not argue that the documents sought in Requests 4 or 5—communications with individuals involved in the Trial of Responsibilities, and whether and to what extent any of them received funds in connection with it—have any bearing on the claims or defenses underlying Plaintiffs' Second Amended Complaint.  *See* Pls.' Sánchez de Lozada Mem. 10-13; Pls.' Berzaín Mem. 10-13.  Instead, Plaintiffs put forward two alternative bases for discovery.  First they contend that the requested documents are discoverable as relevant to bias, *i.e.* as impeachment evidence.  *Id.*[12]  As noted in the very case Plaintiffs cite, however, "the general principle that impeachment evidence <u>can be</u> discoverable does not compel the conclusion that it is discoverable in any form and to any degree."  *Megdal Assocs., LLC v. La-Z-Boy, Inc.*, No. 14-81476-CIV, 2016 WL 4503337, at *2 (S.D. Fla. Feb 1, 2016).  In fact, in that case the court found that even though the requested documents were relevant to the bias of a key witness, "[t]he burden in producing these documents outweighs their marginal benefit to Defendant," and *accordingly refused to compel their production.  Id.* at *3.  Here, the argument for production is even more attenuated and the marginal benefit even slimmer, as the parties can simply ask the witnesses about these very issues and obtain the information sought.

Moreover, impeachment evidence is relevant only to the extent there is a witness to *impeach*.  To that end, Defendants offered to produce non-privileged responsive documents relating to any witnesses from the Trial of Responsibilities who will testify as a witness *in this case*.  Plaintiffs rejected this offer, conceding they have not yet identified which witnesses they may call to testify.  Instead, they seek to compel potential impeachment evidence related to *any and all* witnesses, defendants, legal representatives, and spectators related to the Trial of

---

[12] Defendants' response to this argument regarding relevance as impeachment evidence applies equally to Request No. 4 and is incorporated therein.

Responsibilities, in order to help them formulate their list of potential witnesses in the first instance.  Plaintiffs fail to cite any support for a party's obligation to produce such "impeachment evidence" of countless unidentified potential witnesses, and the Court should deny this overbroad and improper request.  Should the Court compel production, however, Defendant would seek reciprocal information from Plaintiffs regarding communications with and payments to any and all persons involved in the Trial of Responsibilities, as Defendants have the same argument as Plaintiffs regarding bias in that proceeding.  Upon information and belief, various witnesses and spectators were paid by or received benefits from the Bolivian government, and potentially from Plaintiffs' Bolivian counsel, in connection with that Trial.  Again, this would turn discovery into the Trial of Responsibilities into an expensive and distracting side-show in this litigation.

Plaintiffs also argue that communications or payments to witnesses, parties, or their counsel in the Trial of Responsibilities may be discoverable as relevant to a potential evidentiary argument regarding the admissibility of testimony from the Trial.[13]  Setting aside the admissibility of testimony from this politically-motivated foreign proceeding in which Defendants were not parties, Plaintiffs fail to cite any authority that anticipation of this evidentiary argument entitles them to all documents related to any communications with any and all participants in the prior proceeding.  Plaintiffs themselves were participants in the Trial of Responsibilities and already have the entire record from that case from which they can attempt to make a predecessor-in-interest argument if they wish.

---

[13] Plaintiffs are referring to the hearsay exception under which former testimony may be admissible if the declarant is unavailable and the former testimony is, *inter alia*, "now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination."  Fed. R. Evid. 804(b)(1)(B).

E.     **Requests for All Documents Related to Sánchez de Lozada's Bolivian Lawyer and His Agent Are Impermissibly Overbroad and Disproportionate, and Requested Documents Are Privileged and/or Irrelevant.**

**Request No. 19**

In Request No. 19 Plaintiffs seek from Defendant Sánchez de Lozada "[a]ll documents relating to Oswaldo Ramirez from August 1, 2002 to the present, including all Documents sent by you to, or received by you from, Oswaldo Ramirez, or anyone acting on his behalf." Pls.' Sánchez de Lozada Request 7.  To begin, this request is facially overbroad, unduly burdensome, and disproportionate to the needs of the case, as it spans almost fifteen years and has no subject-matter limitation, and should be denied on those bases alone.  *See, e.g.*, *Sheets v. Sorrento Villas*, No. 8:15-CV-1674-T-30JSS, 2016 WL 3021889, at *4 (M.D. Fla. May 26, 2016) (wholly denying request seeking production of all communications with individual who is "eyes and ears" of the Defendant association, where request not tied to claims and defenses and timeframe is overbroad).[14]  As this Court has recognized repeatedly, when a party moves to compel production as to Requests that are facially overbroad, the proper remedy is to deny the motion as to those Requests in their entirety.  *See, e.g.*, *Cabrera v. Gov't Employees Ins. Co.*, No. 12-61390-CIV, 2014 WL 2999206, at *11 (S.D. Fla. July 3, 2014) (Seltzer, Mag. J.) (denying motion to compel in its entirety as to Requests found to be "overbroad on their face"); *State Nat. Ins. Co. v. Lamberti*, No. 08-60760-CIV, 2009 WL 702239, at *3 (S.D. Fla. Mar. 17, 2009) (Seltzer, Mag. J.) (denying motion to compel as to Requests that are "facially overbroad" (citing *Cooper v. Meridian Yachts, Ltd.*, No. 06–61630–CIV., 2008 WL 2229552, at *10 (S.D. Fla. May 28, 2008) (Rosenbaum, Mag.

---

[14]  Plaintiffs mischaracterize Defendant's objections as lacking sufficient specificity and particularity, but Defendants explained why this limitless request is improper.  It is Plaintiffs who have shirked their responsibility to "describe with reasonable particularity each item or category of items" in their Request.  *See* Fed. R. Civ. P. 34(b)(1)(A).

J.) (noting "courts have concluded that production requests that seek information 'relating to' subject areas are impermissibly overbroad"))).

What is more, as Defendants have explained to Plaintiffs, Mr. Ramirez has been Defendant's lawyer in Bolivia throughout this timeframe, and most if not all of Sánchez de Lozada's communications with him would be protected by the attorney-client privilege and/or attorney work product doctrine.  To the extent certain communications with Mr. Ramirez are not privileged—for example, an e-mail about dinner plans—they would be responsive to Plaintiffs' undifferentiated Request for "all documents," but completely unrelated to claims or defenses in this case.  While this Request has an incredibly broad temporal scope and zero subject-matter limitation, Plaintiffs have shown they are only interested in a narrow issue with regard to Sánchez de Lozada's agents.  Plaintiffs agreed not to pursue Requests 19 and 20 if Sánchez de Lozada provided certain statements regarding Mr. Ramirez's and Mr. Balcázar's roles vis-à-vis the Trial of Responsibilities.[15]  *See* Woods Sánchez de Lozada Decl. (Ex. H) (E-mail from E. Woods to A. Reyes, Apr. 24, 2017).  In response, Defendants provided language describing their roles closely mirroring what Plaintiffs proposed, with a few clarifications needed for accuracy.  Def. Sánchez de Lozada's Am. Resp. 14-15.  Not satisfied with these facts, Plaintiffs moved to compel all documents relating to these witnesses regardless of subject-matter and even though Defendants in good faith provided them the information they requested to obviate the Request.  These facially overbroad requests should be denied.

Indeed, Plaintiffs' only stated bases for relevance here are the bias and successor-in-interest arguments, for which the only arguably relevant timeframe is the Trial of Responsibilities, which

_____

[15] As explained below, Mr. Balcázar is Sánchez de Lozada's son-in-law and has also served as an agent to Sánchez de Lozada to facilitate the provision of legal services to him.

began in 2009.  This failure to articulate any relevance beyond that timeframe and subject-matter is itself dispositive, as it underscores the overbreadth and impropriety of the Request itself, which literally asks for "all documents relating" to Mr. Ramirez from 2002 to the present.  Such overbroad requests should be denied in their entirety.  Moreover, as discussed previously, any privileged communications with Sánchez de Lozada's lawyers during the timeframe of the Trial of Responsibilities would not need to be logged.[16]  Compelling Defendant to sift through all documents relating to his Bolivian lawyer for the last 14 years to identify which if any are not privileged, and thus likely completely irrelevant to this case, in search of privileged documents that need not be logged, would be an incredibly burdensome exercise with zero benefit.

**Request No. 20**

Request No. 20 broadly seeks from Sánchez de Lozada "[a]ll Documents relating to Mauricio Balcázar from August 1, 2002 to the present, including all Documents sent by you to, or received by you from, Mauricio Balcázar or anyone acting on his behalf."  Pls.' Sánchez de Lozada Request 7.  Again, such a request spanning almost fifteen years with no subject-matter limitation whatsoever is facially overbroad, unduly burdensome, and disproportionate to the needs of the case, and should be denied outright.  *See Sheets*, 2016 WL 3021889, at *4.  Mr. Balcázar is Sánchez de Lozada's son-in-law, and has also served as an agent to Sánchez de Lozada to facilitate the provision of legal services to him.

Although Plaintiffs broadly (and improperly) seek all documents relating to Mr. Balcázar, as with the request regarding Mr. Ramirez, the only stated bases for relevance here are the Trial-of-Responsibilities-specific arguments regarding bias of potential witnesses and the predecessor-in-interest issue.  As with Mr. Ramirez, the only documents that would be relevant to the stated

---

[16] Sánchez de Lozada incorporates herein the above arguments regarding relevancy and the production of a privilege log.

bases for relevance would be privileged, while non-privileged documents with Mr. Balcázar would be irrelevant.[17]   The Court should reject this improper and facially overbroad request.

**F.      Production of Every Page of Sánchez de Lozada's Passport Is Unnecessary.**

**Request No. 36**

Plaintiffs have moved to compel production of copies of "every page from every passport on which [Defendant Sánchez de Lozada] ha[s] travelled between January 1, 2003 and the present."   Pls.' Sánchez de Lozada Request 9.   Defendant Sánchez de Lozada objected on the ground that this Request is "overbroad, unduly burdensome, designed to harass and annoy Defendant, and unrelated to any claims or defenses in this action," and he is withholding documents on the basis of this objection.   Def. Sánchez de Lozada's Am. Resp. 21.

The details of any and all of Sánchez de Lozada's international travels since 2003 and the personal information in any passports with which he may have traveled have no bearing on Plaintiffs' TVPA and state law claims, which relate to events occurring in Bolivia in September and October 2003.   Plaintiffs' explanations for why the passport is necessary to prove a TVPA-related claim strain credulity.   To make out a claim for extrajudicial killing under the TVPA, a plaintiff must prove three elements: "(1) a legal representative or any person who may be a claimant in an action for wrongful death; (2) of a victim of an extrajudicial killing; (3) committed by an individual acting 'under actual or apparent authority, or color of law, of any foreign nation.'" *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1346 (11th Cir. 2011).   Defendant Sánchez de Lozada's passport has absolutely no bearing on these elements.

Even in cases in which the connection between the passport and the claims was closer than here, courts still refuse to compel the production of passports.   In *Button v. Royal Caribbean*

---

[17] Sánchez de Lozada incorporates herein the above arguments regarding relevancy and the production of a privilege log.

*Cruises Ltd.*, for example, a court in this District denied a motion to compel production of a passport in a tort case in which the movant sought travel information to show that an injury was not as severe as alleged.  No. 12-23624-CIV, 2013 WL 12064490, at *6–7 (S.D. Fla. July 12, 2013).  Specifically, the court explained that, "the passport [was] both collateral and unnecessary[,] considering information on traveling [could] be gathered, more completely, through alternative means."  *Id.*  The *Button* court ascribed great weight to the fact that "'production of such collateral information is unnecessary, especially when other available and less-intrusive avenues of discovery,'" such as a deposition, "'may yield similar results.'"  *Id.* (alteration omitted) (quoting *Buckley Towers Condo., Inc. v. QBE Ins.*, No. 07-22988-CIV., 2008 WL 2645680, at *5 (S.D. Fla. June 26, 2008)).  Like in *Button*, Plaintiffs here have already had the opportunity to depose Defendant Sánchez de Lozada once and asked questions regarding international travel.  In any event, the idea that the passport itself is probative of any theory is incredulous, and, "[a]t best, it is a collateral issue that is unnecessary considering the opportunity to gain similar information in a deposition."  *Id.*

Regardless, as the *Button* court recognized, "international travel occurs for many reasons," and questions about the nature of travel plans will be "far more relevant to the issue than the information gained from a passport stamp."  *Id.*  Answers to those questions can be elicited at a deposition and again at trial.

Accordingly, the Court should deny this overbroad, burdensome, and irrelevant Request.

### G.      Plaintiffs' Request for a Hearing

Pursuant to Local Rule 7.1(b)(2), Plaintiffs requested a hearing on their Motions to Compel.  Defendants defer to the judgment of the Court whether such a hearing is necessary.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

motions.


DATED: May 30, 2017

/s/ Ana C. Reyes
Stephen D. Raber (*pro hac vice*)
Ana C. Reyes (*pro hac vice*)
James E. Gillenwater (*pro hac vice*)
Suzanne M. Salgado (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (facsimile)
    sraber@wc.com
    areyes@wc.com
    jgillenwater@wc.com
    ssalgado@wc.com

Evan B. Berger (Fla. Bar No. 71749)
BECKER & POLIAKOFF P.A.
1 East Broward Blvd., Ste. 1800
Ft. Lauderdale, FL
(954) 987-7550
(954) 985-4176 (facsimile)
    eberger@bplegal.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 30, 2017, I electronically filed the foregoing documents with the Clerk of the Court using CM/ECF. I also certify that the foregoing documents are being served this day on all counsel of record or parties of record on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Evan Berger

Evan Berger

25