**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| ELOY ROJAS MAMANI, *et al.*, | ) | **Case No. 08-21063-CV-COHN** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GONZALO DANIEL SÁNCHEZ DE | ) | |
| LOZADA SÁNCHEZ BUSTAMANTE, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | **Case No. 07-22459-CV-COHN** |
| ELOY ROJAS MAMANI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSÉ CARLOS SÁNCHEZ BERZAÍN, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

**PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS**

# TABLE OF CONTENTS

**Page**

SECTION I RESPONSES TO DEFENDANTS' SMF.................................................................1

SECTION II ADDITIONAL MATERIAL FACTS .............................................................23

    I.      Even before entering office, Defendants developed a plan to use deadly military force against civilian protests in order to implement their policy agenda. ...............................................................................................23

           a.      Defendants knew of Bolivia's culture of protest, and believed that the only way they could achieve their policy goals was through military force and violence. ........................................................23

           b.      Before taking power in 2002, Defendants had a history of using violence to suppress social opposition.........................................24

    II.     Gaining control of Bolivia's political and military institutions, Defendants carried their plan and its strategic objectives into office. .....................................25

           a.      After taking office in August 2002, Defendants altered the legal framework and military code in order to accomplish their objective of crushing social movements....................................................25

           b.      Once in office, Defendants repeatedly rejected traditional political and negotiated solutions to civilian protests, instead responding with violence...............................................................................26

           c.      From their respective offices, Defendants exercised [effective] control over the military and set the institution's strategic objectives. ..............................................................................28

    III.    In mid-2003, Defendants militarized Bolivia to suppress popular opposition to their policy agenda........................................................................30

    IV.    In September 2003 in Sorata and Warisata, Defendants unleashed the military to carry out their plan to suppress social movements, including with the use of lethal force...................................................................32

           a.      On September 20 in Sorata, Defendants rejected offers to negotiate a political solution...................................................................32

            b.      On September 20, Defendants initiated and oversaw a military operation in Sorata and Warisata that represented the implementation of their strategic plan to quash social movements with lethal force. ......................................................................34

i

      c.      Acting under the Defendants' control the military indiscriminately shot at civilians on September 20 in the *Altiplano.* ...................................35

V.      Although widespread outrage over the use of lethal force against civilians led to broader protests and a general strike in El Alto, the Defendants proceeded with their plan to deploy the military to suppress civilian dissent. ...........................................................................................................38

      a.      Defendants refused to dialogue with civilian protesters and instead militarized El Alto........................................................................................40

      b.      On October 12, Defendants oversaw the implementation of their plan to crush social movements in El Alto.................................................42

      c.      The military, under the Defendants' orders, indiscriminately shot at unarmed protesters and other civilians on October 12 in El Alto. ............44

VI.      The pattern of violence of October 12 continued on October 13 in the Zona Sur of La Paz. ...............................................................................................49

      a.      Following widespread violence on October 12 Defendants still refused to negotiate, even when approached by government officials including the mayor of La Paz......................................................49

      b.      On October 13, Defendants oversaw the implementation of their plan to crush social movements in the Southern Zone of La Paz, as the military indiscriminately shot against innocent civilians....................50

VII.      Clear Patterns of Violence Were Repeated on all Three Days Decedents Were Killed .......................................................................................................53

VIII.      By mid-October, Defendants' Ongoing Use of Lethal Force Against Civilians Was Rejected by the Majority and/or Widespread Swaths of the Bolivian Population as Well as Government Officials, Leading to Their Resignation ...........................................................................................................57

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), Plaintiffs submit their Counterstatement of Material facts in response to Defendants' Statement of Material Facts ("SMF"), in which they contend there is no genuine issue to be tried. Section I contains Plaintiffs' responses to each factual assertion contained in the SMF disputed by Plaintiffs. Section II contains Plaintiffs' additional material facts that Defendants omitted from their Rule 56.1 statement.

### SECTION I:  RESPONSES TO DEFENDANTS' SMF

5.      Deny.  Defendants mischaracterize the marital union of Sonia Espejo Villalobos and Lucio Santos Gandarillas Ayala.  Further, Ms. Espejo did obtain compensation for the death of Mr. Gandarillas.  After becoming aware of a 2008 law to provide humanitarian assistance awards to the families of those people who were killed in Bolivia in 2003, Ms. Espejo applied for and received the lump sum benefits for her family.  *See* Ex. HH (Espejo Dep. Tr. 67:17-20, 68:5-15, 71:2-9); Ex. K (Espejo Decl. ¶ 6).[1]  Because of the limited time in which she had to apply for benefits and the time it would have taken to obtain official paperwork showing her common-law marriage status, she instead chose to apply for the benefits for her family under her minor son Aldair's name because she had his birth certificate.  *See* Ex. K (Espejo Decl. ¶ 6).

9.      Deny.  Hermógenes Bernabé Callizaya, along with his siblings and step-mother, received compensation for his father's death under the 2008 Humanitarian Assistance Law.  *See* Ex. F (Bernabé Decl. ¶ 4); *see also* Ex. PPP (MAMANI0024481, 24481T) (Letter from Ministry

---

[1] Exhibits cited herein, which were not cited by Defendants, are attached to the Declaration of Joseph L. Sorkin in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.  Each Defense Exhibit cited herein ("Def. Ex.") is attached to the Declaration of Ana C. Reyes in Support of Defendants' Motion for Summary Judgment.

of Justice attaching Chart of Compensation to Victims and Families of the Events of 2003 under

Law No. 3955 and translation).

10.     Deny.  Mr. Mamani Aguilar received compensation under the 2008 Humanitarian

Benefits law.  Mr. Mamani Aguilar's mother handled applying for the benefits for the entire

family and he did not ask her about the details.  *See* Ex. MM (Mamani Aguilar Dep. Tr. 135:21-

136:14).

12.     Sánchez de Lozada's purported goals and conduct during his first term of office

are immaterial and, therefore, irrelevant.[2]  In addition, deny the purported facts in SMF ¶ 12 as

hearsay.[3]  Further, the deposition testimony fails to establish personal knowledge.[4]

13.     The purported facts in SMF ¶ 13 are immaterial to the killings of Plaintiffs' family

members and, therefore, irrelevant.  *See supra* note 2.  In addition, deny because Def. Ex. 9 is a

newspaper article offered for the truth of its contents.[5]  Further, the deposition testimony fails to

establish personal knowledge.  *See supra* note 4; *see also* Ex. FF (Comboni Dep. Tr. 180:7-

181:9) (Mr. Comboni was not in Chapare in January).

14.     Deny.  Defendants mischaracterize the testimony, which, for example, does not

support the statement that the president had been sitting in the same position shortly before the

---

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[3] The general rule is that inadmissible hearsay "cannot be considered on a motion for summary judgment."  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)); *see also Hartel v. Unity Recovery Ctr., Inc.*, 16-80471-CIV, 2017 WL 1291952, at *10 (S.D. Fla. Jan. 26, 2017) (Cohn, J.).

[4] *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

[5] "Unsworn newspaper articles constitute inadmissible hearsay and cannot be considered as part of the summary judgment record."  *Bouton v. Ocean Props., Ltd.*, 2017 WL 4792488, at *27 n.31 (S.D. Fla. Oct. 23, 2017) (citing *Dallas Cty. v. Comm. Union Assur. Co.*, 286 F.2d 388, 391-92 (5th Cir. 1961)).

palace was attacked.  *See* ████████████████████████████████████████

████████████████████████████  Ex. GG (Eastman Dep. Tr. 102:15-18) (testifying only

that he saw bullet holes in the palace).

15.     Deny.  The OAS did not conclude that there was any plan to kill the president.

*See* Ex. GG (Eastman Dep. Tr. 112:17-113:2).  The statements in the report regarding

proportionality were not made based on individual acts of violence.  *See id.* at 73:22-74:23,

80:13-82:11.  The OAS investigation was limited to the events of February 2003 and did not

assess the violence of September and October 2003.  *See id.* 84:9-16.  An independent report by

Amnesty International disagreed with the OAS and concluded that the use of force was neither

restrained nor proportional.  *See id.* at 90:15-93:2.

16.     Deny.  *See infra* ¶¶ 221-27.  Further, a decision had been made that the port would

be in Chile.  Ex. NN (Meruvia Dep. Tr. 53:15-21, 54:20-56:23).

17.     Deny.  *See infra* ¶¶ 231-42.

18.     Deny.  *See infra* ¶¶ 231-42.  Further, the testimony does not state that there were

regular meetings.

19.     Deny.  The purported facts in SMF ¶ 19 are immaterial to the killings of Plaintiffs'

family members and, therefore, irrelevant.  *See supra* note 2.  Further, deny because Def. Exs.

12, 13 and 14 do not prove that "no decision had been made regarding the export of gas."  *See*

*supra* ¶ 16.

20.     Deny.  Mr. Eastman had no personal knowledge of Mr. Morales's or Mr. Quispe's

willingness to participate in dialogue.  *See* Ex. GG (Eastman Dep. Tr. 137:13-139:15) (admitting

he never spoke to Messrs. Morales or Quispe directly).  Further, Mr. Aparicio's testimony is not

related to the OAS, Mr. Quispe or Mr. Morales.

21.     Deny.  *See infra* ¶¶ 334-36**Error! Reference source not found.**.

22.     The purported facts in SMF ¶ 22 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  Defendants also cite no evidence.

23.     The purported facts in SMF ¶ 23 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  Defendants also cite no evidence.

24.     The purported facts in SMF ¶ 24 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.

25.     The purported facts in SMF ¶ 25 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.

26.     The purported facts in SMF ¶ 26 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  Further, the deposition testimony fails to establish personal knowledge.  *See supra* note 4; *see also* Ex. DD (Bjork-James Dep. Tr. 51:5-20) (simply referencing a "rumor" concerning state influence on the newspaper).

27.     Deny.  Def. Ex. 11 is inadmissible hearsay.  Throughout the SMF, Defendants cite to and rely on Def. Ex. 11, a preliminary report by Bolivian prosecutors that was never finalized and subsequently disregarded by more senior prosecutors who pursued a trial.  *See* Def. Ex. 11 (DEF-0000453 at 453, 486) (Decision to Reject Criminal Complaint No. 016/04); Ex. SSS (MAMANI0023365T) (Resolution No. 091/04, Revocation of Rejection Resolution 016/04).  By its own description, it is based on a "preliminary stage of investigation" and only makes a recommendation to the "criminal examining magistrate."  Def. Ex. 11 (DEF-0000453 at at 453, 486).  It is inherently untrustworthy and may not be considered.[6]  Moreover, not only is the

---

[6] "Rule 803 makes no exception for tentative or preliminary reports subject to revision and review."  *Toole v. McClintock*, 999 F.2d 1430, 1434-35 & n.11 (11th Cir. 1993) (rejecting admission of FDA report containing only "proposed" findings and forecasting later issuance of

report based on a "preliminary" investigation, the absence of the specific evidentiary basis for its findings or the extent of its investigative efforts militates against its admission as evidence.[7]

28.　　Deny.　*See generally infra* Section II.

29.　　Deny.　*See generally infra* Section II; *see also* Def. Ex. 67 (Pls.' Rule 26 Sixth Am. Initial Disclosures); Ex. UUU (Pl. Gonzalo Mamani Aguilar's Resps. & Objs. Defs.' First Set Interrogs.).

30.　　Deny.　Mr. Hayden, based on his experience in the military and the FBI, was able to get "into a soldier's mindset" to understand what actions a soldier might take in a particular situations.　*See* Ex. KK (Hayden Dep. Tr. 330:24-331:7; 332:10-20).

31.　　Deny.　In Bolivia, Mr. Hayden inspected certain physical evidence, including but not limited to bullet holes left in the walls of the Decedents' homes.　*See generally id.*

32.　　Deny.　Ms. Ramos Mamani testified that the bullet struck the wall, she picked it up, and she turned it over to someone a few days later.　*See* Ex. PP (Ramos Mamani Dep. Tr. 28:14-29:25).　The bullet was tested and described as a 7.62 caliber bullet in the Bolivian investigation into Marlene Nancy Rojas Mamani's ("Marlene") killing.　*See* Ex. VVV (MAMANI0002595T) (Ballistics Expert Opinion) (describing "firearm projectile, delivered by Mrs. Etelbina Ramos Mamani de Rojas").

33.　　Deny.　*See infra* ¶¶ 94, 220, 284, 298.

---

"final" document after more study).　The fact that the findings in Def. Ex. 11 were expressly disavowed by the Bolivian government further confirms its inadmissibility.　*See id.* at 1435 n.11; *see also United States v. Gluk*, 831 F.3d 608, 613 (5th Cir. 2016) ("[W]hen an agency disavows ('declines to accept') a report prepared by a staff member, that report does not qualify for the 803(8)(iii) exclusion."); *New York v. Pullman, Inc.*, 662 F.2d 910, 914-15 (2d Cir. 1981) (holding that the "tentative results of an incomplete staff investigation" were properly excluded).

[7] *See Lee v. Exec. Airlines, Inc.*, 31 F. Supp. 2d 1355, 1357 (S.D. Fla. 1998) ("Absent providing any details or otherwise describ[ing] 'the evidence' relied upon, the Letter of Determination poses minimal probative value.").

34.     Deny.  *See generally infra* Section II.

35.     The purported facts in SMF ¶ 35 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  In addition Def. Ex. 11 is inadmissible hearsay.  *See supra* ¶ 27.

36.     The purported facts in SMF ¶ 36 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  In addition, Def. Ex. 11 is inadmissible hearsay.  *See supra* ¶ 27.

37.     Deny.  The statements contained in Def. Ex. 11 are hearsay.  *See supra* ¶ 27.  In addition, Defendants mischaracterize the stated testimony.  Food was available to the tourists in Sorata at the time, and people were able to leave.  *See* Ex. QQQ (Ramirez Dep. Tr.  37:4-5) ("There were some other persons, tourists that wanted to go out and they left.").  Further, ██ ██ was not present in Sorata at the caravan and has no personal knowledge.  ██ ██████████████████████████████████ *see also supra* note 4.

38.     Deny.  Def. Ex. 1, Def. Ex. 11 and the testimony of ██████████████ are hearsay.  *See supra* ¶¶ 27, 37.  Throughout the SMF, Defendants attempt to rely on cables from the U.S. Embassy to prove the truth of their contents.  *See* Def. Exs. 1-5.  Defendants, however, have not provided any testimony or other evidence that indicates that these documents fall under any hearsay exception, and have failed to meet their burden to admit such documents.  Even if the cables fell under an applicable hearsay exception, the cables themselves contain hearsay on hearsay.  In particular, nothing in Embassy cables indicate that the information about various events and political machinations in Bolivia is based on the U.S. Ambassador's—or anyone else's—personal observation or investigation, and therefore, the cables lack sufficient indicia of

trustworthiness.[8]  Defendants further admit the parties are unable to question the U.S.

Ambassador on these Embassy documents.  *See* SMF ¶ 25.  The documents may not be

considered.

39.     Deny.  The purported facts in SMF ¶ 39 are immaterial to the killings of Plaintiffs'

family members and, therefore, irrelevant.  *See supra* note 2.

40.     Deny.  The purported facts in SMF ¶ 40 are immaterial to the killings of

Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.  The statements in Def.

Ex. 11 are hearsay.  *See supra* ¶ 27.  Further, the cited testimony fails to establish personal

knowledge.  *See supra* note 4.

41.     Deny.  The statements in Def. Exs. 1 and 11 are hearsay.  *See supra* ¶¶ 27, 38.

42.     Deny.  The statements in Def. Exs. 1 and 11 are hearsay.  *See supra* ¶¶ 27, 38.

43.     Deny.  Def. Ex. 11 is hearsay.  *See supra* ¶ 27.  Furthermore, eyewitness accounts

report no armed protesters attacking the convoy.  *See* Ex. QQQ (Ramirez Dep. Tr. 89:5-7, 89:21-

23, 96:24-25, 111:12-20); *infra* ¶¶ 245-46.

44.     Deny.  Def. Exs. 1, 2, and 11 are hearsay.  *See supra* ¶ 27, 38.

45.     Deny.  Def. Ex. 32 is hearsay.  Throughout the SMF, Defendants attempt to rely

on military and other Bolivian government reports to prove the truth of their contents, all of

which is hearsay.  *See* Def. Ex. 15, 32, 33, 35.  Defendants, however, have not provided any

---

[8] For either the "records or regularly conducted business activity" or the "public records and reports" exceptions to apply, the report must contain "'factual findings' that are 'based upon the knowledge or observations of the preparer of the report.'" *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (quoting *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994)); *see also United States v. Baker*, 432 F.3d 1189, 1208 n.17 (11th Cir. 2005) ("Statements by out of court witnesses to law enforcement officials" could only be admitted for reasons unrelated to the truth of the statements). The hearsay statements need not "explicitly paraphrase the words or others" if the "only conceivable explanation" for how the information was obtained was by "listening to the statements of others."  *United States v. Ransfer*, 749 F.3d 914, 925 (11th Cir. 2014) (quoting *Baker*, 432 F.3d at 1206).

testimony or other evidence that indicates that these documents fall under any hearsay exception. In addition to being hearsay themselves, the reports often contain other hearsay statements.  *See supra* note 8.  Def. Ex. 15 compiles references to events were reported elsewhere; Def. Ex. 32 contains nothing but observations that could not conceivably be obtained without the statements of others; Def. Ex. 33 details reports of events from different locations and days with no attribution as to the source of the information; and Def. Ex. 35 explicitly states that the details listed are "assumed to be known," and are not first-hand observations.  These documents may not be considered.

46.     Deny.  The statements in Def. Exs. 1, 11, and 32 are hearsay.  *See supra* ¶ 27, 38, 45.  In addition, Mr. Hayden did not testify that soldiers and policemen were killed because of "civilian fire."

47.     Deny.  Def. Ex. 2 and statements published in a book authored by Felipe Quispe, are hearsay.  *See supra* ¶ 38.

48.     Deny.  The purported facts in SMF ¶ 48 are immaterial to the killings of Plaintiffs' family members and, therefore, irrelevant.  *See supra* note 2.

49.     Deny.  The statements made to ███████████ are hearsay.  ███████

█████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

50.     Deny.  The statements in Def. Exs. 1, 11, and the testimony of ████████ ████████ are hearsay.  *See supra* ¶ 27; 38; 49.  Defendants further mischaracterize the testimony of Dr. Bjork-James, who simply said he "read . . . one thing that said former members of the . . . Tupak Katari Guerilla Army."  *See* Ex. DD (Bjork-James Dep. Tr. 188:23-189:4).

Finally, Def. Ex. 8, a newspaper article offered for the truth of its contents, is hearsay. *See supra* note 5.

51.     Deny.  Def. Ex. 34 is hearsay.

52.     Deny.  *See infra* ¶¶ 247-56.  Defendants further misrepresent the testimony of each of the Plaintiffs' experts cited.  For example, Mr. Hayden said only that a report provided by Defendants' counsel indicated firing from the hills and local homes.  *See* Ex. KK (Hayden Dep. Tr. 200:14-24); *see also id* at 113:20-114:16; 195:11-18; 207:4-208:12.

54.     Deny.  Mr. Rojas Mamani left the house only fifteen minutes before Marlene was shot.  *See* Ex. QQ (Rojas Mamani Dep. Tr. 85:11-16; 86:24-87:5).  He saw the military advance through the community over three to four hours, shooting and stopping at every house.  *See id.* 79:5-87:5.

55.     Deny.  The Mamani house is in Warisata, not the immediate downtown area, but in Carisa, a community within Warisata.  *See id.* 20:21-21:6.  The hills do not surround Warisata, but there are a small patch of hills adjacent to the Carisa community.  *See* Ex. Y (Hayden Rpt. ¶ 47 (image indicating the Mamani house and part of downtown Warisata)); Ex. WWW (MAMANI023521) (Ballistics Expert Opinion).

56.     Deny.  A 7.62 bullet can travel over 1000 meters, but will drop significantly in height at that point.  *See* Ex. KK (Hayden Dep. Tr. 195:22-25).  Further , Mr. Hayden  "could not see any way" a bullet traveling over 1000 meters would could have the impact of the bullet that killed Marlene.  *Id.* at 207:11-14.

57.     Deny.  Defendants mischaracterize the stated testimony.  Mr. Rojas Mamani did not concede that "he would not have been able to see if there were individuals firing from the hills."  That quote is in direct response to questions about what he could see from the window in

his house.  *See* Ex. QQ (Rojas Mamani Dep. Tr. 88:24-89:17).  He was not in his house when Marlene was shot—he was in the very hills Defendants claim he could not see.  *See id.* 86:24-88:23.  He could see what was going on in the hills when he was running to them, and when he was present in them.  *See id.*  And he testified that he did not see any civilians with weapons, and he is certain that it was the military that shot Marlene.  *See id.* at 82:13-16, 90:12-91:20, 112:6-21, 129:13-130:6, 131:2-132:10, 132:22-133:7.  He does not know the name of the individual, but based on everything he saw, he knows it was someone in the military.  *Id.*

58.     Deny.  *See supra* ¶ 57; *see also infra* ¶¶ 243-56.

59.     Deny.  *See infra* ¶¶ 243-56.  Mr. Rojas Mamani explained immediately before the quoted testimony that he did not understand the word "chaos," and after it was clarified to him, he testified that the military was firing without any human compassion.  *See* Ex. QQ (Rojas Mamani Dep. Tr. 86:6-12).  The statements contained in Def. Ex. 1 are hearsay.  *See supra* ¶ 38. Defendants further mischaracterize Plaintiffs' experts' testimony, neither of which concluded that the death was accidental.  *See* Ex. KK (Hayden Dep. Tr. 132:3-7);  Ex. Y (Hayden Rpt. ¶ 70); Ex. DD (Bjork-James Dep. Tr. 274:19-24).

60.     Deny.  *See supra* ¶ 32.

61.     Deny.  The cited evidence does not support that "opposition forces implemented blockades in and around the city of La Paz in October 2003," and Plaintiffs dispute that the blockades were anything but consistent with historical civilian protests.  *See infra* ¶¶ 257-64.

62.     Deny that all access to La Paz was completely prevented for the entirety of October 2003.  *See infra* ¶¶ 257-64.

63.     Deny.  Def. Ex. 4 is hearsay.  *See supra* ¶ 38.

64.     Deny that all access to La Paz was completely prevented for the entirety of October 2003.  *See infra* ¶ 257-64.  In addition, deny because Def. Ex. 5 is hearsay.  *See supra* ¶ 38.

65.     Deny.  Def. Ex. 2 is hearsay.  *See supra* ¶ 38.  Defendants also mischaracterize the testimony.  *See* Ex. DD (Bjork-James Dep. Tr. 314:13-16) (clarifying he did not know what the causes of death were).

66.     Deny.  Def. Ex. 3 is hearsay.  *See supra* ¶ 38.

67.     Deny.  Def. Ex. 3 is hearsay.  *See supra* ¶ 38.

68.     Deny.  *See infra* ¶ 334-36.  In addition, deny because Def. Ex. 4 is hearsay.  *See supra* ¶ 38.

69.     Deny.  Other evidence indicates that people were not going hungry or starving.  *See* Ex. TT (Siles Dep. Tr. 151:24-152:17) (conceding that he did not know anyone who was starving in October 2003, and that rice was available in the next door market); Ex. CC (Berindoague Dep. Tr. 164:15-166:23) (testifying that he never personally experienced a food shortage while living in La Paz in October 2003).

70.     Deny.  Defendants mischaracterize the testimony.  Ms. Valencia de Caravajal did not testify that her house was near the Río Seco, and did in fact go outside her home to sweep that morning, and saw roadblocks and protesters.  *See* Ex. UU (Valencia de Caravajal Dep. Tr. 63:15-64:13).

71.     Deny.  Defendants mischaracterize the testimony.  Ms. Espejo did not testify that the blockades caused any shortages at the market.  *See* Ex. HH (Espejo Dep. Tr. 35:7-17).

72.     Deny.  Defendants mischaracterize the testimony.  Mr. Apaza Cutipa testified that he was not sure about the exact date of blockades in El Alto.  *See* Ex. DDDD (Apaza Cutipa Dep. Tr. 69:16-70:2).

73.     Deny that the blockades prevented Bolivians in El Alto from obtaining food.  *See* Def. Ex. 45 (Baltazar Dep. Tr. 35: 10-12) ("Q.  Was it also difficult to obtain food around that time in El Alto?  A. Near us, no.").

74.     Deny.  The deposition testimony of Dr. Harb fails to establish personal knowledge.  *See* supra note 4.  Further, the deposition testimony of Mr. Berindoague is hearsay. *See* Ex. CC (Berindoague Dep. Tr. 61:4-20) (relaying information received from cabinet meeting).  Finally, Def. Ex. 4 is hearsay.  *See* supra ¶ 38.

76.     Deny.  The statements in Def. Ex. 11 are hearsay.  *See supra* ¶ 27.  The decree itself cannot be used to support Defendants' assertion.  Further, Mr. Berindoague testified only to his understanding of what the decree commanded, not what it actually did.  *See* Ex. CC (Berindoague Dep. Tr. 170:19-25).

77.     Deny.  The decree itself does not state that the "gas drivers would not drive trucks otherwise."  Further, the testimony is based on statements made to the deponents, and therefore hearsay.  *See supra* note 4.

78.     Deny.  Def. Ex. 2 is hearsay.  *See supra* ¶ 38.

79.     Deny.  Def. Ex. 32 is hearsay.  *See supra* ¶ 45.  Further, Defendants mischaracterize the testimony.  Mr. Bjork-James did not testify to any protesters using Molotov cocktails during the events described.  *See* Ex. DD (Bjork-James Dep. Tr. 194:21-195:8).

80.     Deny.  The statements in Def. Ex. 11 are hearsay.  *See supra* ¶ 27.  The deposition testimony, which relays what Mr. Berindoague "heard" from "information coming down to the residency" is also hearsay.  *See* Ex. CC (Berindoague Dep. Tr. 180:21-181:24).

81.     Deny.  Def. Ex. 11 is hearsay.  *See supra* ¶ 27.

82.     Deny.  Def. Ex. 3 is hearsay.  *See supra* ¶ 38.

83.     Deny.  Def. Exs. 15, 32, and 33 are hearsay.  *See supra* ¶ 45.

84.     Deny.  Def. Exs. 15, 32, and 33 are hearsay.  *See supra* ¶ 45.

85.     Deny.  Def. Ex. 11 is hearsay.  *See supra* ¶ 27.

87.     Deny.  Defendants mischaracterize the testimony.  Ms. Espejo Villalobos never testified that fuel was unavailable "because of the blockades."  *See* Ex. HH (Espejo Dep. Tr. 31:7-8, 42:12-17).

89.     Deny.  *See infra* ¶¶ 282-85.

90.     Deny.  Defendants mischaracterize the testimony.  Mr. Hayden did not reach the conclusion that it was "not possible" to establish the stated details about the bullet that struck Mr. Gandarillas, and testified that he did not know why the Bolivian investigator reached that conclusion.  *See* Ex. KK (Hayden Dep. Tr. 506:22-25).

91.     Deny.  Defendants mischaracterize the testimony.  Mr. Hayden merely acknowledged that there was no investigative report finding that the shooting was intentional. *See id*. at 526:8-17).  Given the proximity of multiple shootings, Mr. Hayden concluded that the shooting was likely intentional.  *See id.* 530:10-15; Ex. Y (Hayden Rpt. ¶ 129).

93.     Deny.  Defendants mischaracterize the testimony.  Mr. Apaza Cutipa testified that he could not narrow down the time his sister was shot.  *See* Ex. DDDD (Apaza Cutipa Dep. Tr. 12:13-23).  He also testified that his sister Roxana was shot on the rooftop of her home, but he

did not testify that she was "hit by a bullet behind her left ear" or that she was "on the fourth-floor rooftop of her home." *Id.*at 12:13-23.  Furthermore, Mr. Apaza Cutipa did not testify that their home was 400 meters from Juan Pablo Avenue or that Juan Pablo Avenue is the main thoroughfare running through El Alto, only that there are seven streets between his house and Juan Pablo.  *See id.* at 35:19-36:3.

94.     Deny.  Defendants mischaracterize the testimony.  *See* Ex. KK (Hayden Dep. Tr. 240:22-241:5) (discussing hat color); *see also* Ex. Y (Hayden Rpt. ¶ 79).  Further, eyewitness accounts confirm that it was light enough outside to see.  *See* Ex. KK (Hayden Dep. Tr. 293:25-294:5); *see also* Ex. C (Apaza Cutipa Decl. ¶ 11).  Mr. Hayden also reviewed several documents and spoke with several individuals demonstrating that the Bolivian military had snipers.  *See* Ex. KK (Hayden Dep. Tr. 186:8-11, 189:5-13, 190:3-11); Ex. Y (Hayden Rpt. ¶ 39).

95.     Deny.  Defendants mischaracterize the testimony.  Mr. Hayden merely conceded that he was aware of documents regarding protesters in the area, but did not conclude that this was reliable evidence.  *See* Ex. KK (Hayden Dep. Tr. 236:3-6, 237:20-238:7, 263:3-9).

96.     Deny.  The fact that the Bolivian investigator could not establish the stated details about the bullet that struck Ms. Apaza Cutipa does not mean that is it "not possible" to do so.

98.     Deny.  Defendants mischaracterize the testimony.  Mr. Apaza Cutipa testified that there *were* soldiers on Juan Pablo Segundo and neighboring adjacent streets to the home.  *See* Ex. DDDD (Apaza Cutipa Dep. Tr. 24:13-20, 33:11-21).

99.     Deny.  *See infra* ¶¶ 297-98.

100.     Deny.  Defendants mischaracterize the testimony.  Mr. Apaza Cutipa expressly did not believe that his sister was hit by a stray bullet.  *See* Ex. DDDD (Apaza Cutipa Dep. Tr. 117:2-16).  In any event, he testified that he didn't "want to talk about any degree of detail about

something that [he wasn't] sure about." *Id*. at 117:16-18.  In addition, Mr. Hayden concluded that the possibility of a stray bullet killing Ms. Apaza Cutipa was "very, very remote."  Ex. KK (Hayden Dep. Tr. 250:13-18); *see also* Ex. Y (Hayden Rpt. ¶ 88).

103.    Deny.  Defendants cite no evidence.

105.    Deny.  *See infra* ¶¶ 288-90.

106.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden's investigation led him to conclude that the shot that killed Ms. Morales Mamani was intentional.  *See* Ex. KK (Hayden Dep. Tr. 329:3-16); *see also* Ex. Y (Hayden Rpt. ¶ 189).

109.    Deny.  Defendants mischaracterize the testimony.  Ms. Valencia de Carvajal heard no sound of any conflict or confrontation in the minutes before her husband was shot.  *See* Ex. UU (Valencia de Caravajal Dep. Tr. 71:14-72:25).  In fact, she heard the noises of people that she thought were fleeing from military vehicles that were coming.  *See id.*

110.    Deny.  Defendants mischaracterize the testimony.  Ms. Valencia de Carvajal testified that the military were passing her house when her husband was shot.  *See id.* at 73:16-75:9); *see also infra* ¶ 292-96.

111.    Deny.  Defendants mischaracterize the testimony.  Ms. Valencia de Caravajal testified that she only saw soldiers with arms in the area at the time her husband was shot.  *See* Ex. UU (Valencia de Caravajal Dep. Tr. 73:16-75:9).  Further, Mr. Hayden was only asked how one would confirm whether the death was accidental or intentional, and concluded, based on his investigation, that the shooting of Mr. Carvajal was intentional.  *See* Ex. KK (Hayden Dep. Tr. 486:25-487:12); Ex. Y (Hayden Rpt. ¶ 107).

112.    Deny.  Defendants mischaracterize the testimony and rely on hearsay statements by Gen. Antezana.  By his own admission, Gen. Antezana was not in the chain of command of

the troops deployed in the Southern Zone of La Paz in October 2003. Ex. Z (Antezana Dep. Tr. 51:3-8, 78:19-22). Further, Gen. Antezana's testimony is hearsay. *See supra* note 4.

113. Deny. The only information received by Gen. Antezana about the military actions in the Southern Zone, particularly on October 13, 2003, came from Captain Dieter Belmonte. *See* Ex. Z (Antezana Dep. Tr. 78:6-18, 79:7-11); *supra* ¶ 112.

114. Deny. Gen. Antezana's testimony is hearsay. *See supra* ¶ 112. In addition, the purported facts in SMF ¶ 114 are immaterial to the killings of Plaintiffs' family members. Gen. Antezana's testimony nowhere establishes that the military activity he describes in this region (via hearsay statements) took place proximate to the killings of Arturo Mamani Mamani, Jacinto Bernabé Roque, and Raúl Ramón Huanca Quispe in the Southern Zone of La Paz. Further, Gen. Antezana certainly could not place the troop movements near the any of the killings on October 13, 2003, and denied that *any* civilian casualties occurred on that date. *See* Ex. Z (Antezana Dep. Tr. 81:8-15, 88:11-24).

115. Deny. There is no testimony establishing the proximity of the locations described here to the killings. *See supra* ¶ 114.

116. Deny. There is no testimony establishing the proximity of the locations described here to the killings. *See supra* ¶ 114.

117. Deny. There is no testimony establishing the proximity of the locations described here to the killings. *See supra* ¶ 114.

118. Deny. Def. Exs. 3, 32 and the testimony of Gen. Antezana are hearsay. *See supra* ¶¶ 38, 45, 112. Further, there is no testimony establishing the proximity of the locations described here to the killings. *See supra* ¶ 114.

119.    Deny.  Gen. Antezana's testimony is hearsay.  *See supra* ¶ 112.  Further, there is no testimony establishing the proximity of the locations described here to the killings.  *See supra* ¶ 114.

120.    Deny.  Def. Exs. 32 and 35 are hearsay.  *See supra* ¶ 45.  Further, there is no testimony establishing the proximity of the locations described here to the killings.  *See supra* ¶ 114.

121.    Deny.  Def. Exs. 32, 35, and the testimony of Gen. Antezana are hearsay.  *See supra* ¶¶ 45, 112.  Further, Defendants mischaracterize the testimony.  Gen. Antezana did not know the soldier's location or who shot the soldier.  *See* Ex. Z (Antezana Dep. Tr. 96:17-25, 170:24-171:14).

122.    Deny.  Defendants mischaracterize the testimony.  Gen. Antezana did not have the authority to order the troops to take action because he was not in the chain of command on that day.  *See* Ex. Z (Antezana Dep. Tr. 77:14-19); *see also supra* ¶ 112.

123.    Deny.  Defendants mischaracterize the testimony.  Gen. Antezana did not have the authority to order the helicopter to take action because he was not in the chain of command on that day.  *See* Ex. Z (Antezana Dep. Tr. 77:14-19); *see also supra* ¶¶ 45, 112.

124.    Deny.  Def. Ex. 32 and the testimony of Gen. Antezana are hearsay.  *See supra* ¶¶ 45, 112.  Further, Def. Ex. 18, which is purportedly still images from the news of October 13, 2003, lacks foundation and is inadmissible.[9]

128.    Deny.  Defendants mischaracterize the testimony.  While Mr. Mamani Aguilar may not have seen the bullet "hit[ting] [his] father," he heard him crying out, saw him slipping,

---

[9] Defendants' attempt to use stills from a news cast for the truth of the contents fares no better than their attempt to use newspaper articles for the same purpose.  *See supra* note 5.

and bleeding all over and testified that he saw his father "get shot."  *See* Ex. MM (Mamani Aguilar Dep. Tr. 102:8-25, 115:21-24).

129.    Deny.  *See infra* ¶¶ 302-312.

131.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden did not reach the conclusion that it was "not possible" to establish the stated details about the bullet that struck Mr. Mamani Mamani.  *See* Ex. KK (Hayden Dep. Tr. 363:5-14).

132.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden acknowledged Defense counsel's hypothetical as a "possibility" but did not reach that conclusion through his investigation.  *See* Ex. KK (Hayden Dep. Tr. 363:5-14).  His investigation led him to conclude that the shooting of Mr. Mamani Mamani was intentional.  *See* Ex. Y (Hayden Rpt. ¶ 148).

136.    Deny.  Defendants mischaracterize the testimony.  *See infra* ¶ 312.

137.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden did not reach the conclusion that it was "not possible" to establish the stated details about the bullet that struck Mr. Bernabé Roque, he merely agreed that the Bolivian investigator did not assess the point of origin of that bullet.  *See* Ex. KK (Hayden Dep. Tr. 443:4-10).  Further Def. Ex. 37 makes no reference to Mr. Bernabé Roque.

138.    Deny.  *See infra* ¶¶ 302-312.

139.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden believes the military "could have been shooting at targets of opportunity just to shoot somebody up there," and that the multiple shooting deaths in the same vicinity suggested that the shootings were "intentional."  *See* Ex. KK (Hayden Dep. Tr. 444:14-447:20).  Mr. Hayden's investigation led him to conclude that the shooting of Mr. Bernabé Roque was intentional.  *See* Ex. Y (Hayden Rpt. ¶ 170).  Further, there is no evidence that Mr. Bernabé Roque was protesting when he was

shot.  Eyewitness testimony from Mr. Mamani Aguilar indicates that he was in fact lying down, attempting to hide behind some hay while the military was firing at civilians in the hills.  *See* Ex. MM (Mamani Aguilar Dep. Tr. 83:3-85:9); *see also infra* ¶¶ 302-312.

141.    Deny.  Defendants mischaracterize the testimony.  Ms. Huanca Quispe testified only to what "they were saying" regarding a blockade on October 13, 2003, but never identified a specific "blockade on the Animas Valley Road," and in fact did not know if there was a blockade on that date.  *See* Ex. LL (Huanca Quispe Dep. Tr. 30:14-16; 33:3-4).

146.    Deny.  Defendants mischaracterize the testimony.  Ms. Huanca Quispe testified that her father believed the store owner would open to sell items to him.  *See id.* at 39:18-21.

147.    Deny.  Defendants mischaracterize the testimony.  When first asked if "shots were coming from lots of different directions," Ms. Huanca Quispe testified that the shots were coming from "*caymanes*."  *See id.* at 46:24- 3.  A caiman (or "*caymanes*") is a type of military truck.  *See* Ex. N (García Decl. ¶ 6).

149.    Deny.  Defendants provide no support for the purported facts in SMF ¶ 149.

150.    Deny.  Def. Ex. 23 is hearsay.  *See supra* ¶ 45.  Evidence from eyewitnesses suggests Mr. Huanca Márquez was unarmed and hiding when he was shot.  *See infra* ¶¶ 313-14.

151.    Deny.  *See infra* ¶¶ 313-14.

152.    Deny.  Defendants mischaracterize the testimony.  Mr. Hayden did not reach the conclusion that it was "not possible" to establish the stated details about the bullet that struck Mr. Huanca Márquez, he merely agreed that the Bolivian investigator did not assess those details about that bullet.  *See* Ex. KK (Hayden Dep. Tr. 588:20-589:2).

153.    Deny.  Defendants mischaracterize the testimony.  None of the citations to Mr. Hayden's testimony support Defendants' assertion in SMF ¶ 153.  *See* Ex. KK (Hayden Dep. Tr.

547:19-21, 551:10-13, 583:17-584:2, 588:20-589:2).  Based on his investigation, Mr. Hayden

concluded that Mr. Huanca Márquez's shooting was intentional.  *See* Ex. Y (Hayden Rpt. ¶ 160).

159.    Deny.  The "Command in Chief," to which Article 36 of the Organic Law of the

Armed Forces of Bolivia refers, is a decision-making organ composed of the Commander in

Chief, the Head of the General Staff, the Inspector General, the General Staff, and the Cabinet of

the Commander in Chief. *See* Def. Ex. 36 (MAMANI0009992, at 998) (Art. 36, Organic Law of

the Armed Forces of Bolivia).  The Commander in Chief takes orders from the President of the

Republic.  *See* Def. Ex. 36 (MAMANI0009992, at 999) (Art. 39, Organic Law of the Armed

Forces of Bolivia).

160.    Deny.  Def. Ex. 20 is not evidence of the truth of its contents.  Defendants further

mischaracterize the stated testimony.  When asked "[d]id you ask somebody to -- to prepare this

order," Defendant Sánchez de Lozada stated only that he "asked for this order to be prepared by

the legal – the counsel.  Without stating that, but it's understood it should be seen by the legal

counsel."  *See* Ex. RR (Sánchez de Lozada Dep. Tr. 230:2-11) (May 15, 2015).  He further

testified that had no "specific knowledge" that the order was "reviewed by a lawyer" before he

signed it.  *See id.* at 231:11-17.

161.    Deny.  Def. Ex. 6 is not evidence of the truth of its contents.

162.    Deny.  Def. Exs. 6 and 20 are not evidence of the truth of their contents.  Further,

Defendants mischaracterize the testimony.  Mr. Borrelli refused to opine as to the application of

Bolivian law, but rather testified that the orders issued by Sánchez de Lozada and Sánchez

Berzaín were within their "authority" in the command structure of the Bolivian military.  *See* Ex.

EE (Borrelli Dep. Tr. 164:11-166:4).  Further, Mr. Borrelli was not engaged to offer legal

opinions.  *Id.* at 151:9-21.

163. Deny. Defendants' assertion conflates the authority of the office of the President to issue orders with the lawfulness of the given orders. The President indeed does have authority under Bolivian law to issue orders and, specifically, to order the use of military force, including inside of the country. *See infra* ¶¶ 213-20. However, the process for issuing orders says nothing about whether the power was exercised and executed lawfully. *See generally* Ex. W (Borrelli Rpt.).

164. Deny. *See infra* ¶¶ 213-20, 240-42.

165. Deny. *See infra* ¶¶ 213-20, 240-42.

166. Deny. *See infra* ¶¶ 213-20, 240-42.

168. Deny. Def. Ex. 72 is not evidence of the truth of its contents.

171. Deny. Def. Exs. 73 and 74 are not evidence of the truth of their contents.

172. Deny. Def. Ex. 73 is not evidence of the truth of its contents.

173. Deny. Def. Ex. 74 is not evidence of the truth of its contents.

174. Deny. Def. Exs. 73 and 74 are not evidence of the truth of their contents.

175. Deny. The assertion in SMF ¶ 175 is an unsupported legal conclusion.

176. Deny. Defendants mischaracterize the testimony, and ignore the purpose of Mr. Borrelli's expertise. *See supra* ¶ 162.

177. Deny. Defendants provide no support for the purported facts in SMF ¶ 177, and Plaintiffs dispute this assertion. *See generally infra* Section II.

178. Deny. Defendants provide no support for the purported facts in SMF ¶ 178, and Plaintiffs dispute this assertion. *See generally infra* Section II.

179. Deny. Defendants provide no support for the purported facts in SMF ¶ 179, and Plaintiffs dispute this assertion. *See generally infra* Section II.

180.     Deny.  Defendants provide no support for the purported facts in SMF ¶ 180.
Further, there is ample evidence that both Defendants gave orders that led to the killings of many
innocent Bolivians.  *See generally infra* Section II.

181.     Deny.  *See generally infra* Section II.

182.     Deny.  *See generally infra* Section II.

183.     Deny.  Defendants provide no support for the purported facts in SMF ¶ 183, and
Plaintiffs dispute this assertion.  *See generally infra* Section II..

184.     Deny.  Defendants further mischaracterize the contents of both Def. Ex. 7 and
Def. Ex. 16.  The section in Def. Ex. 7 cited deals with the issue of prosecution of wrongdoing
by the police, and does not address military discipline.  *See* Def. Ex. 7 (DEF-0000078, at -90)
(May 2003 OAS Rep.).  Nothing in Def. Ex. 16 indicates that the president or the defense
minister lack authority to investigate or punish military action.  *See* Def. Ex. 16 (DEF-0003425,
at 3432, 3425) (U.S. State Dep't Country Rep. on Human Rights Practices - 2003).  Further,
Defendant Sánchez de Lozada testified that "at his request" during his presidency, special
prosecutors were appointed to investigate the circumstances surrounding the "reports of unarmed
civilians shot by the Bolivian military."  *See* Ex. RR (Sánchez de Lozada Dep. Tr. 265:12-14,
285:1-14) (May 15, 2015); *see also infra* ¶ 219.

185.     The purported facts in SMF ¶ 185 are immaterial to the killings of Plaintiffs'
family members and, therefore, irrelevant.  *See supra* note 2.

196.     Deny.  Defendants mischaracterize the website.  The website of the U.S. Embassy
in Bolivia provides advice to *Americans* seeking to be married in Bolivia, and does not purport to
"explain the Bolivian Marriage Laws."  *See* Def. Ex. 78 (U.S. Embassy Website)).

## SECTION II:  ADDITIONAL MATERIAL FACTS

I.      **Even before entering office, Defendants developed a plan to use deadly military force against civilian protests in order to implement their policy agenda.**

197.    In 2001, Defendants Gonzalo Sánchez de Lozada and Carlos Sánchez Berzaín agreed to a plan that "when [they] came to power" they would use massive military force to suppress civilian protests that might derail their policies and programs.  *See* Ex. H (Canelas Decl. ¶¶ 4-7).  The Defendants' plan had three key strategic elements:

- Defendants would reverse the Bolivian government's historical practice of negotiating and compromising when faced with civilian protests against unpopular policies.  *See id*. ¶¶ 5, 7.

- Massive military force, led by trained troops from Eastern Bolivia rather than conscripts, would be used against civilians.  *See id.* ¶¶ 6-7.

- The plan would require the troops to use lethal force against civilians, and it "would be necessary to 'kill two or three thousand people'" to break popular opposition to Defendants' policies.  *Id.* ¶¶ 6-7.

a.      **Defendants knew of Bolivia's culture of protest, and believed that the only way they could achieve their policy goals was through military force and violence.**

198.    Public protest, including marches, roadblocks, strikes and rallies, has played a key role in Bolivian national politics for decades.  *See* Ex. X (Goldstein Rpt. ¶¶ 25, 31); *see also* Ex. V (Bjork-James Rpt. ¶ 63); Ex. VV (Sánchez Berzaín Dep. Tr. 98:20-99:3).  Such protests have long been used to make popular demands known to the government and were seen as having broad political legitimacy.  *See* Ex. X (Goldstein Rpt. ¶ 31); *see also* Ex. J (Davis Decl. ¶ 5); Ex. V (Bjork-James Rpt. ¶¶ 33-34, 45, 49, 53, 81); Ex. CC (Berindoague Dep. Tr. 87:7-18, 96:7-10); Ex. TT (Siles Dep. Tr. 39:4-40:5); Ex. NN (Meruvia Dep. Tr. 63:24-64:5).

199.     Historically, political discussions and negotiations have been used by the government to resolve the demands and end the protests.  *See* Ex. X (Goldstein Rpt. ¶¶ 13, 25, 31, 33); Ex. V (Bjork-James Rpt. ¶¶ 41-44, 78-79); Ex. L (del Granado Decl. ¶¶ 6-7); *See* Ex. G (Calla Decl. ¶ 10); *see also* Ex. B (Albarracín Decl. ¶ 10).

200.     Defendants were aware that government policy agendas could be heavily influenced by civilian protests.  *See* Ex. V (Bjork-James Rpt. ¶ 43); *See* Ex. H (Canelas Decl. ¶¶ 5, 7).  Defendants explicitly agreed that they would not repeat the perceived mistakes of the previous administration in responding to the "Water War."[10]  *See* Ex. H (Canelas Decl. ¶¶ 5, 7).

201.     Instead of negotiation and pursuing political solutions, Defendants' plan required the use of trained troops from Eastern Bolivia.  *See id.* ¶¶ 5-7, 9; Ex. M (Flores Limachi Decl. ¶¶ 5, 35); Ex. A (Aguilar Vargas Decl. ¶ 43).

 **b.** **Before taking power in 2002, Defendants had a history of using violence to suppress social opposition.**

202.     Defendants had previously resorted to violence rather than negotiation in the face of protest.  *See* Ex. G (Calla Decl. ¶ 9); Ex. B (Albarracín Decl. ¶ 11).  For example, during the first administration of Defendant Sánchez de Lozada, the Bolivian government violently dislodged two to three thousand protesters from mines in Amayapampa and Capacirca killing nine civilians and one police officer in the process, rather than engage in peaceful negotiations.  *See* Ex. B (Albarracín Decl. ¶ 11); *see also* Ex. XXX (MAMANI0000349) (Report On The Situation Of Human Rights In Amayapampa, Llallagua And Capasirca, Northern Potosi).

---

[10] During the "Water War," the government had announced a plan to privatize the water system in Cochabamba, but in the face of massive protests, the government was forced to return the water system to government control.  *See* Ex. RR (Sánchez de Lozada Dep. Tr. 53:5-54:8) (May 14, 2015).

203.     Defendant Sánchez Berzaín himself gave instructions for the official assault in the face of requests by the Permanent Assembly of Human Rights of Bolivia (APDHB)[11] to negotiate peacefully and not open fire.  *See* Ex. B (Albarracín Decl. ¶ 11).[12]

## II.     Gaining control of Bolivia's political and military institutions, Defendants carried their plan and its strategic objectives into office.

204.     After Defendant Sánchez de Lozada took office in August 2002, Defendants altered the legal framework and military code in order to accomplish their objective of crushing social movements:  specifically, the Sánchez de Lozada government revised the Manual on the Use of Force to make all social protest a subversive act and issued the "Republic Plan" ("*Plan República*"), which characterized social movements as "subversives" and authorized the use of military force against them.  *See* Ex. YYY (MAMANI0000001) (Manual on the Use of Force), Ex. ZZZ (MAMANI0000032) (Republic Plan); *see also* Ex. W (Borrelli Rpt. ¶ 70).  As early as September 9, several days before the festival at Sorata began, the military had been mobilized as part of the "Republic Plan."  *See* ████████████████████████████████████ ████████ Ex. NNN (Transcript, Audio Recording of Testimony of Juan Veliz Herrera, at 2-4, Trial of Responsibilities, Sucre, Bolivia (Sept. 15, 2009)).

205.     On August 8, 2002, two days after entering office, Defendant Sánchez de Lozada issued Presidential Decree 26757, designating members of the Armed Forces to form his Military High Command: Roberto Claros; Gonzalo Rocabado Mercado; Juan Veliz Herrera; José Quiroga

---

[11] The Permanent Assembly of Human Rights of Bolivia is a nongovernmental human rights organization in Bolivia.  *See* Ex. B (Albarracín Decl. ¶ 5).

[12] A month after he had publically condemned the government's actions, Waldo Albarracín, the President of the APDHB, was kidnapped and tortured by the police.  *See* Ex. B (Albarracín Decl. ¶¶ 13-14).  Defendant Sánchez Berzaín was minister of Government and in charge of the police. *See id*. ¶ 15.

Mendoza; and Alberto Aranda Granados.  *See* Ex. RRR (Def. Sánchez de Lozada's Resp. Pls.'

First RFA at 162); Ex. AAAA (Def. Sánchez Berzaín's Resp. Pls.' First RFA at 162).

206.    By Resolution 11/02 (August 14, 2002), Commander Juan Veliz Herrera approved

the "Manual on the Use of Force."  *See* Ex. BBBB (MAMANI0005372) (Resolution 11/02).  The

Manual permits counter-subversive operations against roadblocks, marches, and demonstrations.

*See* Ex. YYY (MAMANI0000001, at -14) (Manual on the Use of Force).

207.    Five months later, on January 12, 2003, Commander Herrera released the

"Republic Plan" which ordered the entire army (including Special Forces) to execute operations

to support the stability of the Republic.  *See* Ex. ZZZ (MAMANI0000032) (Republic Plan); ███

████████████████████████████████████████████  Under this plan, the military could be

mobilized in response to civil disturbances and highway roadblocks.  *See* Ex. ZZZ

(MAMANI0000032) (Republic Plan).  The "Republic Plan" applied principles of "mass and

shock" ("*masa y sorpresa*") that called for "maximum combat power" to be deployed.  *Id.* at -32;

Ex. W (Borrelli Rpt. ¶ 106) (citing Ex. CCCC (MAMANI0021859) (Bolivian Military

Dictionary dated January 1, 2005)).

> a.    **Once in power, Defendants repeatedly rejected traditional political and negotiated solutions to civilian protests, instead responding with violence.**

208.    In January 2003, Defendant Sánchez Berzaín opposed a preliminary agreement

with protesters in Chapare, and Defendant Sánchez de Lozada reversed his position and

repudiated the agreement he had negotiated and employed military force, resulting in four deaths

and dozens of injuries.  *See* Ex. B (Albarracín Decl. ¶ 16); ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  The Defendants' approach to protests again resulted

in deaths in February 2003 in connection with protests near the national palace.  *See* Ex. B

(Albarracín Decl. ¶ 18); *see also* Ex. KKK (Transcript, Audio Recording of Testimony of Carlos Mesa Gisbert, at 1-2, Trial of Responsibilities, Sucre, Bolivia (Nov. 24, 2009)).

209.     When the mayor of La Paz reached out to Defendant Sánchez Berzaín to express concern about this in Feburary 2003 violence and the need to pacify the city immediately, Sánchez Berzaín said, "Mayor, if there are 5 dead, then it doesn't matter if there are 50 more, as long as we solve the problem."  Ex. L (del Granado Decl. ¶ 9); *see also* Ex. A (Aguilar Vargas Decl. ¶ 7).

210.     Despite an agreement between the government and protesters early on February 13, military violence continued that day.  *See* Ex. B (Albarracín Decl. ¶ 20).  The military implemented "tactics of war" instead of "crowd control methods appropriate to dealing with civil protests", and "caus[ed] a massacre in which 33 people were killed, including civilians."  *Id*. ¶ 20.

211.     In March 2003, Ricardo Calla, a former government minister, told Defendant Sánchez de Lozada that non-violent negotiation with protesters should be the government's method to resolve disputes.  *See* Ex. G (Calla Decl. ¶ 5-11).  Mr. Calla told Defendant Sánchez de Lozada that he "was going to taint his hands with blood."  *Id*. ¶ 7.  Mr. Calla warned him that the brutal and "trigger happy" hardliners in his government, including Defendant Sánchez Berzaín, would cause a "massacre" if Defendant Sánchez de Lozada gave him "power to make decisions."  *Id.* ¶ 8; *see also* Ex. KKK (Transcript, Audio Recording of Testimony of Carlos Mesa Gisbert, at 1-2, Trial of Responsibilities, Sucre, Bolivia (Nov. 24, 2009)) (asking Sánchez de Lozada to remove Sánchez Berzaín from the cabinet).

212.     After the violent events of February 12 and 13, Defendant Sánchez Berzaín left the government.  *See* Ex. (Sánchez Berzaín Dep. Tr. 106:5-13).

      **b.**      **From their respective offices, Defendants exercised effective control over the military and set that institution's strategic objectives.**

213.    Defendant Sánchez de Lozada exercised de jure control over the Bolivian military on both administrative and operational issues.  *See* Ex. W (Borrelli Rpt. ¶¶ 47, 51-53) (citing, *inter alia*, Bol. Const. (1995), arts. 97, 210); Ex. VV (Sánchez Berzaín Dep. Tr. 94:5, 113:11-114:14, 143:7-20).  Under the Bolivian Constitution in effect in 2002-2003, the President is the Captain General of the Armed Forces and the Armed Forces are subordinate to the President of the Republic.  *See* Ex. W (Borrelli Rpt. ¶¶ 47, 51-53) (citing, *inter alia*, Bol. Const. (1995), arts. 97, 210); ███████████████████████████.  The Armed Forces receive their orders from the President through the Minister of Defense and the Army Commander in Chief.  *See* Ex. RR (Sánchez de Lozada Dep. Tr. 155: 9-11, 154:17-19) (May 15, 2015).  The law regulating the Bolivian Armed Forces, the Organic Law of the Armed Forces, states that the President is the highest military authority and that both the President and the Minister of Defense are members of the Military High Command, the highest decision-making body of the Armed Forces.  *See* Def. Ex. 36 (MAMANI0009992) (Arts. 9, 19, 21, Organic Law of the Armed Forces of Bolivia).  The President has explicit authority under Bolivian law to issue orders and, specifically, to order the use of military force, including inside of the country.  *See* Ex. W (Borrelli Rpt. ¶ 47, 49); Def. Ex. 36 (MAMANI0009992) (Art. 8, Organic Law of the Armed Forces of Bolivia); *see also* Ex. RR (Sánchez de Lozada Dep. Tr. 196:10-197:5, 210:16-21, 230:12-18, 233:24-234:6, 248:10-16) (May 15, 2015); Ex. SS (Sánchez de Lozada Dep. Tr. 42:2-8, 46:23-47:5, 114:7-14) (Oct. 4, 2017).

214.    Defendant Sánchez Berzaín had de jure control over the Bolivian military on administrative matters and supervisory responsibilities for its domestic activities.  *See* Ex. W (Borrelli Rpt. ¶ 47) (citing Bol. Const. (1995), art. 210).  He can "plan, organize, direct, and

supervise" civil defense nationally. *Id. ¶* 59; *see also* Def. Ex. 36 (MAMANI0009992) (Art. 22 Organic Law of the Armed Forces of Bolivia).  Defendant Sánchez de Lozada gave an order that put Sánchez Berzaín in charge of operations in El Alto in October 2003.  *See* Def. Ex. 6 (DEF-0000069) (Supreme Decree 27209).  Sánchez de Lozada also gave orders to the officer corps through Sánchez Berzaín.  *See* ███████████████████████ Ex. RR (Sánchez de Lozada Dep. Tr. 230:12-233:12) (May 15, 2015); Ex. VV (Sánchez Berzaín Dep. Tr. 122:12); *see also* Ex. W (Borrelli Rpt. ¶ 70).

215.    The President and Minister of Defense set strategic priorities for the Bolivian Armed Forces which are implemented through the chain of command.  *See* Ex. W (Borrelli Rpt. ¶¶ 52, 72, 75).

216.    Defendants had laid out strategic objectives: to "use the superior and overwhelming might of the Armed Forces to overcome the civilian social movements as quickly as possible."  *See* Ex. W (Borrelli Rpt. ¶ 5).  The contours of their strategic objectives were set before the Defendants entered office.  *See* Ex. H (Canelas Decl. ¶¶ 5-7); Ex. W (Borrelli Rpt. ¶¶ 100-101).

217.    The Commander in Chief takes orders from the President of the Republic.  *See* Def. Ex. 36 (MAMANI0009992, at 998) (Art. 39, Organic Law of the Armed Forces of Bolivia)

218.    The "Command in Chief" to which Article 36 of the Organic Law of the Armed Forces of Bolivia refers is a decision-making organ composed of the Commander in Chief, the Head of the General Staff, the Inspector General, the General Staff, and the Cabinet of the Commander in Chief.  *See id.*

219.    Defendants understood the operation of the chain of command.  *See* Ex. SS (Sánchez de Lozada Dep. Tr. 112:25-114:13) (Oct. 4, 2017) ("The Commander in Chief does

what he has to do to execute these orders, which are very general. . . . Q.  But that general order comes from you, as president? A. Yeah."); *see also* Ex. W (Borrelli Rpt. ¶¶ 6, 73-78, 99) ███████ ████████████████████████  As the *de facto* and *de jure* commanders of the Bolivian military, Defendants had both an obligation and the authority to investigate and punish all violations of military law.  See Ex. W (Borrelli Rpt. ¶¶ 65, 98, 147-149, 161); Ex. RR (Sánchez de Lozada Dep. Tr. 265:12-14, 285:1-14) (May 15, 2015).

220.    Certain units in the Bolivian Armed Forces had special forces with specialized equipment and training. *See* Ex. A (Aguilar Vargas Decl. ¶¶ 19-20, 24, 26, 42); ███████████ ████████████████████████  One particular unit, the Chachapumas (also known as the F-10 or FCTC), took direct command from Defendant Sánchez de Lozada. █████████████████ ███████████████████  The military had sharpshooters and snipers.  *See* Ex. KK (Hayden Dep. Tr. 186:8-11, 189:5-13, 190:3-11); Ex. A (Aguilar Vargas Decl. ¶ 4) (only officers were trained as sharpshooters); *see also* Ex. Y (Hayden Rpt. ¶ 39); Ex. B (Albarracín Decl. ¶ 18). Officers with specialized training played an important role in shooting civilians to implement Defendants' strategic plan.  *See* Ex. I (Castaño Decl. ¶ 12).

**III.    In mid-2003, Defendants militarized Bolivia to suppress popular opposition to their policy agenda.**

221.    The exportation of natural gas through Chile was a key point of Defendants' political agenda that generated broad popular controversy in Bolivia.  *See* Ex.CC (Berindoague Dep. Tr. 118:2-13); Ex. L (del Grando Decl. ¶ 17); *see also* Ex. FF (Comboni Tr. 23:23-25); Ex. BB (Bedoya Tr. 75: 22-78:10); ███████████████████████.  The only economically viable route for the pipeline was through Chile, and any delays in moving the project forward could have resulted in the loss of the opportunity to export to the California market.  *See* Ex. CC

(Berindoague Dep. Tr. 82:11-22; 102:15-25); *see also* Ex. VV (Sánchez Berzaín Dep. Tr. 74:4-10).

222.    In September, protests arose in El Alto regarding a number of issues, including Defendants' plan to export gas through Chile.  *See* Ex. L (del Granado Decl. ¶ 11).

223.    The government failed to send top officials to meet with the protesters.  *See* Ex. JJ (Harb Dep. Tr. 39:19-40:4).  In the second week of September, peasant leaders went on a hunger strike in the city of El Alto and began a partial roadblock of some roads in the high plateau region (the "*altiplano*").  *See* Ex. L (del Granado Decl. ¶ 11).

224.    Against this backdrop of growing protest, Defendant Sánchez Berzaín had returned to the cabinet as Minister of Defense.  *See* Ex. VV (Sánchez Berzaín Dep. Tr. 108:23-24).  On August 4, Congress passed a new statute that increased the criminal penalties for social protests, including roadblocks.  *See* Ex. RR (Sánchez de Lozada Dep. Tr. 230:2-11) (May 15, 2015) (discussing Law of National System of Public Safety).

225.    On September 11, the Mayor of La Paz initiated contact between more than 100 peasant leaders and two government ministers to open formal talks to end the roadblocks and hunger strike.  *See* Ex. L (del Granado Decl. ¶¶ 12-15).  The ministers reported the peasant leaders request for dialogue to government, but that same evening, Defendant Sánchez de Lozada refused to authorize the dialogue.  *See id*. ¶¶ 14-15.

226.    Instead, between September 10 and 12, the Republic Plan was put into effect by the military.  *See* Ex. NNN (Transcript, Audio Recording of Testimony of Juan Veliz Herrera, at 2-4, Trial of Responsibilities, Sucre, Bolivia (Sept. 15, 2009)).  The Commander-in-Chief ordered a "Red Alert." █████████████████████████████████████████

██

227.     In the following days, military commanders and soldiers equipped for war were sent to patrol non-violent protests.  *See* Ex. A (Aguilar Vargas Decl. ¶¶ 10-11).

**IV.    In September 2003 in Sorata and Warisata, Defendants unleashed the military to carry out their plan to suppress social movements, including with the use of lethal force.**

228.     On September 14, Bolivian and international tourists visited Sorata, a small town to the northeast of La Paz, for the start of a local festival.  *See* Ex. J (Davis Decl. ¶ 4).

229.     On the morning of September 15, farmers from small villages outside Sorata blocked the highway to La Paz, making it difficult to travel to La Paz.  *See id.* ¶ 4; *see also* Ex. S (Smith Decl. ¶ 7).  Even with the protest, the atmosphere in Sorata was calm.  *See* Ex. J (Davis Decl. ¶ 8); Ex. S (Smith Decl. ¶ 10); Ex. N (García Decl. ¶¶ 12-13).  Over the next few days, the numbers of travelers and tourists in Sorata diminished as people were able to move past roadblocks.  *See* Ex. J (Davis Decl. ¶¶ 7-8); *see also* Ex. S (Smith Decl. ¶¶ 8-9).

230.     Local leaders from Sorata met with leaders from Warisata on September 18 to coordinate how to get the remaining tourists and travelers out of Sorata over the coming days.  *See* Ex. N (García Decl. ¶ 3).  On September 19, Defendant Sánchez Berzaín, on behalf of Defendant Sánchez de Lozada, ordered the military to transport people from Sorata.  *See* Ex. NNN (Transcript, Audio Recording of Testimony of Juan Veliz Herrera, at 3-4, Trial of Responsibilities, Sucre, Bolivia (Sept. 15, 2009)).

**a.      On September 20, Defendants rejected offers to negotiate a political solution in Sorata**

231.     Other sectors of the national government as well as local community leaders worked to negotiate a political resolution to the protests and roadblocks in El Alto as well as Sorata.  *See* Ex. JJ (Harb Dep. Tr. 33:12-23; 39:8-41:11); *see also* Ex. N (García Decl. ¶ 3).

232.     Defendant Sánchez Berzaín, who was in ongoing contact with Defendant Sánchez de Lozada, rejected the non-military alternative.  *See* Ex. N (García Decl. ¶ 4); Ex. RR (Sánchez de Lozada Dep. Tr. 216:7-18) (May 15, 2015); Ex. VV (Sánchez Berzaín Dep. Tr. 122:11, 125:7, 138:10-139:5); Ex. JJ (Harb Dep. Tr. 33:12-23; 38:17-39.7, 39:8-41:11) .

233.     Defendant Sánchez Berzaín directed the military helicopter to transport him to Sorata over the objections of Commander-in-Chief General Veliz.  *See* Ex. NNN (Transcript, Audio Recording of Testimony of Juan Veliz Herrera, at 3-4, Trial of Responsibilities, Sucre, Bolivia (Sept. 15, 2009)).  The helicopter arrived in Sorata in the morning of September 20.  *See* Ex. N (García Decl. ¶ 6); Ex. VV (Sánchez Berzaín Dep. Tr. 122:11-21).  Around the same time, a caravan including the military, police, and buses arrived in Sorata.  *See* Ex. S (Smith Decl. ¶ 13).  Local leaders invited Defendant Sánchez Berzaín to discuss their plan to transport the tourists safely through the roadblocks, including those in Warisata, without military interference. *See* Ex. N (García Decl. ¶¶ 4, 8-10); Ex. VV (Sánchez Berzaín Dep. Tr. 124:16-125:18). Defendant Sánchez Berzaín stated that there were orders from the government to remove the tourists "the good way or the bad way" and threatened "if you oppose this, you will face consequences."  Ex. N (García Decl. ¶ 9).  Defendant Sánchez Berzaín dismissed the community representative and stated, "I have nothing to say to you, I have orders from the government."  *Id.* ¶ 10.

234.     Tourists were not trapped or being held hostage.  *See id.* ¶¶ 11-13; Ex. S (Smith Decl. ¶ 10).  People were able to leave Sorata on their own, by hiking through or by taking transportation to the roadblocks, walking through them, and boarding public transportation on the other side.  *See* Ex. J (Davis Decl. ¶ 7); Ex. S (Smith Decl. ¶¶ 9-10).

235.    Defendant Sánchez Berzaín refused the offer to resolve the situation peacefully and responded, "Fucking Indians, I'm going to shoot you.  Leave me to do my work."  *See* Ex. N (García Decl. ¶ 14).

**b.    On September 20, Defendants initiated and oversaw a military operation in Sorata and Warisata that represented the implementation of their strategic plan to quash social movements with lethal force.**

236.    Defendant Sánchez Berzaín commanded the military operation in Sorata and Warisata on September 20, 2003.  *See* Ex. N (García Decl. ¶¶ 8-15) (Sánchez Berzaín gave orders to military officers); *see also* Ex. W (Borrelli Rpt. ¶¶ 87-90).  Defendant Sánchez Berzaín carried out "orders from the government" in Sorata on September 20.  *See* Ex. N (García Decl. ¶¶ 10, 15).  As Minister of Defense, Defendant Sánchez Berzaín received orders from the President.  *See* Ex. W (Borrelli Rpt. ¶¶ 70, 88) (Bol. Const. (1995), art. 210).

237.    Defendant Sánchez Berzaín reported to Defendant Sánchez de Lozada that things were going well in Sorata although there was a possibility that the military convoy transporting the tourists out of Sorata might be met with an "ambush."  ███████████████████  ██████  Defendant Sánchez de Lozada rejected a proposal that the convoy take an alternate route, saying, "the state will never back down."  ████████████████

238.    Late that morning, the military convoy accompanying the tourists left Sorata.  *See* Ex. N (García Decl. ¶¶ 18-19); Ex. S (Smith Decl. ¶ 13); Ex. VV (Sánchez Berzaín Dep. Tr. 127:9).  There were least two military vehicles on each end of the caravan, carrying approximately 20 soldiers or military police each.  *See* Ex. S (Smith Decl. ¶ 13).

239.    The convoy arrived around 3:00 p.m. to the outskirts of Warisata.  *See* Ex. A (Aguilar Vargas Decl. ¶ 15); *see also* Ex.TTT (Map of route from Sorata to Warisata).  That afternoon, Defendant Sánchez Berzaín again spoke to Defendant Sánchez de Lozada by phone.  ████████████████████████████████

240.     Defendant Sánchez de Lozada then signed a written order dictated by Sánchez Berzaín, which directed General Gonzalo Rocabado, the acting Commander in Chief of the Armed Forces, to use "necessary force" to restore order.  *See* ███████████████ ███████ Ex. RR (Sánchez de Lozada Dep. Tr. 230:12-233:12) (May 15, 2015); *see also* Def. Ex. 20 (DEF-0000066) (Letter to Gen. Rocabado).  The Order made the false claim that there was a "serious guerrilla attack" although no reports of guerrilla activities were received by the military or police.  *See* Ex. LLL (Transcript, Audio Recording of Testimony of Jairo Sanabria Gonzales, at 3, Trial of Responsibilities, Sucre, Bolivia (Oct. 9, 2014)).

241.     Gen. Rocabado issued Directive 27/03, which created a Joint Task Force instructed to carry out "Internal Defense of Territory" ("DIT") operations against civilian protesters.  *See* Def. Ex. 72 (MAMANI0000080, at -81) (Directive 27/03); Ex. W (Borrelli Rpt. ¶ 73).  Field officers' actions aligned with the Defendants' strategic objectives of suppressing civilians through use of lethal force.  *See* Ex. N (García Decl. ¶¶ 14, 22); Ex. A (Aguilar Vargas Decl. ¶¶ 18, 20, 22).

242.     The Special/Counter Terrorist Forces such as F10/FCTC/Chachapumas, which were present in Warisata on September 20, were only deployable via a direct order from Sánchez de Lozada.  *See* Ex. W (Borrelli Rpt. ¶ 71); ███████████████████████

**c.     Acting under the Defendants' control, the military indiscriminately shot at civilians on September 20 in the *altiplano*.**

243.     Throughout the day on September 20, the military shot indiscriminately at civilians in Sorata and Warisata, as well as at civilians along the route between the two towns.  *See* Ex. QQ (Rojas Mamani Dep. Tr. at 75:17-76:21); Ex. J (Davis Decl. ¶ 7); Ex. N (García Decl. ¶¶ 22-25); Ex. A (Aguilar Vargas Decl. ¶¶ 18, 20-21).  The military made no distinction between civilians and anyone who they reasonably considered to pose a threat.  *See* Ex. QQ

(Rojas Mamani Dep. Tr. at 75:17-76:21); Ex. J (Davis Decl. ¶ 7); Ex. N (García Decl. ¶¶ 22-25); Ex. A (Aguilar Vargas Decl. ¶¶ 18, 20-22).

244.    Shortly after stating that he would shoot indigenous leaders in Sorata, Defendant Sánchez Berzaín was seen in a white helicopter while soldiers were shooting out of its side doors at civilians on the ground who were fleeing in the hills.  *See* Ex. N (García Decl. ¶¶ 14, 22). Military personnel on the ground also shot indiscriminately at civilians.  *See id* ¶¶ 24-25.  People in the hills were running, attempting to escape the gunfire.  *See id.* ¶¶ 23-25.

245.    About an hour after the military caravan accompanying the tourists left Sorata towards the *altiplano*, a soldier or military policeman wearing camouflage, standing approximately 20 feet in front of one of the caravan buses, drew his weapon and fired at a group of individuals up a hillside.  *See* Ex. S (Smith Decl. ¶¶ 16, 18).  This shooting was unprovoked. *See* Ex. J (Davis Decl. ¶ 13); Ex. S (Smith Decl. ¶¶ 20-21, 23-25).  More than once, passengers disembarked from the buses and walked around without fear, as did the soldiers.  *See* Ex. J (Davis Decl. ¶ 13); Ex. S (Smith Decl. ¶¶ 23-24).

246.    When the convoy stopped at San Isidro, a small town on the road between Sorata and Warisata, soldiers were shooting at farmers up on a hillside although there were no signs of gunfire from the hillside.  *See* Ex. J (Davis Decl. ¶ 13); Ex. S (Smith Decl. ¶ 21).  Military planes were swooping back and forth.  *See* Ex. J (Davis Decl. ¶ 14); Ex. S (Smith Decl. ¶ 21).  The helicopter repeatedly came close to the people on the hillside.  *See* Ex. J (Davis Decl. ¶ 14).

247.    In addition to the convoy, other soldiers arrived in Warisata from the other direction from Achacachi around 3 p.m.  *See* Ex. A (Aguilar Vargas Decl. ¶ 15).

248.     In Warisata, conscripts were armed with high-powered FAL rifles.  *See id.* ¶ 20.
Also present were special forces from the Ayacucho Eighth Infantry Regiment from Achacachi
with "specialized guns," as well as ski masks, radios, and helmets.  *See id.* ¶¶ 19-20.

249.     Soldiers were not told to avoid civilian casualties or to protect civilians.  *See id.* ¶
5.  The soldiers had been ordered not to help injured people.  *See id.* ¶ 23.

250.     The troops were ordered to switch from non-lethal to lethal munitions and to
"shoot at anything that move[d]."  *Id.* ¶¶ 17-18, 22.

251.     Soldiers in formations moved along a front leading northwardly towards the
Warisata town center and surrounding areas.  *See* Ex. QQ (Rojas Mamani Dep. Tr. 67:5-14,
68:23-69:8); *see also* Ex. Y (Hayden Rpt. ¶ 49).  For three to four hours the military advanced,
reaching the Carisa community, near the house of Decedent Marlene.  *See* Ex. QQ (Rojas
Mamani Dep. Tr. 77:15-23); *see also* Ex. Y (Hayden Rpt. ¶ 50).

252.     The Special Forces proceeded through the backside of the town, to take the hill.
*See* Ex. A (Aguilar Vargas Decl. ¶ 19).  They were "like Rambo and 'ready to kill'" and "entered
the houses shooting, with no indication that they feared being attacked."  *Id.*

253.     As the military advanced, people fled north in the direction of the nearby hills to
escape the advancing military's gunfire.  *See* Ex. Y (Hayden Rpt. ¶ 50).  The soldiers were firing
at villagers and had abducted at least one man.  *See* Ex. QQ (Rojas Mamani Dep. Tr. 74:22-75:3,
76:14-77:3); *see also* Ex. Y (Hayden Rpt. ¶ 50).  As the military swept through Warisata, no
civilians were shooting at the soldiers.  *See* Ex. A (Aguilar Vargas Decl. ¶ 22).

254.     Upon seeing civilians in windows, the officers gave orders to shoot at them and
themselves shot at civilians, including at civilians who were warning neighbors that the soldiers
were coming.  *See id.* ¶¶ 20-22.  Soldiers were ordered, "If you see a fly, shoot!"  *Id.* ¶ 22.

255.     That afternoon, eight-year-old Marlene was fatally shot when standing at the window of her home in Warisata.  *See* Ex. PP (Ramos Mamani Dep. Tr. 18:18-25); *see also* Ex. KK (Hayden Dep. Tr. 131:10-21); Ex. GGGG (Map of Warisata on Sept. 20, 2003).  Marlene was struck by a 7.62 caliber bullet.  *See* Ex. PP (Ramos Mamani Dep. Tr. 15:5-11); Ex. Y (Hayden Rpt. ¶ 52); Ex. VVV (MAMANI0002595T at 2597T) (Ballistics Expert Opinion).  A soldier shot Marlene through a window with a single shot.  *See* Ex. PP (Ramos Mamani Dep. Tr. 22:17-25, 23:1-25, 24:1-4); Ex. Y (Hayden Rpt. ¶ 52); *see also* Ex. A (Aguilar Vargas Decl. ¶¶ 20-21) (soldiers in Warisata were ordered to shoot into houses and at people in windows, and officers shot at house windows).

256.     Soldiers bound and beat civilians. Ex. A (Aguilar Vargas Decl. ¶ 23).  They commented "It's these Indians' fault that we're out here."  *See id*.  In addition to Marlene, at least two other civilians and one soldier were killed that day in Warisata.  Ex. RR (Sánchez de Lozada Dep. Tr. 270:1-3, 273:8-10) (May 15, 2015); Ex. A (Aguilar Vargas Decl. ¶ 16).

**V.     Although widespread outrage over the use of lethal force against civilians led to broader protests and a general strike in El Alto, the Defendants proceeded with their plan to deploy the military to suppress civilian dissent.**

257.     As a result of the military's actions on September 20, people from Sorata and the surrounding villages who had not been involved in demonstrations began to march by foot to La Paz to protest the violence against their community.  *See* Ex. N (García Decl. ¶¶ 28-30).

258.     Shortly thereafter, General Rocabado, the acting Commander of the Armed Forces, ordered the creation of a Joint Task Force with instructions to perform DIT operations—counter-insurgency measures.  Def. Ex. 73 (MAMANI000262, at -263) (Directive 33/03).  This Task Force was to be deployed in seven provinces—an area of scope far beyond that of Sorata and Warisata, where the events of September 20 occurred.  *See id.*

259.    Also on the evening of September 20, Defendant Sánchez de Lozada called a meeting of the Cabinet, other government leaders, and members of the military high command. ████████████████████████

260.    Also on September 21, some conscripts had their rifles changed from FAL rifles to M-16 rifles, and they were shown how to "switch from single shot to machine gun burst." *See* Ex. A (Aguilar Vargas Decl. ¶ 25).

261.    In the weeks following September 20, new soldiers, rations, and weapons arrived at the "*Ingavi*" Barracks in El Alto. *See id.* ¶ 28. The new soldiers included Green Berets. *See id.* ¶¶ 25, 26. Soldiers were also ordered to work security at the Senkata gas plant. *See id.* ¶ 29.

262.    Starting in late September and gaining strength in early October, people in El Alto protested the use of military force against civilians by Defendant Sánchez de Lozada. *See* Ex. T (Soria Decl. ¶ 4); Ex. U (Zabala Decl. ¶¶ 8-9).

263.    The protests in October 2003 were organized as protests in a typical manner, at the local level by residents of the community. *See* Ex. V (Bjork-James Rpt. ¶ 81); Ex. X (Goldstein Rpt. ¶¶ 13, 39, 45); Ex. T (Soria Decl. ¶ 5); Ex. E (Aramayo Decl. ¶¶ 11-13). In El Alto neighborhoods, members of the community organized their own meetings and made their own decisions. *See* Ex. E (Aramayo Decl. ¶¶ 12, 14); Ex. T (Soria Decl. ¶ 5). There was no single leader or political organization that told protesters what to do. *See* Ex. E (Aramayo Decl. ¶¶ 11-14); Ex. T (Soria Decl. ¶ 5).

264.    Starting around October 8, the people of El Alto had organized a general strike in response to the ongoing killings by the military. *See* Ex. U (Zabala Decl. ¶ 11). At that time, there was no civilian traffic in the streets of El Alto, and the city was largely shut down. *See* Ex. T (Soria Decl. ¶ 6); Ex. U (Zabala Decl. ¶ 11). People put tires, stones and other obstacles in the

street to impede traffic.  *See* Ex. T (Soria Decl. ¶ 6).  There was little public transportation.  *See* Ex. U (Zabala Decl. ¶ 11).  Although stores and restaurants were closed during these strikes, people were able to buy food and other necessities in small markets that were open from about 3:00 am until about 6:00 or 7:00 am.  *See* Ex. T (Soria Decl. ¶ 6); Ex. U (Zabala Decl. ¶ 11).  The situation in the city of La Paz was still relatively normal as well, with the Mayor presiding over and attending the weekly Fair of Cultures on Sunday, October 12.  *See* Ex. L (del Granado Decl. ¶ 21).

> **a.    Defendants refused to dialogue with civilian protesters and instead militarized El Alto.**

265.    In the weeks following September 20, Defendants rebuffed repeated efforts by colleagues and community leaders who sought a peaceful resolution and expressed concern about civilian bloodshed.  *See* Ex. L (del Granado Decl. ¶¶ 18-20); Ex. B (Albarracín Decl. ¶¶ 31-37).  Defendant Sánchez de Lozada would not negotiate with those trying to mediate the disputes.  *See* Ex. L (del Granado Decl. ¶¶ 18-20) (Sánchez de Lozada refused to negotiate; Sánchez Berzaín was making decisions); Ex. B (Albarracín Decl. ¶¶31-38).

266.    Starting in early October, military personnel were in the streets of El Alto, especially on Juan Pablo II Avenue.  *See* Ex. E (Aramayo Decl. ¶ 8); Ex. T (Soria Decl. ¶ 7).  There were also planes flying low over the city.  *See* Ex. U (Zabala Decl. ¶ 11).

267.    On October 8, the Bolivian military detained civilians on the street and brought them to the Ingavi military barracks, where they were threatened and beaten.  *See* Ex. E (Aramayo Decl. ¶¶ 32, 40).  At least one detainee was bloodied, insulted with racial slurs and threatened with death, the officers pointing their weapons at him to terrorize him.  *See id.* ¶¶ 34-37, 41.

268.     Civilians were treated for gunshot wounds in El Alto on October 11, and community leaders were worried others would be shot because the military was in the area.  *See* Ex. T (Soria Decl. ¶¶ 8-9).

269.     On October 11, representatives from the APDHB along with leaders from the Catholic Church met with Defendant Sánchez de Lozada (and several ministers) and again petitioned him to seek peace, avoid further acts of repression against the people, and to prevent even a single additional death.  *See* Ex. B (Albarracín Decl. ¶¶ 32-33).  At the meeting, Defendant Sánchez de Lozada was urged to replace Defendant Sánchez Berzaín and one other minister.  *See id.* ¶ 34.

270.     Defendant Sánchez de Lozada again refused to negotiate; he reaffirmed his commitment to the Defendants' plan to refuse negotiation and employ military force.  *See id.* ¶ 38.  When the representatives tried to contact Defendant Sánchez de Lozada the next day, they received no response.  *See id.* ¶ 37.

271.     On October 10, the police were ordered to withdraw from any security function in El Alto and the military were put in charge of all security.  *See* Ex. LLL (Transcript, Audio Recording of Testimony of Jairo Sanabria Gonzales, at 1, Trial of Responsibilities, Sucre, Bolivia (Oct. 9, 2014)).  The police were not overwhelmed by the protests and performed their duties until the army was placed in charge of El Alto.  *See id.* at 4.  The police had been instructed to avoid extreme force and instead used chemical tear gas.  *See id.* at 3.

272.     On October 12, Vice President Mesa told Defendant Sánchez de Lozada that if he sent in the armed forces, "no matter how good [his] intentions [were], the risk of deaths is high" and that "in the end, the dead people will bury you, because the more people die, the more

untenable this situation becomes."  Ex. KKK (Transcript, Audio Recording of Testimony of

Carlos Mesa Gisbert, at 3-4, Trial of Responsibilities, Sucre, Bolivia (Nov. 24, 2009)).

> **b.  On October 12, Defendants oversaw the implementation of their plan to crush social movements in El Alto.**

273.    After refusing to negotiate with community leaders, Defendants decided to use the

military to bring gasoline from El Alto to La Paz.  *See* Ex. O (Loza Decl. ¶ 22).

274.    On October 11, 2003, Defendant Sánchez de Lozada issued Decree 27/209,

whereby he declared a national state of emergency and placed Defendant Sánchez Berzaín in

charge of the operation to "ensure regular distribution and supply of liquid fuels" to La Paz.  Def.

Ex. 6 (DEF-0000069) Supreme (Decree 27209); Ex. W (Borrelli Rpt. ¶ 93).

275.    Decree 27209 followed from a meeting late in the evening on October 10 at the

Ministry of Defense.  *See* Ex. O (Loza Decl. ¶¶ 12-13, 15-16).  Among those present at that

meeting were Defendant Sánchez Berzaín, officers of the La Paz Gas Stations Association, and

other senior officers.  *See id.* ¶ 16).

276.    At the meeting, Defendant Sánchez Berzaín grew angry on more than one

occasion and stated the gas tankers would get through one way or another; he was told the plan

would only supply a few hours of gas for La Paz.  *See id.* ¶¶ 7-8, 17-18, 20.  Told that having the

military transport gas was risky, Defendant Sánchez Berzaín threatened to take operating licenses

away from those who did not cooperate.  *See id.* ¶¶ 19-20, ¶¶ 24, 26 (administrative decree

passed next morning to penalize gas station owners that did not cooperate).  After it was

explained the operation could cause an explosion at a gas station and result in many deaths,

Defendant Sánchez Berzaín responded simply: "There will be deaths, but there will also be

gasoline."  *See id.* ¶ 21.

277.    At the meeting, Defendant Sánchez Berzaín approved of the plan for the military to transport the gas directly, and operational planning was done at the meeting.  *See id.* ¶ 22.

278.    Directives 33/03 and 34/03, issued by Commander in Chief Roberto Flores, translated Decree 27209 into operational military orders.  *See* Def. Ex. 73 (MAMANI000262) (Directive 33/03); Def. Ex. 74 (MAMANI0000267) (Directive 34/03); Ex. W (Borrelli Rpt. ¶¶ 74-75, 78-79).  On October 12, 2003 at 12:30 p.m., Commander in Chief Roberto Claros Flores issued Directive 33/03, which established six Joint Task Forces to carry out DIT missions.  *See* Def. Ex. 73 (MAMANI000262) (Directive 33/03).  Also on October 12, 2003, at 3:00 p.m., the Commander in Chief detailed the nature of the actions that the Joint Task Forces would undertake.  *See* Ex. W (Borrelli Rpt. ¶ 79).  None of these directives included any instructions to minimize civilian casualties or protect civilian lives, even though it would be "routine for a responsible commander to highlight the need to ensure minimal loss of life within the civilian population."  *See* Ex. W (Borrelli Rpt. ¶¶ 73, 78-79).

279.    In El Alto, field officers' actions aligned with the Defendants' strategic objectives of suppressing civilians through use of lethal force.  *See* Ex. A (Aguilar Vargas Decl. ¶ 34) (officer gave orders to shoot civilians in El Alto, and units unwilling to shoot at civilians were replaced); Ex. P (Ortega Decl. ¶¶ 22-28) (officer gave orders to shoot civilians, and officer executed conscript unwilling to shoot civilians and threatened others, who then shot at civilians).

280.    Around 4:00 p.m. on October 12, government spokesperson Mauricio Antezana arrived at the presidential residence, looking "very alarmed," and informed the President that nine people had already died that day in El Alto.  *See* Ex. KKK (Transcript, Audio Recording of Testimony of Carlos Mesa Gisbert, at 3-4, Trial of Responsibilities, Sucre, Bolivia (Nov. 24, 2009)).

### c. The military, under the Defendants' orders, indiscriminately shot at unarmed protesters and other civilians on October 12 in El Alto.

281.    On October 12, 2003, unarmed protesters gathered on roads in El Alto and La Paz, in particular in two locations:  (1) near a gas plant in Senkata, in the south of El Alto, and (2) in the Río Seco area and surrounding neighborhoods, in the north of El Alto.  *See* Ex. A (Aguilar Vargas Decl. ¶ 33); Ex. P (Ortega Decl. ¶¶ 7, 11, 18).  At both locations, Bolivian military forces, under the Defendants' orders, shot at these protesters indiscriminately, and without provocation.  *See* Ex. A (Aguilar Vargas Decl. ¶ 38); Ex. P (Ortega Decl. ¶¶ 19-21, 28); *see also* Ex. HHHH (Maps of El Alto on October 12, 2003).

282.    **Senkata Area:**  In the Senkata area, protesters gathered near the gasoline fueling station.  *See* Ex. I (Castaño Decl. ¶ 14).  Armed forces opened fire on unarmed civilians.  *See id*. ¶¶ 14, 16-19, 21-23); Ex. A (Aguilar Vargas Decl. ¶¶ 34, 36).

283.    Soldiers deployed in Senkata had machine guns and were only carrying lethal munitions.  Ex. A (Aguilar Vargas Decl. ¶ 32).

284.    The soldiers gave no warning before shooting.  *See* Ex. I (Castaño Decl. ¶¶ 16, 19).  The civilians began to flee in different directions as the military opened fire.  *See id*. ¶¶ 16-17.  A group of military officers chased the fleeing civilians: one officer fired a machine gun down an alley near the *Colegio José Manuel Pando* at unarmed civilians, including children and those who had not been protesting.  *See id*. ¶ 17.  On this other side of the street, then a group of soldiers lined up in a formation, took aim "the way sharpshooters target people" and shot at hiding unarmed civilians.  *See id*. ¶ 18.  One of the civilians shot and killed on this street at this time was Decedent Lucio Santos Gandarillas Ayala, who had been traveling through the Senkata area to obtain cooking gas from his brother's house.  *See* Ex. K (Espejo Decl. ¶ 4); Ex. HH (Espejo Dep. Tr. 31:3-13, 33:2-3).  Mr. Gandarillas, who was wearing a colorful jacket that had

green and yellow, was intentionally shot by a Bolivian soldier; he was unarmed, fleeing, and hiding, was hit in the abdomen by a bullet when he peeked out from behind a kiosk; he later died.  *See* Ex. K (Espejo Decl. ¶ 4); Ex. HH (Espejo Dep. Tr. 34:4-6); Ex. I (Castaño Decl. ¶ 19); Ex. (Hayden Rpt. ¶¶ 117-21, 129).

285.    In the area near the Bolivia Bridge, soldiers were also ordered to shoot civilians. Ex. A (Aguilar Vargas Decl. ¶ 34).  When one unit of soldiers was hesitant to shoot at civilians, they were replaced by another section of the same Squadron.  *Id.* ¶ 37. The new section used machine guns and "shot like crazy at the campesinos and women." *Id.* ¶ 38.

286.    **Río Seco Area:** On the same day, protesters, including men, women, and children, gathered in the Río Seco area, at the "*Ex Tranca*" and at the Río Seco Bridge.  *See* Ex. D (Apaza Morales Decl. ¶ 5); Ex. U (Zabala Decl. ¶¶ 10, 14).  The protesters did not have guns.  *See* Ex. D (Apaza Morales Decl. ¶ 12).

287.    About 200-300 soldiers carrying guns, accompanied by trucks and tanks, advanced down the Avenue Juan Pablo II in two lines towards the Río Seco Bridge.  *See* Ex. C (Apaza Cutipa Decl. ¶¶ 9-12); Ex. U (Zabala Decl. ¶ 16).  Some soldiers also went up in to the Villa Ingenio neighborhood.  *See* Ex. U (Zabala Decl. ¶ 16).  Shots were heard coming from the Avenue Juan Pablo II and areas around the Río Seco Bridge and *Ex Tranca*.  *See* Ex. T (Soria Decl. ¶¶ 10-13, 16); Ex. U (Zabala Decl. ¶ 16).

288.    When the military reached the Ex Tranca, people began to flee the soldiers and the soldiers shot civilians as they fled.  *See* Ex. D (Apaza Morales Decl. ¶ 14).  The shooting was very intense at times.  *See* Ex. T (Soria Decl. ¶¶ 11-13).  Civilians hid from the shooting in a church in the area, and wounded civilians who had been shot flooded into the church for treatment along with people carrying the dead.  *See id.* ¶¶ 12-14.

289.     Near the Ex Tranca on Avenue Juan Pablo II, a bullet was fired into the house where Decedent Teodosia Morales Mamani was sitting and she was intentionally and fatally shot.  *See* Ex. D (Apaza Morales Decl. ¶¶ 20-22); Ex. KK (Hayden Dep. Tr. 329:3-16); Ex. Y (Hayden Rpt. ¶ 189).  Bolivian soldiers were shooting at fleeing civilians in the area, and soldiers were outside of her house at the time Ms. Morales Mamani was shot.  *See* Ex. D (Apaza Morales Decl. ¶¶ 9-22); Ex. Y (Hayden Rpt. ¶ 175).  On the street, soldiers had raised weapons and pointed them at people's windows, including the window of Ms. Morales Mamani's home.  *See* Ex. D (Apaza Morales Decl. ¶¶ 16, 18).  Earlier that afternoon, Ms. Morales Mamani had attempted to leave the apartment but saw a soldier shoot another civilian and came back inside because she was terrified.  *See id.* ¶ 17; Ex. Y (Hayden Rpt. ¶ 178).  Bolivian soldiers had also already threatened to shoot members of Ms. Morales Mamani's family when they attempted to look out the window.  *See* Ex. D (Apaza Morales Decl. ¶ 16); Ex. Y (Hayden Rpt. ¶ 176).  Civilians were not armed with guns at the scene of Ms. Morales Mamani's death at the time she was shot.  *See* Ex. D (Apaza Morales Decl. ¶ 13).

290.     After being shot, Ms. Morales Mamani was put on a stretcher and brought downstairs.  *See id.* ¶ 25.  Her sister went outside with a white flag that she made from a stick and fabric.  *See id.* ¶ 26.  She yelled, "Why did you shoot my sister? I don't care. Shoot me. It's my sister."  *Id.* ¶ 26.  The soldiers ordered her to go back inside the house.  *See id.* ¶ 26.  Ms. Morales Mamani and her unborn child died the next day. *See id.* ¶ 29

291.     More protesters had gathered further down the Avenue Juan Pablo II on and around an overpass over the Río Seco, in the north of El Alto.  *See* Ex. U (Zabala Decl. ¶ 14).  In two groups, the soldiers, accompanied with several trucks and a tank, advanced on the protesters and other civilians, the first one firing at protesters blocking the bridge, and the second marching

through the neighborhood of *Villa Ingenio*, where few roadblocks existed.  *See* Ex. U (Zabala Decl. ¶¶ 14-16); Ex. P (Ortega Decl. ¶¶ 18-22, 28).  Soldiers pursued and shot a man who was fleeing. *See* Ex. P (Ortega Decl. ¶¶ 35, 37).

292.     Many civilians were killed as a result of the military's aggressive and unlawful tactics in the Río Seco area.  *See* Ex. U (Zabala Decl. ¶ 18); Ex. P (Ortega Decl. ¶ 19).  In a single church, more than 20 injured were transported in a truck for treatment on October 12, and wounded and dead continued by arrive on October 13.  *See* Ex. T (Soria Decl. ¶¶ 15, 18).  By October 14, 16 dead bodies were in the chapel.  *See* Ex. T (Soria Decl. ¶¶ 15-16, 18, 20); Ex. U (Zabala Decl. ¶ 21) (there were 11 caskets at one funeral service alone in El Alto). In contrast, not a single Bolivian soldier was killed.  *See* Ex. U (Zabala Decl. ¶ 19).

293.     When a woman in Río Seco came out of her house and said that her daughter had been shot while looking out of the window, the soldiers yelled, "Get in your house.  We'll kill you.  We don't want to see Indians out here walking."  *See* Ex. P (Ortega Decl. ¶¶ 19, 35, 37).

294.     Soldiers in the Río Seco area were ordered to shoot at civilians.  *See id.* ¶¶ 22, 24. When young soldiers and conscripts refused to follow orders to kill unarmed civilians, they were threatened by their superiors, and one conscript was executed by an officer.  *See id.* ¶¶ 25-27; Ex. A (Aguilar Vargas Decl. ¶ 35).  After the officer shot the conscript, he told the other younger soldiers, "Let's go, let's go. Take off. If not, you're going to die."  Ex. P (Ortega Decl. ¶ 27). Seeing the murder of the conscript who defied the order, other young soldiers began firing at the civilians who were present in the area.  *See id.* ¶ 28.

295.     Older soldiers, likely officers, beat up Ela Trinidad Ortega Tarifa, hitting her with the butts of their rifles and kicking her.  *See id.* ¶ 32.  As they beat her up, the soldiers said to her, "What the fuck are you doing here? These fucking Indians. These fucking local people" and

commented to each other, "We have to get rid of these garbage people, these worthless people. This fucking bitch has to die." *See id.* ¶ 33.  Younger soldiers who were ordered to continue beating her up asked Ms. Ortega Tarifa not to move, saying, "We don't want to do this" and "they're forcing us to do this. They are making us kill." *See id*. ¶ 36.

296.    Decedent Marcelino Carvajal Lucero was intentionally shot by the Bolivian military when he was reaching close to a window in his home on Avenue Juan Pablo II between 6:30 p.m. and 6:45 p.m. that night.  *See* Ex. Y (Hayden Rpt. ¶¶ 94, 107).  Bolivian troops were outside of Marcelino's house at the time that he was shot.  *See, e.g.*, Ex. Y (Hayden Rpt. ¶ 91) His house was on the Avenida Juan Pablo II, where soldiers had been marching and shooting throughout the afternoon, and the military was shooting in that area of the avenue at the time of Marcelino's death.  *See* Ex.C (Apaza Cutipa Decl. ¶¶ 13-15); Ex. Y (Hayden Rpt. ¶ 89); *see also* Ex. U (Zabala Decl. ¶¶ 15, 17); Ex. T (Soria Decl. ¶¶ 7, 10); Ex. D (Apaza Morales Decl. ¶ 9); Ex. P (Ortega Decl. ¶ 16–22).. There are no reports that place civilians armed with guns at the scene of Mr. Carvajal Lucero's death at the time he was shot.  *See* Ex. Y (Hayden Rpt. ¶ 91). Another bullet also came through the window and left a second bullet hole very close to the first, suggesting that both shots were targeted.  *See* Ex. UU (Valencia de Carvajal Dep. Tr. 77:14-78:18); Ex. EEEE (MAMANI0002372T at 2372T.0003) (Planimetric Photographs, Lucero).

297.    In El Alto that evening, the military fatally shot Decedent Roxana Apaza Cutipa at the family home.  *See* Ex. DDDD (Apaza Cutipa Dep. Tr. 12:13-18, 33:11-34:4); Ex. C (Apaza Cutipa Decl. ¶ 8); Ex. Y (Hayden Rpt. ¶ 88).  Curious about the sounds outside the home—which sounded to the children like firecrackers—Ms. Apaza Cutipa, her younger brother Guzman, and their cousin's three children went up on the roof to see what was going on.  *See* Ex. C (Apaza Cutipa Decl. ¶¶ 9-10).  The children were short, and only Ms. Apaza Cutipa was tall enough to

peer fully over the roof's terrace.  *See id.* ¶ 11; Ex. Y (Hayden Rpt. ¶ 79).  Guzman saw tanks and military trucks on Juan Pablo II Avenue, with soldiers shooting to all sides; he did not see any civilians with guns.  *See* Ex. C (Apaza Cutipa Decl. ¶¶ 12-15).  As she was peering over the terrace, Ms. Apaza Cutipa was fatally struck by a bullet in the head.  *See* Ex. C (Apaza Cutipa Decl. ¶ 18).  The sound of the shot came from the direction of Juan Pablo II Avenue.  *See id.*  She died instantly.  *See id.*

298.    Soldiers were marching through the streets, firing on unarmed civilians.  *See id.* ¶¶ 13-15.  The targeting shooting of Ms. Apaza Cutipa, an innocent bystander in El Alto, and the bullet-hole evidence at the site of her death, suggests that she was intentionally killed.  *See* Ex. Y (Hayden Rpt. ¶¶ 87-88).  The close proximity of the shots suggests that they were fired by a sniper.  *See id.* ¶ 88.  At the time that Roxana was shot, it was still light enough outside to see.  *See* Ex. C (Apaza Cutipa Decl. ¶ 18).

299.    Defendant Sánchez de Lozada then stated that, as President of the Republic and Captain General of the Armed Forces, he was the only one responsible for what was happening.  *See* Ex. JJJ (Transcript, Audio Recording of Testimony of Roberto Claros Flores, at 1-2, Trial of Responsibilities, Sucre, Bolivia (Sept. 16, 2009)).

## VI.    The pattern of violence of October 12 continued on October 13 in the Zona Sur of La Paz.

### a.    Following widespread violence on October 12 Defendants still refused to negotiate, even when approached by government officials including the mayor of La Paz.

300.    Despite the bloody events of October 12, Defendants continued to refuse to negotiate with the protesters, despite efforts by government officials and community and church leaders.  *See* Ex. L (del Granado Decl. ¶¶ 25-26, 28).  Over several days, Sánchez de Lozada

ignored efforts by the mayor, representatives of the Church, and other civil leaders for additional

dialogue.  *See id.* ¶¶ 37-38; Ex. B (Albarracín Decl. ¶¶ 22, 36-38).

> **b.     On October 13, Defendants oversaw the implementation of their plan to crush social movements in the Southern Zone of La Paz, as the military indiscriminately shot against innocent civilians.**

301.     On October 13, 2003, military regiments in the Southern Zone of La Paz

continued to shoot indiscriminately at civilians, mirroring prior operations in September and

October in Warisata, and El Alto, respectively.  *See* Ex. MM (Mamani Aguilar Dep. Tr. 90:20-25,

91:2-3, 102:10-25). Ex. Q (Pari Decl. ¶ 13).  These incidents occurred in the localities of the

Animas Valley area and Ovejuyo in the Southern Zone of La Paz. *See* Ex. M (Flores Limachi

Decl. ¶¶ 2, 4, 5, 14-15, 25-26); Ex. R (Sirpa Decl. ¶¶ 4-5); Ex. MM (Mamani Aguilar Dep. Tr.

90:20-25, 91:2-3, 102:10-25). Ex. Q (Pari Decl. ¶ 13); *see also* Ex. FFFF (Map of Zona Sur on

October 13, 2003).

302.     **Animas Valley**:  The morning of October 13, Bolivian soldiers, who had camped

overnight in the Uni area to keep protesters from blocking roads, were ordered to move toward

Chasquipampa.  *See* Ex. M (Flores Limachi Decl. ¶¶ 4-8).  The soldiers confronted protesters,

aiming their guns at them to scare them.  *See id.* ¶¶ 8-9.  The protesters, who included men,

women, children, and babies, were unarmed.  *See* Ex. R (Sirpa Decl. ¶¶ 4-5, 8).  No civilians

were seen with arms.  *See id.* ¶¶ 8, 45; Ex. M (Flores Limachi Decl. ¶ 39).

303.     A soldier was killed by an unknown shooter.  *See* Ex. M (Flores Limachi Decl. ¶¶

10-12); *see also* Ex. Z (Antezana Dep. Tr. 96:4-16).

304.     Officers ordered soldiers to switch to lethal ammunition and "shoot anything that

move[d]."  *See* Ex. M (Flores Limachi Decl. ¶ 13).  Soldiers followed orders, shooting at fleeing

civilians and those hiding in the hills and cliffs for almost an hour.  *See id.* ¶¶ 13-15; Ex. R (Sirpa

Decl. ¶¶ 7, 10).

305.     The protesters fled into the hills, and the soldiers shot at them as they fled.  *See* Ex. R (Sirpa Decl. ¶¶ 11-14).  The soldiers were not being attacked and they did not assume a defensive position, but rather were shooting at the civilians in the open from the road.  *See id*.

306.     A helicopter arrived and replenished the soldiers' stock of lethal ammunition.  *See* Ex. M (Flores Limachi Decl. ¶ 16).  Officers told the soldiers to climb into the hills and to shoot at civilians, ordering "Whatever head you see, you need to shoot."  *Id*. ¶¶ 18-20.

307.     Officers ordered the soldiers not to stop to help wounded civilians as they took the hill.  *See id* ¶ 21.  The soldiers also captured civilians in the hills as they descended the hill, including individuals who had been shot.  *See* Ex. R (Sirpa Decl. ¶ 15); Ex. M (Flores Limachi Decl. ¶ 22).  Soldiers and officers beat some detained civilians, and took them to the military outposts where they were interrogated, beaten to the point of being bloodied, tortured, and called "fucking Indians."  Ex. R (Sirpa Decl. ¶¶ 21-24, 28, 29, 34, 36–37, 39, 40); Ex. M (Flores Limachi Decl. ¶¶ 23-24, 31-33).

308.     Plaintiff Gonzalo Mamani Aguilar witnessed the shootings of his father, decedent Arturo Mamani Mamani, and another man from his village, decedent Jacinto Bernabé Roque. *See* Ex. MM (Mamani Aguilar Dep. Tr. 90:20-25, 91:2-3, 102:10-25).

309.     Mr. Mamani Aguilar had left his home that morning to tend to his family's land, and witnessed the military positioning itself in the valley.  *See id.* at 62:2-9, 63:20-25, 64:2-8. He was unable to make it there before the gunfire began, and attempted to hide on an adjacent hilltop.  *See id*. 71:4-13.

310.     Mr. Mamani Aguilar saw Mr. Bernabé Roque attempting to hide behind some straw on the hilltop, and crawled right behind him, lying down behind a the tall straw.  *See id.* 82:23-83:3.

311.    While hiding, Mr. Mamani Aguilar saw his father on the hilltop directly across from his position, and witnessed his father get hit by a bullet.  *See id.* 74:23-75:2.

312.    Mr. Mamani Aguilar also witnessed the shooting of Jacinto Bernabé Roque.  *See id.*at 90:6-13, 91:8-13).  Mr. Mamani Aguilar testified that he was directly behind Mr. Bernabé Roque when he was shot, and was in fact so close to him that, on impact, Mr. Bernabé Roque's blood "splattered on [Mr. Mamani Aguilar's] face."  *Id.* at 90:23-91:3.  Because Mr. Mamani Aguilar was behind the decedent, he did not see the bullet enter, but witnessed the bullet exiting Mr. Bernabé Roque's body.  *See id.* at 92:14-18) (noting he "saw it coming out" and the "droplets of blood").  Further, while he did not see the exact soldier who fired the bullet that hit Mr. Bernabé Roque, he testified that he saw the military shooting "in different directions" and is sure that they were firing towards the both of them.  *See id.* at 90:17-25.

313.    **Ovejuyo**:  As soldiers left the Animas valley in military trucks to head back to their barracks through the locality of Ovejuyo and then Chasquipampa, officers repeatedly ordered them to shoot at civilians, including giving such commands multiple times to shoot at those looking out windows.  *See* Ex. M (Flores Limachi Decl. ¶¶ 25-31); Ex. R (Sirpa Decl. ¶ 32).  Officers and soldiers did shoot at civilians, including those fleeing.  *See* Ex. M (Flores Limachi Decl. ¶¶ 27-31).  One officer shot at fleeing civilians with a machine gun.  *See id.* ¶ 29.  Some soldiers did not want to shoot civilians, and shot into the air, disobeying their commanders.  *See id.* ¶¶ 27-28, 30.

314.    The same afternoon, in the locality of Ovejuyo, the military shot and killed Decedent Raúl Ramón Huanca Márquez, an elderly man who was walking on a road behind a

store by the dry riverbed.  *See* Ex. Q (Pari Decl. ¶ 8).[13]  According to his daughter, Mr. Huanca Marquez had left his home that afternoon to buy some goods at the local store.  *See* Ex. LL (Huanca Quispe Dep. Tr. 38:21-25, 39:18-24).  He was not protesting, nor was he armed or carrying any object that could be mistaken for a weapon.  *See* Ex. Q (Pari Decl. ¶ 10). Eyewitness accounts of that afternoon indicate that soldiers marched through the area, indiscriminately firing at the unarmed civilians in homes and on the road, including Mr. Huanca Márquez, who posed no threat to the military.  *See* Ex. Q (Pari Decl. ¶ 9); *see also* Ex. M (Flores Limachi ¶ 25-17); Ex. R (Sirpa Decl. ¶ 32); Ex. Y (Hayden Rpt. ¶ 153).  The soldiers intentionally shot Mr. Huanca Márquez in the abdomen, and continued firing at other civilians, leaving him to die in the street.  *See* Ex. Y (Hayden Rpt. ¶¶ 159-60); Ex. Q (Pari Decl. ¶ 13-14). Ms. Huanca Quispe found her father's body on the street after soldiers had passed through town. *See* Ex. LL (Huanca Quispe Dep. Tr. 49:20-23).

## VII.   Clear Patterns of Violence Were Repeated on all Three Days Decedents Were Killed

315.    Unarmed civilians were repeatedly targeted resulting in injuries and dozens of deaths at least six different locations on at least four different days.  See Ex. N (García Decl. ¶¶ 14, 22-25) (Sorata); Ex. S (Smith Decl. ¶¶ 18, 26) (Sorata); Ex. PP (Ramos Mamani Dep. Tr. 18:18-25) (Warisata); Ex. RR (Sánchez de Lozada Dep. Tr. 273:8-10) (May 15, 2015); Ex. U (Zabala Decl. ¶ 18, 21) (Río Seco area, El Alto); Ex. T (Soria Decl. ¶¶ 15-16, 18, 20) (Río Seco, El Alto); Ex. K (Espejo Decl. ¶ 4) (Senkata, El Alto); Ex. I (Castaño ¶¶ 19, 21-22) (Senkata, El Alto); Ex. MM (Mamani Aguilar Dep. Tr. 90:20-25, 91:2-3, 102:10-25) (Animas Valley); Ex. R (Sirpa Decl. ¶¶ 15-17) (Animas Valley); Ex. Q (Pari Decl. ¶¶ 8, 13) (Ovejuyo).

---

[13] Mr. Pari, who witnessed the shooting of Mr. Huanca Marquez, was able to identify Mr. Huanca Marquez as the victim because Mr. Pari later helped to transport Mr. Huanca Marquez's body to a nearby church.  *See* Def. Ex. 68 (Pl. Felicidad Rosa Huanca Quispe's Am. Resps. & Objs. Defs.' First Set of Interrogatories, at 7); Ex. KK (Hayden Dep. Tr. 564:13-565:19).

316.     In at least four different locations, including all areas where decedents were killed, officers gave orders to soldiers to shoot at civilians.  *See* Ex. A (Aguilar Vargas Decl. ¶¶ 18, 20, 22, 34-35); Ex. M (Flores Limachi Decl. ¶¶ 13, 20, 26, 30); Ex. J (Davis Decl. ¶ 7); Ex. P (Ortega Decl. ¶¶ 22, 25, 27).

317.     In at least four different locations, including all areas where decedents were killed, witnesses saw soldiers shoot unarmed civilians.  *See* Ex. J (Davis Decl. ¶ 7); Ex. D (Apaza Morales Decl. ¶¶ 14, 17); Ex. C (Apaza Cutipa Decl. ¶¶ 12–16); Ex. N (García Decl. ¶¶ 22-25); Ex. P (Ortega Decl. ¶¶ 11, 19-21, 28); Ex. M (Flores Limachi Decl. ¶¶ 14-15, 19, 28-30); Ex. A (Aguilar Vargas Decl. ¶¶ 19, 20-22, 31, 38, 45; Ex. R (Sirpa Decl. ¶¶ 10, 12-14); Ex. Q (Pari Decl. ¶ 13); Ex. MM (Mamani Aguilar Dep. Tr. 90:6-13, 91:8-13); Ex. S (Smith Decl. ¶ 18); Ex. QQ (Rojas Mamani Dep. Tr. 75:17-76:21, 83:17-86:25).

318.     Defendants had knowledge of the civilian deaths, but continued to deploy the military as part of their plan to suppress civilian opposition.  *See* Ex. B (Albarracín Decl. ¶¶ 32-33); Ex. JJJ (Transcript, Audio Recording of Testimony of Roberto Claros Flores, at 1-4, Trial of Responsibilities, Sucre, Bolivia (Sept. 16, 2009)); *see also* Ex. CC (Berindoague Dep. Tr. 155: 2-13); Ex. B (Albarracín Decl. ¶ 38); Ex. L (del Granado Decl. ¶ 21); Ex. G (Calla Decl. ¶ 12); Ex. RR (Sánchez de Lozada Dep. Tr. 96:15-22) (May 14, 2015).

319.     Neither the orders issued by Sánchez de Lozada, nor the implementing directives issued by the military Chain of Command in response to those orders, contained instructions to protect civilians or minimize civilian casualties.  *See* Def. Ex. 6 (DEF-0000069) (Supreme Decree 27209); Def. Ex. 73 (MAMANI000262) (Directive 33/03); Def. Ex. 74 (MAMANI0000267) (Directive 34/03); Ex. W (Borrelli Rpt. ¶¶ 73, 78-79).  Such instructions would be typical, particularly in the wake of the violence of September 20.  *See* Ex. W (Borrelli

Rpt. ¶¶ 73, 78-79).  But the government failed to "specifically" discuss risks to human life.  *See* Ex. CC (Berindoague Dep. 172:25-173:25).

320.    In practice, the soldiers that were directly involved in operations in September and October 2003 received no warnings or instructions during those months that they should try to avoid civilian casualties and/or protect civilians. Ex. A (Aguilar Vargas Decl. ¶ 5).

321.    In September and October 2003, conscripts were repeatedly ordered to fire at unarmed civilians and were even punished for failing to do so.  *See id.* ¶¶ 18, 20, 22, 34-37; Ex. P (Ortega Decl. ¶¶ 22-27, 35).  Conscripts that resisted shooting at their fellow Bolivians were threatened and/or replaced, and at least one was executed by his superior officer.  *See* Ex. A (Aguilar Vargas Decl. ¶¶ 34-37); Ex. P (Ortega Decl. ¶¶ 22-27); Ex. M (Flores Limachi Decl. ¶¶ 13, 20, 26, 27, 30).  Under threat, conscripts were told to shoot at civilians; they were told to execute at least one civilian (though they secretly disobeyed the order).  *See* Ex. P (Ortega Decl. ¶¶ 22-27, 35-36).  Others simply shot into the air.  *See* Ex. M (Flores Limachi Decl.¶ ¶ 27-28).

322.    In all locations where decedents were killed, soldiers aimed at windows and shot at civilians looking out of windows.  *See* Ex. P (Ortega Decl. ¶ 19); Ex. C (Apaza Cutipa Decl.¶ 18); Ex. A (Aguilar Vargas Decl. ¶¶ 20-22); Ex. R (Sirpa Decl. ¶ 32).  Officers gave orders to shoot at residents' windows.  *See* Ex. A (Aguilar Vargas Decl. ¶¶ 20, 22).

323.    The main weapon used by the Bolivian military in 2003, the Assault Léger Rifle ("FAL" or "*Fusil d' Assault Léger*"), used a 7.62 caliber bullet.  *See* Ex. Y (Hayden Rpt. ¶ 43); ███████████████████████████████.  FAL rifles fire 7.62 caliber bullets, and Mauser rifles in Bolivia use a different caliber bullet.  *See* Ex. Z (Antezana Dep. Tr. 96: 4-16); Robert W.D. Ball, Mauser Military Rifles of the World 57-61 (5th ed. 2011).

324.     In four different locations, including all areas where decedents were killed, military helicopters were sighted.  *See* Ex. N (García Decl. ¶¶ 6, 18-19); Ex. S (Smith Decl. ¶¶ 13, 21); Ex. J (Davis Decl. ¶ 14); Ex. I (Castaño Decl. ¶ 16); Ex. P (Ortega Decl. ¶¶ 6, 15); Ex. A (Aguilar Vargas Decl. ¶¶ 14, 41); Ex. M (Flores Limachi Decl. ¶¶ 16, 24).  Soldiers also shot out of helicopters at unarmed civilians.  *See* Ex. N (García Decl. ¶ 22); *see also* Ex. W (Borrelli Rpt. ¶¶ 95, 126 (iv)-(v)).  Shooting at unarmed civilians from a helicopter who were fleeing and/or not participating in protests, particularly using a machine gun, "would not be an application of lethal force that falls in line with . . . . any other principle of the Manual [on Use of Force] (or accepted military practice)."  Ex. W (Borrelli Rpt. ¶¶ 126(iv)-(v)).

325.     Soldiers were ordered to beat civilians, and both officers and soldiers beat civilians.  *See* Ex. P (Ortega Decl. ¶¶ 35-36); Ex. A (Aguilar Vargas Decl. ¶ 23); Ex. R (Sirpa Decl. ¶¶ 24, 28, 37); Ex. M (Flores Limachi Decl. ¶¶ 23, 32); Ex. E (Aramayo Decl. ¶¶ 34, 41).

326.     Soldiers were also repeatedly ordered to refuse assistance to wounded civilians. *See* Ex. A (Aguilar Vargas Decl. ¶ 23); Ex. M (Flores Limachi Decl. ¶ 21).

327.     Soldiers were prohibited from accessing sources of news, and were also forbidden from talking with soldiers from other regiments.  *See* Ex. A (Aguilar Vargas Decl. ¶¶ 26, 40, 42).

328.     Civilian residents of Sorata and Warisata were not seen with firearms on September 20, 2003.  *See* Ex. N (García Decl. ¶ 5); Ex. J (Davis Decl. ¶ 6); Ex. S (Smith Decl.¶ 21); Ex. A (Aguilar Vargas Decl. ¶ 45); Ex. PP (Ramos Mamani Dep. Tr. at 22:17-25, 23:1-25, 24:1-4).

329.     Civilian residents of El Alto were not seen with firearms in October 2003.  *See* Ex. A (Aguilar Vargas Decl. ¶ 45); Ex. D (Apaza Morales Decl. ¶ 12); Ex. C (Apaza Cutipa Decl.

¶ 15); Ex. I (Castaño Decl. ¶ 23); Ex. U (Zabala Decl. ¶ 10); Ex. E (Aramayo Decl. ¶ 16); Ex. P (Ortega Decl. ¶ 11).

330.    Civilian residents in the Ánimas Valley and Oveyujo were not seen with firearms in October 2003.  *See* Ex. R (Sirpa Decl. ¶ 45); Ex. M (Flores Limachi Decl. ¶ 39); Ex. Q (Pari Decl. ¶ 6).

331.    There was no armed insurgency active in Bolivia at this time, nor was any such group active in the protests in September and October of 2003.  See Ex. L (del Granado Decl. ¶ 31); ███████████████████████████ Ex. III (Transcript, Audio Recording of Testimony of Jorge Botelo Monje at 1-2, Trial of Responsibilities, Sucre, Bolivia (Aug. 18, 2010)); Ex. MMM (Transcript, Audio Recording of Testimony of Fernando Uribe Encinas, at 3-4, Trial of Responsibilities, Sucre, Bolivia (Aug. 18, 2010)).

332.    Once the military ceased involvement in the protests, there were no more persons injured or dead.  *See* Ex. L (del Granado Decl. ¶ 31).

333.    Consistent with Defendants' original plan, troops were brought in from Eastern Bolivia to carry out operations.  *See* Ex. M (Flores Limachi Decl. ¶ 35).  These troops were physically different than indigenous communities in the *altiplano* and La Paz, and were typically taller and lighter skinned.  *See* Ex. Q (Pari Decl. ¶ 15).  They spoke with different dialect and accent.  *See id.* ¶ 13; *see also* Ex. E (Aramayo Decl. ¶ 36).  Soldiers who were brought in from Santa Cruz in the east of Bolivia were told that they were going to "kill '*kollas*'"—"an insulting term for people from the *Altiplano*."  Ex. A (Aguilar Vargas Decl. ¶¶ 23, 43); *see also* Ex. P (Ortega Decl. ¶¶ 19, 33, 37); Ex. R (Sirpa Decl. ¶ 40); Ex. E (Aramayo Decl. ¶ 36).

**VIII.   By mid-October, Defendants' Ongoing Use of Lethal Force Against Civilians Was Rejected by the Majority and/or Widespread Swaths of the Bolivian Population as Well as Government Officials, Leading to Their Resignation**

334.    By October 13, members of the government coalition and government officials began to abandon the government due to the violent path chosen by Defendants.  *See* Ex. CC (Berindoague Dep. Tr. 185:16-186:22); Ex. GG (Eastman Dep. Tr. 129:22-130:20); ███

████████████████████  Public opposition to the violence and demands for Sánchez de Lozada's resignation began to grow, including by civil leaders and representatives from across the social strata. Ex. B (Albarracín Decl. ¶ 39); Ex. G (Calla Decl. ¶ 16); Ex. L (del Granado Decl. ¶ 30).  Mass demonstrations took place in the city of La Paz from the afternoon of Tuesday, October 14, until the evening of Friday, October 17, when Sánchez de Lozada resigned and the Defendants left the country.  *See* Ex. L (del Granado Decl. ¶ 31); Def. Ex. 59 (Sánchez Berzaín Dep. Tr. 260:2-262:12).

335.    On October 15, the Armed Forces published a press release, affirming that the Armed Forces were under the command of the President and took orders from the Minister of Defense, and that they "reiterated their subordination to, compliance with and support for the President of the Republic and Captain General of the Armed Forces, Gonzalo Sánchez de Lozada."  Ex. IIII (MAMANI0022393T) (National Armed Forces, Press Release).

336.    In 2011, high-ranking military commanders and officers, along with government officials that reported directly to the Defendants, were convicted in Bolivia for their involvement in the Defendants' plan and associated crimes against civilians.

## IX.    Relevant Additional Bolivian Law

337.    Article 14 of the Code of Criminal Procedure establishes that a civil action arises "from the commission of every crime."  Ex. AAA (Bol. Code Crim. P., art. 14); *see also id.* (Bol. Code Crim. P., art. 36).

338.    Article 20 of the Code of Criminal Procedure defines both direct and indirect perpetrators, as well as co-conspirators who provide assistance without which the "unlawful

action could not have been committed."  Def. Ex. 75 (Bol. Code Crim. P., art. 20); *see also* Ex. HHH (Supreme Judicial Court of the Plurinational State of Bolivia, Judgment of the Trial of Responsibilities (Oct. 4, 2011) (ruling on Art. 20 of the CCP); *see also* Ex. GGG (Bolivian Plurinational Constitutional Judgment 0216/2015-S2 (Feb. 25, 2015)).

339.    The Family Code states that civil and not religious marriages are recognized under the law.  *See* Ex. ZZ (Bolivian Family Code, arts. 1 (Apr. 4, 1988) and 42 (Aug. 23, 1972)).

340.    Article 159 of the Family Code states that free conjugal unions produce similar effects as marriage, and that "the norms that regulate the effects of marriage" apply to such relationships.  *See* Ex. OOO (Verástegui Rpt. ¶ 33).

341.    The 2009 Constitution defines marriage and civil unions as equal: "Free or de facto unions […] shall produce the same effects as a civil marriage."  Ex. WW (Bolivian Constitution, art. 63 (2009)); *see* Ex. FFF (Bolivian Constitutional Judgment 1731/2010-R on applicability of provisions); *see also* Exs. DDD and EEE (Bolivian Constitutional Judgments on free or de facto unions).

342.    Articles 1061-1064 of the Civil Code states that, for purposes of inheritance, parties in a free conjugal union have the same rights and protections as married spouses.  *See* Ex. XX (Bolivian Civ. Code, arts. 1061-64 (Aug. 6, 1975)).

343.    Law 3955 defers to existing hereditary laws and establishes financial assistance and benefits for victims who were injured, and heirs of victims who died during events of 2003.  *See* Ex. BBB (Bolivian Law No. 3955, arts. 1-2, 6-7 (Nov. 6, 2008)).

344.    Supreme Decree No. 29884 regulates Law 3955 and establishes that the benefit for the heirs of deceased victims is a single and final lump sum payment for the entire group of beneficiaries.  *See* Ex. CCC (Bolivian Supr. Decree No. 29884 (Jan. 14, 2009)).

345.    The Code of Civil Procedure states that default is possible only against a "duly summoned party," Ex. YY (Bolivian Code Civ. P., art. 68) (Aug. 6, 1975), and establishes that a person who resides outside of Bolivia must be summoned "by commission through international letters rogatory […]".  *Id.* art. 123.

Dated: December 29, 2017          Respectfully submitted,
        Miami, Florida

                                  By*:*    */s/ Ilana Tabacinic*
                                  Ilana Tabacinic (Florida Bar No. 57597)
                                  AKERMAN LLP
                                  Three Brickell City Centre
                                  98 Southeast Seventh Street, Suite 1100
                                  Miami, FL 33131
                                  Tel: (305) 374-5600
                                  Fax: (305) 374-5095
                                  Email: ilana.tabacinic@akerman.com


                                  *Counsel for Plaintiffs*

*Counsel for Plaintiffs*

| | |
|---|---|
| Ilana Tabacinic (Florida Bar No. 57597)<br>AKERMAN LLP<br>Three Brickell City Centre<br>98 Southeast Seventh Street, Suite 1100<br>Miami, FL 33131<br>Tel: (305) 374-5600<br>Fax: (305) 374-5095<br>Email: ilana.tabacinic@akerman.com | Steven H. Schulman (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>Robert S. Strauss Building<br>1333 New Hampshire Avenue NW<br>Washington, DC 20036<br>Tel:  (202) 887-4000<br>Fax: (202) 887-4288<br>E-mail: sschulman@akingump.com |
| Judith Brown Chomsky (*pro hac vice*)<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>Post Office Box 29726<br>Elkins Park, PA  19027<br>Tel:  (215) 782-8367<br>Fax:  (215) 782-8368<br>E-mail: judithchomsky@icloud.com | Joseph L. Sorkin (*pro hac vice*)<br>Jennifer L. Woodson (*pro hac vice*)<br>Saurabh Sharad (*pro hac vice*)<br>Christine Doniak (*pro hac vice*)<br>Harley Raff (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>Tel:  (212) 872-1000<br>Fax: (212) 872-1002<br>E-mail: jsorkin@akingump.com<br>E-mail: jwoodson@akingump.com<br>E-mail: ssharad@akingump.com<br>E-mail: cdoniak@akingump.com<br>E-mail: hraff@akingump.com |
| Beth Stephens (*pro hac vice*)<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway<br>Seventh Floor<br>New York, NY 10012<br>Tel:   (212) 614-6431<br>Fax:  (212) 614-6499<br>E-mail: beth.stephens@rutgers.edu | Zak Franklin (*pro hac vice*)<br>Erica Abshez Moran (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>1999 Avenue of the Stars, Suite 600<br>Los Angeles, CA 90067<br>Tel:  (310) 229-1000<br>Fax: (310) 229-1001<br>E-mail: zfranklin@akingump.com<br>E-mail: emoran@akingump.com |
| David Rudovsky (*pro hac vice*)<br>KAIRYS, RUDOVSKY, MESSING &<br>FEINBERG LLP<br>718 Arch Street, Suite 501 South<br>Philadelphia, PA 19016<br>Tel: (215) 925-4400<br>Fax: (215) 925-5365<br>E-mail: drudovsk@law.upenn.edu | Rubén H. Muñoz (*pro hac vice*)<br>Jason Weil (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>Two Commerce Square<br>2001 Market Street, Suite 4100<br>Philadelphia, PA 19103<br>Tel:  (212) 965-1328<br>Fax: (215) 965-1210<br>E-mail: rmunoz@akingump.com<br>E-mail: jweil@akingump.com |

| | |
|---|---|
| Paul Hoffman (*pro hac vice*)<br>SCHONBRUN, SEPLOW,<br>HARRIS & HOFFMAN, LLP<br>723 Ocean Front Walk<br>Venice, CA 90201<br>Tel: (310) 396-0731<br>Fax: (310) 399-7040<br>E-mail: hoffpaul@aol.com | Tyler R. Giannini (*pro hac vice*)<br>Susan H. Farbstein (*pro hac vice*)<br>Thomas Becker (*pro hac vice*)<br>INTERNATIONAL HUMAN RIGHTS CLINIC,<br>Human Rights Program<br>Harvard Law School<br>Pound Hall 401, 1563 Massachusetts Avenue<br>Cambridge, MA 02138<br>Tel: (617) 495-9362<br>Fax: (617) 495-9393<br>E-mail: giannini@law.harvard.edu<br>E-mail: sfarbstein@law.harvard.edu<br>E-mail: thomasbainbecker@gmail.com |

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2017, I electronically filed the foregoing

Counterstatement of Material Facts with the Clerk of the Court using CM/ECF.  I also certify that

the foregoing Counterstatement of Material Facts is being served this day on counsel of record

on the attached Service List either via transmission of Notice of Electronic Filing generated by

CM/ECF or via e-mail.

*/s/ Ilana Tabacinic*
Ilana Tabacinic

## <u>SERVICE LIST</u>

Ana C. Reyes
Stephen D. Raber
James E. Gillenwater
Suzanne M. Salgado
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (facsimile)
areyes@wc.com
sraber@wc.com
jgillenwater@wc.com
ssalgado@wc.com

Evan B. Berger
BECKER & POLIAKOFF, P.A.
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL  33301
(954) 364-6055
(954) 985-4176 (facsimile)
eberger@bplegal.com