UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22459-CIV-COHN/SELTZER
CASE NO. 08-21063-CIV-COHN/SELTZER

ELOY ROJAS MAMANI, et al.,

    Plaintiffs,

v.

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

    Defendant in No. 07-22459,

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,

    Defendant in No. 08-21063.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DANIEL M. GOLDSTEIN**

**THIS CAUSE** is before the Court upon Defendants' Motion to Exclude the Testimony of Daniel M. Goldstein [DE 359 in Case No. 07-22459; DE 336 in Case No. 08-21063] ("Motion").[1] The Court has considered the Motion, Plaintiffs' Response and Defendants' Reply, the parties' related submissions, and the record in these cases, and is otherwise advised in the premises. For the reasons stated below, Defendants' Motion is granted in part and denied in part.

---

[1] All docket citations refer to Case No. 07-22459, which was consolidated with Case No. 08-21093 in May 2008. See DE 68.

1

## BACKGROUND[2]

Plaintiffs proffer Daniel M. Goldstein, a cultural anthropologist, as an expert on the culture and history of Bolivia's indigenous populations. See Defendants' Ex. A ¶¶ 1-3 (Opening Expert Report of Daniel M. Goldstein ("Goldstein Report")).[3] Dr. Goldstein is a professor of anthropology at Rutgers University. Id. ¶ 7. He has spent many years studying Bolivia and has "authored or edited four books on Bolivia, law, politics, violence, human rights, and social protest." Id. ¶ 9. His expert opinions are summarized below:

1. "The [2003 protests] w[ere] part of Bolivia's culture of protest—a long history of demonstration against and resistance to the dominance of minority rule over the indigenous majority in Bolivia." DE 378 at 3 (citing Goldstein Report ¶¶ 13, 25-35).

2. "The [2003 protests] were not instigated, coordinated, or led by any one opposition leader, groups of leaders, or political party, but instead the organization of the demonstrations was decentralized and 'local communities were the principal actors and decision makers' of the demonstrations." Id. (citing Goldstein Report ¶¶ 13, 36-48).

3. "The [2003 protests] were largely economic in nature, and an 'authentic popular uprising against economic inequality in Bolivia.'" Id. (citing Goldstein Report ¶¶ 13, 49-54).

---

[2] The Court's Order Denying Defendants' Joint Motion for Summary Judgment contains a comprehensive discussion of the facts of these cases, which will not be repeated here. See DE 408 at 2-24.

[3] Defendants' exhibits are attached to the Declaration of Ana C. Reyes in Support of Defendants' Motion to Exclude Testimony of Daniel M. Goldstein. DE 359-2.

Put simply, Plaintiffs wish to have Dr. Goldstein opine on the unique "culture of protest" in Bolivia and, relatedly, "the way indigenous communities are decentralized and act independently to make decisions about joining protests." Id. at 12. Such testimony would serve as his springboard to offer specific conclusory opinions about the nature and purportedly peaceful character of the protests in September and October 2003. See Goldstein Report ¶¶ 13, 25-35. For instance, Dr. Goldstein claims that "the techniques employed by protestors in the Gas War—use of dynamite and road blockades most prominently—are common features of protest . . . . [E]x-miners use dynamite (always present as a tool in mine work) not as a weapon but as a kind of public address system." Id. ¶ 35. And he considers it "highly unlikely that many protestors had firearms," because "[i]n all [his] years in Bolivia, [he] ha[s] never seen or heard of a gun of any sort in a Bolivian home, and it is highly unlikely that firearms were widespread among protestors in the Gas War." Id.

Defendants move to preclude Dr. Goldstein's testimony for failing to satisfy the standards set forth in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. They offer three primary arguments, which track the Daubert elements. First, Defendants claim that Dr. Goldstein is not qualified to opine on the protests of September and October 2003, because his fact-specific conclusions about those events are not anthropological in nature. DE 359-1 at 5-7. Second, Defendants argue that Dr. Goldstein failed to observe an acceptable methodology in reaching his opinion, since, contrary to standard practice for cultural anthropologists, he performed no field work and instead relied exclusively upon secondary sources. Id. at 8-15. And third, Defendants contend that

Dr. Goldstein's opinion would not prove helpful to the trier of fact, since the limited portion of the opinion that he is arguably qualified to offer—his general view of Bolivian history and culture—is irrelevant to the narrow issues in dispute, namely, whether the deaths of Plaintiffs' eight decedents meet the Torture Victim Protection Act's ("TVPA") definition of an extrajudicial killing, and, if so, whether Defendants can be held vicariously liable for them. Id. at 16.

Plaintiffs respond, *inter alia*, that cultural anthropology as a practice is broader than Defendants would characterize it, DE 378 at 4-6, that Dr. Goldstein's methodology was proper since he relied on both secondary sources and his own long history of studying Bolivia, id. at 9-11, and that Dr. Goldstein's opinion would aid the jury by providing important contextual background information, id. at 12.

## **LEGAL STANDARD**

In applying Rule 702,[4] district courts are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. This critical gatekeeping function "ensure[s] that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc.,

---

[4] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

4

400 F.3d 1286, 1291 (11th Cir. 2005) (some internal quotation marks omitted). To perform this gatekeeping function, district courts engage in a "rigorous inquiry" to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id. at 1291-92. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Id. at 1292.

In addressing the reliability prong of the Daubert analysis, the Supreme Court has identified four factors that the district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. United Fire & Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1341 (11th Cir. 2013) (citing Daubert, 509 U.S. at 593-94). Yet, "these factors are not exhaustive and are intended to be applied in a 'flexible' manner." Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).

Finally, even expert testimony that passes muster under Rule 702 may be excluded if irrelevant or if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see Allison v.

McGhan Med. Corp., 184 F.3d 1300, 1309-10 (11th Cir. 1999). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc).

## DISCUSSION

### I.  DAUBERT PRONG 1: EXPERT QUALIFICATIONS

Defendants concede Dr. Goldstein's qualifications to offer the first of his three findings: that Bolivia has a "culture of protest."[5] DE 359-1 at 6 n.4. But they contend that he may not offer his second and third findings, since cultural anthropology is merely the study of "cultural traits and behavior patterns of a particular group of people of a given ethnicity or nationality." Id. at 5 (quoting Jinro Am. Inc. v. Secure Invs., Inc., 266 F.3d 993, 1006 (9th Cir. 2001)). It is not, in other words, a discipline that would grant one of its practitioners any unique insight into the particular circumstances surrounding events like the 2003 protests. Plaintiffs respond that "[s]uch a restrictive view . . . would narrow the entire field of anthropology." DE 378 at 5. They argue that "Dr. Goldstein's second finding regarding the decentralized organizational culture of decision-making structures surrounding protests in Bolivia is clearly an analysis of a 'behavior pattern,'" and that "Defendants erroneously separate Dr. Goldstein's conclusion [that the protests

---

[5] Defendants do argue that, while Dr. Goldstein may be knowledgeable about certain aspects of Bolivian society, his expertise is less relevant to these cases, since his past studies have focused on the population in and around Cochabamba, while the events at issue here occurred in Sorata, Warisata, El Alto, and La Paz. DE 359-1 at 6-7. But, given the extremely general nature of the portion of Dr. Goldstein's first Opinion that the Court will allow him to present, see Section III, infra, the Court finds that his general knowledge of Bolivia sufficiently qualifies him.

6

were decentralized] from his established expertise and years of study of how Bolivian communities are organized . . . ." Id. at 6.

Defendants have the more persuasive argument. While the "organizational culture" of Bolivian protest in general may constitute a "behavioral pattern" appropriate for testimony from an expert anthropologist, Plaintiffs have not shown that Dr. Goldstein is qualified to describe any specific features of the events of late 2003. This deficiency is evident in the Goldstein Report. While Dr. Goldstein provides some background information about Bolivian culture, his key conclusions are based upon a recounting of the factual circumstances surrounding the 2003 protests. See, e.g., Goldstein Report ¶ 40 ("Local leaders, in consultation with what they called their 'bases' (i.e., their local constituents) deliberated as to their interests and whether or not to join with the growing movement that was emerging across the country. One by one, these groups determined to take to the streets to demand an end to the plans to export gas to the United States through a Chilean port.") Recitations such as these—which form the meat of the Goldstein Report—are not analyses of unique behavioral patterns or traits; they are hearsay accounts of specific events.[6] Cf. Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) ("The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events.")

Accordingly, the Court finds that Dr. Goldstein's second and third opinions fail the first prong of the Daubert standard.

---

[6] As source material for these factual descriptions, Dr. Goldstein cites a series of secondary scholarly works, media reports, diplomatic cables, and discovery documents provided to him by Plaintiffs' counsel. Goldstein Report at ¶¶ 23-24. But, while Rule 703 affords expert witnesses a degree of flexibility with respect to the rule against hearsay, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) (internal quotation marks omitted).

## II. DAUBERT PRONG 2: RELIABLE METHODOLOGY

Defendants argue that the proffered expert testimony fails the second prong of the Daubert standard, because, in formulating his opinion, Dr. Goldstein did not employ acceptable methodology for a cultural anthropologist. DE 359-1 at 8-11. As is facially apparent from the Goldstein Report, Defendants are correct.

The Supreme Court has explained that:

**The objective of [a district court's gatekeeping function] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.**

Kumho Tire, 526 U.S. at 152. Under this standard, Dr. Goldstein's analysis is woefully deficient. Early in the Goldstein Report, he provides a helpful primer on the nuts and bolts of cultural anthropology as a discipline. Goldstein Report ¶¶ 15-22. As he explains, cultural anthropology consists of a process in which the anthropologist spends an extended period of time living amongst the studied population. Id. ¶¶ 16-17. If unfamiliar with the local language, the anthropologist will learn it and begin participating in local customs, generating daily field notes in the process. Id. ¶¶ 16-19. This immersive experience culminates in the anthropologist's performing a series of interviews with locals. Id. ¶¶ 18-20. Dr. Goldstein notes that, for each of the books he has published on Bolivia, he conducted "upwards of 100 interviews with people ranging from the poorest local women to representatives of the municipal and federal governments, to gain their differing perspectives . . . ." Id. ¶ 20. Cultural anthropologists also consult secondary documents to "supplement[ ] this first-hand data collection." Id. ¶ 21.

The methodology discussed above stands in stark contrast to that Dr. Goldstein actually practiced in preparing his Report. By his own admission, the secondary sources Dr. Goldstein consulted could not "supplement" his first-hand data collection, because he performed no first-hand data collection. Id. ¶¶ 23-24. He did not travel to Bolivia, nor did he interview any witnesses to (or participants in) the events of late 2003. The sole interview he conducted was of an American journalist in Philadelphia, who was not herself a first-hand witness to those events. Id. ¶ 23. At his deposition, Dr. Goldstein conceded that, in preparing his Report, he utilized a methodology entirely distinct from that which he normally follows. When asked whether he "typically provide[s] opinions on peoples' motivations without ever talking to those people," he responded: "If I'm doing ethnographic work, no. If I'm writing an expert report, yes." Defendants' Ex. B at 113:12-18 (Daniel M. Goldstein Deposition Transcript ("Goldstein Dep. Tr.")). Such practice flies in the face of the Supreme Court's admonition that testifying experts must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

Plaintiffs argue that Dr. Goldstein's methodology was sufficient. They note that, in addition to performing field research, cultural anthropologists also consult secondary sources. DE 378 at 9. But the problem is not with Dr. Goldstein's consulting secondary sources, it is with his doing so exclusively, without conducting any primary research at all. Next, Plaintiffs contend that Defendants' critique of the methodology overlooks Dr. Goldstein's reliance on his extensive experience studying Bolivia. Id. But as discussed in Section I, *supra*, while that past experience may allow him to opine on Bolivian culture generally, it does not qualify him to testify regarding the 2003 protests (which he

concededly has never studied directly).  Finally, Plaintiffs claim that: "With no further authority, Defendants assert that evaluating a documentary record is inconsistent with accepted anthropological methods."  Id. at 10.  This assertion misses the mark.  The authority Defendants rely upon is Dr. Goldstein himself, whose Report, as noted above, emphasizes the critical importance of field work to the practice of cultural anthropology.

Accordingly, the Court finds that Dr. Goldstein's proffered testimony fails the second prong of the Daubert standard.

### III.    DAUBERT PRONG 3: HELPFULNESS TO THE TRIER OF FACT

As addressed in Sections I and II, *supra,* Dr. Goldstein's opinions regarding the specific events of September and October 2003 fail the first two prongs of the Daubert standard, leaving him qualified to offer, if anything, only a portion of his first opinion: that Bolivia has a unique "culture of protest."  Goldstein Report ¶ 13.  The Court finds that this limited opinion—stripped of any reference to the events of September and October 2003—(barely) passes muster under the Daubert standard.

Defendants argue that testimony about the culture of protest would not aid the trier of fact, and is therefore inadmissible pursuant to Rule 702(a) (requiring that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue").  While the Court agrees with Defendants that "[t]he question for the litigation is whether civilians were killed extrajudicially by state actors—as opposed to accidentally, negligently, or by non-state actors, and, if so, whether Defendants are vicariously liable under the TVPA," it finds that testimony about the culture of protest could potentially assist the jury.  It could, for instance, make the jury slightly more inclined to believe that Defendants would have anticipated mass protests in response to their plan to export

10

gas and, therefore, more inclined to believe that Defendants would have enacted a plan to forcefully quell the protests. The Court cautions Plaintiffs, however, that this testimony is highly circumstantial, minimally relevant, and appears to overlap completely with testimony to be offered by Plaintiffs' other anthropology expert, Dr. Carwil R. Bjork-James. While the Court will allow Plaintiffs to present expert testimony regarding this unique aspect of Bolivian culture, it will not permit the trial to devolve into an extended lecture on the history of Bolivian protest. See Fed. R. Evid. 403 (Permitting exclusion of evidence "it its probative value is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence.").

## CONCLUSION

In light of the foregoing, it is thereupon **ORDERED AND ADJUDGED** that Defendants' Motion [DE 359 in Case No. 07-22459; DE 336 in Case No. 08-21063] is **GRANTED in part and DENIED in part**. Daniel M. Goldstein is precluded from providing expert testimony in these cases regarding his Opinions 2 and 3 and regarding any aspect of his Opinion 1 that addresses the specific events of September and October 2003.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 22nd day of February, 2018.

_____
JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF