UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22459-CIV-COHN/SELTZER
CASE NO. 08-21063-CIV-COHN/SELTZER

ELOY ROJAS MAMANI, et al.,

    Plaintiffs,

v.

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

    Defendant in No. 07-22459,

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,

    Defendant in No. 08-21063.

_____/

## ORDER GRANTING DEFENDANTS' MOTION
## TO EXCLUDE TESTIMONY OF CARWIL R. BJORK-JAMES

    **THIS CAUSE** is before the Court upon Defendants' Amended Motion to Exclude the Bjork-James Database and Opinions [DE 399 in Case No. 07-22459; DE 374 in Case No. 08-21063] ("Motion").[1] The Court has considered the Motion, Plaintiffs' Response and Defendants' Reply, the parties' related submissions, and the record in these cases, and is otherwise advised in the premises. For the reasons stated below, Defendants' Motion is granted.

---

[1] All the parties' filings concerning Defendants' Motion are redacted versions that were also filed unredacted and under seal. For the sake of efficiency, consistency, and clarity, the Court will cite to the redacted filings where possible. The Court has redacted references to certain materials filed under seal in connection with Defendants' Motion that were designated by the parties as confidential. The Court has simultaneously filed an unredacted version of this Order under seal, for viewing by the parties and the Court only. Additionally, all docket citations refer to Case No. 07-22459, which was consolidated with Case No. 08-21093 in May 2008. See DE 68.

1

Plaintiffs proffer Carwil R. Bjork-James as an expert on Bolivian political culture. See Defendants' Ex. 2 ¶¶ 1-3 (Opening Expert Report of Carwil Bjork-James ("Bjork-James Report")).[3] Dr. Bjork-James is an assistant professor of anthropology at Vanderbilt University. Id. ¶ 3. His dissertation fieldwork "consisted of twelve months of ethnographic observation, oral history interviews, and documentary evidence collection in Bolivia," during which he "consulted and interviewed social movement leaders and protest participants in Cochabamba, La Paz, and Sucre." Id. ¶ 5. Dr. Bjork-James offers the following opinions:

A. **Bolivia has a highly contentious political culture marked by high levels of participation in protest, high levels of involvement in large grassroots organizations, frequent intervention of these organizations in matters of public policy, and the expectation that the governments will negotiate with, rather than criminalize or physically disperse, protesters.** Id. at 14.

B. **Frequent disruptive protest is the norm in Bolivia's political culture. The September-October 2003 protests were largely comprised of common elements within Bolivia's so-called repertoire of contention.** Id. at 20.

C. **Bolivian legal traditions authorize the country's widespread unionization, its variety of civil society organizations, and these organizations' unusually broad right to engage in disruptive strikes. Informally, policing and prosecutorial practice have usually respected these rights during the democratic period. When they occur, large deployment of force by the police or army may attract public criticism.** Id. at 34.

D. **The events of September and October 2003, while larger in scale than in prior years, generally involved the use of tactics within the Bolivian repertoire of contention, and were conducted with the expectation of negotiating with the Sánchez de Lozada government. Calls for the president's resignation were also consistent with longstanding political traditions.** Id. at 38.

---

[2] The Court's Order Denying Defendants' Joint Motion for Summary Judgment contains a comprehensive discussion of the facts of these cases, which will not be repeated here. See DE 408 at 2-24.

[3] Defendants' exhibits are attached to the Declaration of Ana C. Reyes in Support of Defendants' Motion to Exclude the Bjork-James Death Database and Opinions Derived From It. DE 399-2.

E. **The police and military response to the September and October 2003 protests is a quantitative outlier, far outside the general approach of Bolivian democratic governments in its lethality. This is true even though other democratically elected presidents have faced more frequent and more intense protests.** Id. at 44.

F. **In the current democratic era, other Bolivian presidents have responded to large-scale and highly disruptive protests by exercising greater restraint, avoiding or limiting bloodshed. The impulse to do so is an important part of Bolivia's post-dictatorship democratic political culture.** Id. at 47.

Opinions D, E, and F conclude, in other words, that a disproportionate degree of state-perpetrated political violence occurred during the second presidential term of Defendant Lozada. This finding is based largely upon what the parties refer to as Dr. Bjork-James's "death database" (the "Database"). See Bjork-James Report ¶¶ 27-29. The Database, which Dr. Bjork-James has spent several years assembling, lists "some 425 deaths related to political conflict [in Bolivia] since the resumption of democracy in 1982, including deaths of protestors and security forces during confrontations, assassinations, deaths of social movement participants while in state custody, accidental deaths of people engaged in protest, and incidental deaths caused by the process of conflict." Id. ¶ 28. Dr. Bjork-James concedes that the Database is a "work in progress," and that it will probably include roughly 500 deaths once complete. Id. ¶ 28; Defendants' Ex. 1 at 260:10-13 (Deposition Transcript of Carwil R. Bjork-James ("Bjork-James Dep. Tr.")). The Database is "organized to consider variables related to victims, perpetrators, cause of death, [and] domain of protest." Bjork-James Report ¶ 29. Critically, the Database purports to assign responsibility for the various killings and labels certain ones as "intentional." Id.

Defendants move to exclude testimony regarding the Database for failing to satisfy the standards set forth in Federal Rule of Evidence 702 and Daubert v. Merrell

<u>Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.  DE 399-1 at 9-15.
Their challenge is premised upon the purported unreliability of both the Database's input
data and the methodology used to assemble the Database.  <u>Id.</u>  Defendants note that
Dr. Bjork-James cannot independently vouch for the accuracy of the data, since he did
not gather the data and has made no effort to corroborate it.  <u>See, e.g.</u>, Bjork-James
Dep. Tr. at 263:25-264:19.  Nor can Dr. Bjork-James explain the methodology
underlying the Database's death attribution labels.  Those were assigned—sometimes
by his research assistant acting independently—on a discretionary basis without
consistent, defined criteria.  <u>Id.</u> at 221:6-225:14.  And Defendants specifically challenge
the accuracy of the particular source material for Dr. Bjork-James' conclusions about
the deaths attributed to the Bolivian military which occurred in September and October
2003.  DE 399-1 at 5-6.  They argue that the sources from which Dr. Bjork-James
gathered this information are heavily biased and intrinsically unreliable.  <u>Id.</u>

Defendants argue that, based upon the deficiencies in the Database, Opinions D,
E, and F should be excluded in their entirety.[4]  Plaintiffs respond that Opinions D and F
are not derived from the Database, but rather are premised on reliable secondary
sources from which Dr. Bjork-James has drawn defensible conclusions.  DE 400 at 6-8.
As for Opinion E, they contend that Defendants overstate Dr. Bjork-James's reliance on
the Database, and that, in any event, any errors in the underlying data can be
addressed through cross-examination and do not warrant exclusion of the testimony.
<u>Id.</u> at 9-13.

---

[4] Defendants do not challenge Opinions A, B, or C.

4

## LEGAL STANDARD

In applying Rule 702,[5] district courts are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. This critical gatekeeping function "ensure[s] that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (some internal quotation marks omitted). To perform this gatekeeping function, district courts engage in a "rigorous inquiry" to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id. at 1291-92. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Id. at 1292.

In addressing the reliability prong of the Daubert analysis, the Supreme Court has identified four factors that the district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the

---

[5] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

theory or technique used by the expert has been subjected to peer review and

publication; (3) whether there is a known or potential error rate of the methodology; and

(4) whether the technique has been generally accepted in the relevant scientific

community. United Fire & Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1341 (11th Cir.

2013) (citing Daubert, 509 U.S. at 593-94). Yet, "these factors are not exhaustive and

are intended to be applied in a 'flexible' manner." Id. (quoting Kumho Tire Co. v.

Carmichael, 526 U.S. 137, 141 (1999)).

Finally, even expert testimony that passes muster under Rule 702 may be

excluded if irrelevant or if "its probative value is substantially outweighed by a danger of

. . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see Allison v.

McGhan Med. Corp., 184 F.3d 1300, 1309-10 (11th Cir. 1999). Because "expert

testimony may be assigned talismanic significance in the eyes of lay jurors," a district

court "must take care to weigh the value of such evidence against its potential to

mislead or confuse." United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) (en

banc).

## DISCUSSION

Defendants argue that the proffered testimony fails the second prong of the

Daubert standard, because Dr. Bjork-James has not employed a reliable methodology

in reaching his conclusions. DE 399-1 at 9-13. And, indeed, application of the factors

identified by the Supreme Court, Daubert, 509 U.S. at 593-94, starkly illustrates the

flawed nature of the Database and, by extension, any opinions derived from it.

## I.    THE DEATH DATABASE

The Database's methodology has not been tested, nor could it be tested.  In fact, the Court fails to see how the Database is the product of any defined methodology at all.  Dr. Bjork-James has not personally investigated or corroborated the circumstances surrounding any of the logged deaths.  See, e.g., Bjork-James Dep. Tr. at 263:25-264:19.  Instead, he has simply gathered secondhand information from various published sources and compiled it in a spreadsheet.  Id.  And if such a practice were even proper for an expert (whose role is to provide testimony based upon specialized "knowledge, skill, experience, training, or education," Fed. R. Evid. 702), Defendants have pointed to several compelling reasons to question the reliability of much of the collated information.  First, Dr. Bjork-James concedes that the Database is incomplete.  It currently lists 425 deaths, but will ultimately grow to roughly 500.  Bjork-James Report ¶ 28.  In other words, 75 out of 500 final data points (a full fifteen percent of the complete set) are missing.  Nor has Dr. Bjork-James taken the necessary steps to ensure the accuracy of the data he has compiled.  One particular exchange at his deposition highlights this failing:

> **Q: Let me ask you this: Is there any distinction drawn on this database between a state-perpetrator attributed death that you've determined using an unreliable source, and a state-perpetrator attributed death that you've characterized based on a reliable source?**
>
> **A: At the moment, there is space within this database to examine this question, but we have not fully utilized that space.**
>
> **So we've created a way of assessing or rating . . . perpetrator certainty, but there's a lot of empty space in that column, precisely because what we prioritized doing over the past six months is getting as many people into the database as possible and *not doing the follow-up work of finding all investigations about each of the people listed* in the database.**

**It is part of the *longer intention of the research plan* to move a lot of these things from, as they're listed now, reported to investigated or convicted and other things like that, but we have – *I have not had the money or the time to either get my [research assistant] or a larger team of [research assistants] to go through and look for all investigations of everyone in here.***

Bjork-James Dep. Tr. at 228:19-229:21 (emphasis added).

Thus, Dr. Bjork-James admittedly has not audited his Database to ensure that its contents (based entirely on secondhand information) are accurate. Yet, he acknowledged later in his deposition that he would need to perform such an audit before sharing his work with other members of his field or submitting it for peer review. Id. at 267:21-268:17; cf. Daubert, 509 U.S. at 594 ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is based."). Such a discrepancy between the rigor employed by a testifying expert and that which would characterize the practice of an expert in the field is strictly proscribed by the Daubert doctrine. See Kumho Tire, 526 U.S. at 152 (The district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

This problem is compounded by the fact that Dr. Bjork-James cannot name a defined set of criteria that he consistently followed in formulating his critical death attribution labels. Bjork-James Dep. Tr. at 221:6-225:14. And he further concedes that the "notes" column of his Database—the portion which contains qualitative descriptions of how and why he made his attribution determinations—has not yet been populated for many of the listed deaths. Id. at 222:3-19. He claims that these omissions will be rectified down the road, when he performs a "number of future research steps." Id.

Moreover, concerns regarding the Database's accuracy are particularly acute with respect to the deaths that took place in September and October 2003, which Dr. Bjork-James labels "intentional" killings and attributes to the Bolivian military. He identifies four sources upon which he primarily relied in gathering data pertaining to those deaths. They include: (1) a book called *Hacer Justicia*, written by the Bolivian attorney representing Plaintiffs, (2) Plaintiffs' Amended Complaint in this case, (3) the request for the extradition of Defendants made by the Evo Morales government, and (4) ██████████████████████████. DE 399-1 at 5-6; Bjork-James Dep. Tr. at 220:17-25, 251:8-15, 254:24-255:22.

Defendants argue persuasively that the first three sources are intrinsically partial to Plaintiffs. DE 399-1 at 5-6, 11-14. Allowing Dr. Bjork-James to testify about such a critical issue in this case based upon little more than his review of material written by Plaintiffs' counsel and by a government openly hostile to Defendants would be to sanction his use as a vehicle for introducing skewed hearsay testimony. Cf. Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." (internal quotation marks omitted)); Harrison v. Royal Caribbean Cruises, Ltd., 2013 WL 11316997, at *3 (S.D. Fla. Nov. 8, 2013) (excluding expert testimony that would have "merely recite[d] counsel's legal and factual conclusions"). ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

## II. OPINIONS D, E, and F

Defendants argue that, because the Database fails to pass muster under the Daubert standard, Opinions D, E, and F are, *a fortiori*, inadmissible. DE 399-1 at 14-15. Plaintiffs respond that any problems with the Database infect only Opinion E, since Opinions D and F are not derived from the Database. DE 400 at 6-8. As for Opinion E, they maintain that Defendants overstate its reliance on the Database. Id. at 9-11.

The Court finds that Opinions E and F are largely dependent upon the Database. Both purport to draw historical comparisons between the degree of violence perpetrated by the government of Defendant Lozada in September and October 2003 and that perpetrated by other Bolivian governments facing disruptive protests, with the data underlying such comparison having been drawn from the Database. Dr. Bjork-James admitted as much in his deposition.[6] Bjork-James Dep. Tr. 306:6-17, 310:8-14. As such, Opinions E and F and any derivative testimony are inadmissible under Rule 702 and Daubert. See Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1341 (11th Cir. 2010) ("[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." (quoting McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1245 (11th Cir. 2005))). As for Opinion D, the Court agrees with Plaintiffs that it does not primarily rely upon the Database, yet concludes that it is inadmissible nonetheless.[7]

Rule 702(a) provides that admissible expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Opinion D concludes, in

---

[6] The Bjork-James Report cites the autobiography of former Bolivian President Carlos Mesa, as well as other statements from past Bolivian presidents regarding their own conduct, as support for the conclusions in Opinion F. Bjork-James Report ¶¶ 101-06. But even if the Court were to assume that these sources, rather than the Database, were the primary contributors to Opinion F, admitting that Opinion would, once again, simply allow Dr. Bjork-James to serve as a conduit for inadmissible hearsay. Cf. Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013).

[7] Dr. Bjork-James testified that Opinion D relies upon the Database "to a limited extent." Bjork-James Dep. Tr. at 306:6-14.

essence, that the tactics of civil disobedience on display in September and October 2003 mirrored those employed in prior rounds of Bolivian protest. Plaintiffs, as the parties offering the expert testimony, bear the burden of demonstrating its admissibility. Rink, 400 F.3d at 1292. The Court finds that they have not met this burden, since nowhere do they explain—nor can the Court divine on its own—how a comparison between the key features of the 2003 protests and previous protests would aid the jury in resolving any disputed factual issue.

These cases are not a general referendum on the administration of Defendant Lozada. The narrow questions at issue are whether the deaths of the Plaintiffs' eight specific decedents meet the TVPA's definition of "extrajudicial killing," and, if so, whether Defendants can be held vicariously liable for them. The Court fails to see how testimony regarding Opinion D would impact those determinations one way or the other. Accordingly, Opinions D, E, and F are inadmissible under Rule 702 and Daubert.[8]

## CONCLUSION

In light of the foregoing, it is thereupon **ORDERED AND ADJUDGED** that Defendants' Motion [DE 399 in Case No. 07-22459; DE 374 in Case No. 08-21063] is **GRANTED**. Carwil Bjork-James is precluded from providing expert testimony as to his Opinions D, E, and F.

---

[8] Defendants also lodge a Rule 403 challenge to the expert opinion as it pertains to conclusions about the deaths in September and October 2003. DE 399-1 at 15-19. They argue that Dr. Bjork-James cannot identify any factual support for his attribution of certain deaths to the Bolivian military. Id. at 16. And they note that his conclusion that various killings were intentional is particularly flawed, since intent is an inherently nuanced, qualitative question, inappropriate for expert testimony. Id. at 15. Moreover, they contend that Dr. Bjork-James has used a definition of intent at odds with the governing legal standard in this case. Id. at 17-18. In these circumstances, Defendants contend that any testimony from Dr. Bjork-James regarding specific deaths would prove unduly confusing and prejudicial. Id. at 17-19. The Court will not address the Rule 403 challenge, since it finds that the arguments are largely—and more appropriately—encompassed within the Rule 702 challenge, and that the Court's Daubert analysis resolves the issue in favor of Defendants.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, this 26th day of February, 2018.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF