UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22459-CIV-COHN/SELTZER
CASE NO. 08-21063-CIV-COHN/SELTZER

ELOY ROJAS MAMANI, et al.,

    Plaintiffs,

v.

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

    Defendant in No. 07-22459,

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,

    Defendant in No. 08-21063.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
AMENDED MOTION TO EXCLUDE TESTIMONY OF ALLEN BORRELLI**

**THIS CAUSE** is before the Court upon Defendants' Amended Motion to Exclude the Testimony of Allen Borrelli [DE 362 in Case No. 07-22459; DE 339 in Case No. 08-21063] ("Motion").[1] The Court has considered the Motion, Plaintiffs' Response and Defendants' Reply, the parties' related submissions, and the record in these cases, and is otherwise advised in the premises. For the reasons stated below, Defendants' Motion is granted in part and denied in part.

---

[1] All docket citations refer to Case No. 07-22459, which was consolidated with Case No. 08-21093 in May 2008. See DE 68.

**BACKGROUND**[2]

Plaintiffs proffer Allen Borrelli as a military analyst with expertise in investigating and analyzing military structures in the context of violence against civilians during armed conflict. See DE 379 at 1; Defendants' Ex. A ¶ 1 (Opening Expert Report of Allen Borrelli ("Borrelli Report")).[3] Mr. Borrelli has nearly two decades of experience investigating international criminal law and human rights violations, including fourteen years as an analyst and investigator for the International Criminal Tribunal for the Former Yugoslavia. Borrelli Report ¶¶ 11-12.

Plaintiffs seek to have Mr. Borrelli give an opinion on whether the Defendants in these cases—the former President of Bolivia, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante, and the former Minister of Defense of Bolivia, José Carlos Sánchez Berzaín—are responsible, under the doctrine of command responsibility, for the allegedly improper use of force by the Bolivian Armed Forces against Bolivian civilians, including the eight decedents in these cases, in September and October 2003. See id. ¶ 10. Specifically, Mr. Borrelli opines on three areas: (1) command responsibility and the *de jure* and *de facto* roles of Defendants during the events at issue in these cases; (2) the military as an institution in Bolivia; and (3) an evaluation of the Bolivian military's violence against civilians in September and October 2003, namely, whether there was a deliberate pattern of military violence and, if so, whether that violence was justified. Id. ¶ 3.

---

[2] The Court's Order Denying Defendants' Joint Motion for Summary Judgment contains a comprehensive discussion of the facts of these cases, which will not be repeated here. See DE 408 at 2-24.

[3] Defendants' exhibits are attached to the Declaration of Ana C. Reyes in Support of Defendants' Motion to Exclude Testimony of Allen Borrelli. DE 362-2.

Defendants move to exclude Mr. Borrelli's testimony as inadmissible under Federal Rule of Evidence 702, as interpreted by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Defendants make three primary arguments. First, Defendants contend that Mr. Borrelli is not qualified to opine on the structure of the Bolivian military or, more specifically, Defendants' roles within that structure. Second, Defendants say that Mr. Borrelli's opinions are unreliable because they are based on the opinions of another of Plaintiffs' proffered experts, Philip P. Hayden. Defendants also moved to exclude Mr. Hayden's testimony, and the Court granted that motion in a separate order. See DE 422. And third, Defendants assert that Mr. Borrelli does nothing more than offer legal conclusions in the guise of expert opinion.

## **LEGAL STANDARD**

In applying Rule 702,[4] district courts are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. This critical gatekeeping function "ensure[s] that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc.,

---

[4] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> 
> (b) the testimony is based on sufficient facts or data;
> 
> (c) the testimony is the product of reliable principles and methods; and
> 
> (d) the expert has reliably applied the principles and methods to the facts of the case.

400 F.3d 1286, 1291 (11th Cir. 2005) (some internal quotation marks omitted).  To perform this gatekeeping function, district courts engage in a "rigorous inquiry" to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  Id. at 1291-92.  "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence."  Id. at 1292.

In addressing the reliability prong of the Daubert analysis, the Supreme Court has identified four factors that the district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.  United Fire & Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1341 (11th Cir. 2013) (citing Daubert, 509 U.S. at 593-94).  Yet, "these factors are not exhaustive and are intended to be applied in a 'flexible' manner."  Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).

Finally, even expert testimony that passes muster under Rule 702 may be excluded if irrelevant or if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; see Allison v.

4

McGhan Med. Corp., 184 F.3d 1300, 1309-10 (11th Cir. 1999). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc).

## DISCUSSION

### I. QUALIFICATIONS

An expert witness must be qualified to testify on the subject matter he intends to address. Fed. R. Evid. 702; City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 562-63 (11th Cir. 1998). "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (internal quotation marks omitted). This is not a stringent inquiry; so long as the expert is minimally qualified, any objections to the degree of his expertise go to credibility and weight, not admissibility. Id.

Defendants argue that Mr. Borrelli is not qualified to testify about the Bolivian military structure and Defendants' roles within it. They point to deposition testimony in which Mr. Borrelli admitted that, before his work on these cases, he did not have specific knowledge about the Bolivian military or its chain of command. See Defendants' Ex. B (Borrelli Deposition Transcript at 38:17-39:25 ("Borrelli Dep. Tr.")). Plaintiffs counter that "Mr. Borrelli's comparative experience qualifies him to identify facts that show that the response by the Bolivian Armed Forces was inconsistent with expected military behavior in similar situations." DE 379 at 17. And Plaintiffs point to cases permitting an expert witness to "testify regarding narrow sub-topics within his

5

broader expertise—notwithstanding a lack of specific experience with the narrower area—as long as his testimony would still assist a trier of fact." Remington v. Newbridge Secs. Corp., 2014 WL 505153, at *4 (S.D. Fla. Feb. 7, 2014).

The Court agrees with Plaintiffs. Mr. Borrelli spent nearly two decades as an analyst investigating militaries throughout the world. See Borrelli Report ¶¶ 11-14. Once engaged in these cases, Mr. Borrelli applied his skills to familiarize himself with the Bolivian military, its structures and chain of command, and Defendants' roles within it. Mr. Borrelli's expertise on military structures will help the trier of fact understand the significance of the evidence as it pertains to military structure and chain of command.[5]

Accordingly, under Federal Rule of Evidence 702, based upon Mr. Borrelli's knowledge, experience, and education, the Court finds that he is qualified as a military analyst to render opinions within the field of military structures as they relate to armed conflicts.

## II. RELIANCE ON MR. HAYDEN'S INADMISSIBLE OPINIONS

Plaintiffs sought to have Mr. Hayden opine that each decedent was intentionally shot and killed by the Bolivian military. Using Mr. Hayden's opinions as a foundation, Mr. Borrelli ties Defendants to these deaths. The Court, however, excluded Mr. Hayden's testimony in its entirety on a number of grounds. See DE 422. Defendants assert that if Mr. Hayden's opinions are inadmissible, then, as a consequence of his reliance on Mr. Hayden, Mr. Borrelli's testimony must likewise be excluded. And it is

---

[5] Defendants take issue with what they see as Mr. Borrelli's attempt to opine on how Bolivian military officials should have drafted their orders. DE 362-1 at 15. Plaintiffs say that Mr. Borrelli does no such thing, but rather he states that most high-ranking officials direct their subordinates to respect human rights and the rules of engagement with civilians. DE 379 at 19 n.9. The Court accepts Plaintiffs' description of Mr. Borrelli's opinion and will permit Mr. Borrelli to testify in this manner.

6

clear that Mr. Borrelli indeed relies to an extent on Mr. Hayden. For instance, Mr. Borrelli states:

> Having reviewed the evidence available to me, *including specifically the findings of Phillip Hayden in his expert report*, it is evident to me that the Bolivian military, under the command and control of the Defendants, engaged Bolivian civilians, including family members of the Plaintiffs with the intent to cause substantial bodily harm, and that the ensuing deaths were not the result of accident or provocation, but instead the result of a concerted effort by the military to target the civilian population with lethal force. The use of military force, particularly against the killed family members of the Plaintiffs, was indiscriminate and not justified by any military doctrine.

Borrelli Report ¶ 9 (emphasis added); see also Borrelli Dep. Tr. at 136:13-16 ("I believe in the conclusions by the expert Hayden and that the killings were targeted and specific in a sense that, you know, there was intent behind the actions."). But, as only a limited portion of Mr. Borrelli's opinions rely upon Mr. Hayden, the Court will not exclude Mr. Borrelli's proposed testimony in its entirety.

An expert's testimony can be excluded if it is inextricably linked to—and relies *solely* on—another expert's inadmissible testimony. See, e.g., J.B. Hunt Transp., Inc. v. General Motors Corp., 243 F.3d 441, 444 (8th Cir. 2001) ("Given that we find that the district court committed no error by excluding Wallingford's testimony, we also find no error in excluding Sances's testimony because the two are inextricably linked. . . . Sances's testimony had no evidentiary basis absent Wallingford's testimony . . . ."); Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc., 2012 WL 13012778, at *11 (S.D. Fla. May 24, 2012) ("The Court has already excluded Coté's burn test, so to the extent Henderson's opinions are solely based on that test, they are excluded."); United States v. Batchelor-Robjohns, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005) ("Without Medland's asset valuations, May and Gartrell have no evidentiary basis for the

7

conclusions they reach. . . . May and Gartrell reports must be excluded because they are inextricable linked to Medland's asset valuations . . . .").

Mr. Borrelli's opinions do not solely rely upon those of Mr. Hayden.  In fact, Mr. Borrelli cites Mr. Hayden just three times in his entire 197-paragraph report.  See Borrelli Report ¶¶ 7, 9, 22.  In performing his analysis, Mr. Borrelli also consulted a substantial list of other sources, including documents and testimony in these cases; official Bolivian documents; materials from the Trial of Responsibilities; and interviews of Bolivian military officers and conscripts, as well as witnesses to the events of September and October 2003.  See id. ¶¶ 20-22.  Therefore, the Court will only exclude those portions of Mr. Borrelli's testimony derived from Mr. Hayden's inadmissible opinions.

Mr. Borrelli concedes that his understanding of "the circumstances leading to the deaths of Plaintiffs' family members" is necessarily founded upon Mr. Hayden's expert report.  Borrelli Report ¶ 22; see also id. ¶ 9 ("Having reviewed the evidence available to me, including specifically the findings of Phillip Hayden in his expert report, it is evident to me that the Bolivian military . . . engaged Bolivian civilians, including family members of the Plaintiffs with the intent to cause substantial bodily harm").  The Court therefore holds that Mr. Borrelli may offer no opinions about the specific circumstances of decedents' deaths.  Mr. Borrelli also may not mention or reference Mr. Hayden's report or the opinions contained therein, including whether decedents were intentionally shot by the Bolivian military.

Moreover, even if Mr. Hayden's proposed testimony were admissible, Mr. Borrelli's reliance on his opinions would be improper for the additional reason that he

failed to verify them in any meaningful way. Rule 703 does not permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); see also In re TMI Litig., 193 F.3d 613, 716 (3d Cir. 1999) (Holding that an expert witness's "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under Daubert as it was not calculated to produce reliable results."), amended by 199 F.3d 158 (3d Cir. 2000); Sofillas v. Carnival Corp., 2016 WL 5407889, at *4 (S.D. Fla. July 8, 2016) ("an expert cannot blindly rely or ratify another expert's opinion"); Deutz Corp. v. City Light & Power, Inc., 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009) ("Rule 703 . . . does not permit an expert to simply parrot the opinions of other experts."); Batchelor-Robjohns, 2005 WL 1761429, at *5 ("[A]n expert may not blindly rely on the conclusions of another and still meet the reliability requirements of Rule 702 and Daubert.").

Yet that is exactly what Mr. Borrelli admits he did here. Indeed, Mr. Borrelli has openly conceded on more than one occasion that he assumed the accuracy of Mr. Hayden's opinions, without making any effort to verify them. In his report, Mr. Borrelli states: "Based on my review of the expert report by Philip Hayden, it is my *assumption* that the descriptions of the circumstances leading to the deaths of Plaintiffs' family members are reliable and on this basis, I conclude that they were contrary to accepted standards." Borrelli Report ¶ 22 (emphasis added). And in his deposition, Mr. Borrelli testified that he "didn't take any particular steps to check the veracity of [Mr. Hayden's]

9

report," and instead merely "assume[d] the truth in [Mr. Hayden's] analysis." Borrelli Dep. Tr. at 103:9-17; see also id. at 111:24-112:2 (Mr. Borrelli "presumed the accuracy of the information" that Mr. Hayden put in his report). To make matters worse, in accepting Mr. Hayden's opinions, Mr. Borrelli proceeded from the mistaken understanding that Mr. Hayden was an expert in ballistics. See id. Borrelli Dep. Tr. at 270:3-7 ("Q. Is it your understanding that Mr. Hayden is an expert in ballistics? A. I believe that's how I understood it to be." (objection omitted)).

Mr. Borrelli's blind reliance on Mr. Hayden cannot be squared with the basic precepts governing the admissibility of expert testimony. The Court will not permit one expert to "simply parrot the opinions" of another. Deutz Corp., 2009 WL 2986415, at *6. This commonsense limitation is doubly important where, as here, the underlying expert's opinion has itself been excluded under Daubert.

Accordingly, Mr. Borrelli may not mention or reference Mr. Hayden's opinions, including, specifically, his opinions regarding the specific circumstances of decedents' deaths.

### III. OPINIONS ON DEFENDANTS' COMMAND RESPONSIBILITY

An expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. Expert testimony is not helpful, however, if it "offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63. Thus, an expert "may not testify to the legal implications of conduct or tell the jury what result to reach." Commodores Entm't Corp. v. McClary, 879 F.3d 1114, 1128 (11th Cir. 2018) (internal quotation marks omitted). The district court "must be the jury's

only source of law, and questions of law are not subject to expert testimony." Id. at 1128-29 (internal quotation marks omitted); see Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Defendants make two arguments regarding Mr. Borrelli's opinions on Defendants' command responsibility. First, Defendants say that Mr. Borrelli inappropriately interprets and applies the three-pronged command responsibility standard articulated in opinions of the Eleventh Circuit and by this Court. Second, Defendants assert that Mr. Borrelli misinterprets and misapplies the command responsibility standard in a manner that is prejudicial and would confuse the jury. The Court will consider each point in turn.

### A. Mr. Borrelli Impermissibly Opines on Defendants' Liability Under the Command Responsibility Doctrine

To hold Defendants liable under the doctrine of command responsibility, Plaintiffs must establish three elements:

> (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1288 (11th Cir. 2002). The Court has set forth this standard in the context of these cases—first when denying Defendants' motion to dismiss, see 21 F. Supp. 3d 1353, 1375-76 (S.D. Fla. 2014), and, more recently, when denying Defendants' motion for summary judgment, see DE 408 at 46-47.

11

Mr. Borrelli's report tracks Ford's three-pronged standard. The first three sections of his report analyze each element, with his fourth and final section addressing "possible defenses." He ultimately concludes that each element is met, and that Defendants' "possible defenses" all fail. See Borrelli Report ¶¶ 187-97. As Mr. Borrelli summarizes:

> Defendants' 2003 control over the Armed Forces, combined with their knowledge and encouragement of the use of combat troops to use lethal force against civilians as well as their ultimate failure to prevent or punish these activities, mean that Sánchez de Lozada and Sánchez Berzaín are, *from a command responsibility perspective*, responsible for the resulting violence by the Bolivian Armed Forces against the civilian population, including the unlawful deaths of Plaintiffs' family members.

Id. ¶ 10 (emphasis added). Defendants say that Mr. Borrelli's opinions amount to nothing more than an impermissible legal conclusion regarding Defendants' liability.

As an initial matter, Mr. Borrelli offers his own view on the correctness of the Court's articulation of that standard. He states that his analysis is "guided by established principles regarding command responsibility I have employed throughout my career, which are consistent with the legal principles articulated [by the Court in its order denying Defendants' motion to dismiss]." Id. ¶ 23. Mr. Borrelli's enunciation of legal standards is impermissible. See Cordoves v. Miami-Dade Cty., 104 F. Supp. 3d 1350, 1364 (S.D. Fla. 2015) ("Experts are not permitted to explain to the jury what the applicable legal standards are.").

But Mr. Borrelli not only offers an opinion on the legal standard itself, he then applies that standard and concludes that it has been met in these cases. This he cannot do. "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." Burkhart, 112 F.3d at 1212-13. Expert

12

testimony amounts to a legal conclusion if it either "track[s] the language of the applicable statute" or uses a term that "has a specialized legal meaning that is more precise than the lay understanding of the term." Id. at 1212.  For example, "the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." 1972 Advisory Committee Notes on Fed. R. Evid. 704, 28 U.S.C. App., p. 398.

Plaintiffs describe Mr. Borrelli's opinions as an exercise in explaining how certain facts concerning the Bolivian military's structure and Defendants' actions during 2003 support a legal conclusion about command responsibility.  To be sure, Mr. Borrelli does analyze facts that, if found, would support a conclusion that the command responsibility standard has been met.  But Mr. Borrelli actually goes one step further and *makes* the legal conclusion.  Consider how Mr. Borrelli approaches each element.

    1. <u>Superior-Subordinate Relationship</u>. — A superior-subordinate relationship requires "effective control" over the guilty troops, and "effective control" is a material ability (either *de jure* or *de facto*) to prevent or punish criminal conduct.  See DE 408 at 47-48; 21 F. Supp. 3d at 1376.  Mr. Borrelli "reviewed the Bolivian legal framework and facts to evaluate whether Defendants had 'effective control' over the troops under their command, meaning that they had the ability to prevent or punish illegal acts." Borrelli Report ¶ 24.  This process included a comprehensive review of the relevant Bolivian law related to the Armed Forces, including the military justice system and roles and responsibilities of the President of Bolivia, the Commander in Chief of the Armed

13

Forces, and the Ministry of Defense and its Minister.  See id. ¶¶ 40-99.  Mr. Borrelli's opinions on these matters would assist the jury in understanding key factual issues concerning the Bolivian military structure.

However, at the conclusion of his analysis (and at times during it), Mr. Borrelli goes one step too far when he reaches the legal conclusion that "[b]oth Sánchez de Lozada and Sánchez Berzaín had effective control over the Armed Forces of Bolivia during the time period at issue in this litigation."  Id. ¶ 187; see also, e.g., id. ¶¶ 68, 76-80, 82-83, 147, 187.  Mr. Borrelli's testimony on the superior-subordinate relationship prong will be limited to exclude those ultimate legal conclusions.

2. Knowledge. — As to the knowledge element of command responsibility, Mr. Borrelli explains that he "took into account factors such as whether the Defendants received information about the killings or of the possibility of the occurrence of the unlawful acts," and also "considered whether Defendants took the necessary measures to obtain knowledge about the conduct of their troops."  Id. ¶ 25.  Mr. Borrelli's analysis includes opinions that would be of assistance to the trier of fact, namely, analysis regarding Defendants' alleged plan to use the Bolivian military to kill civilians, changes to military doctrine to facilitate this plan, the military's reportedly widespread use of force, and indications that Defendants were informed of civilian casualties.  See id. ¶¶ 100-46.  For the most part, this is unobjectionable, and Mr. Borrelli may offer his opinions on these facts.

What is objectionable, however, is Mr. Borrelli's conclusion, which is purely legal in nature:

> In looking at the pattern of violence . . . during 2003, the Bolivian Armed Forces, which was a fully capable professional military, with a functioning chain of

> command, was ordered to attack the civilian population, and *Defendants knew or should have known* that there was an unacceptably high probability that innocent civilian casualties would result. . . . Once the killings occurred, the Defendants *knew* that these civilian casualties resulted from the Armed Forces engagement with the civilian population.

Id. ¶ 7 (emphasis added); see also, e.g., id. ¶¶ 10, 78, 102, 150, 149, 161. Mr. Borrelli's testimony on the knowledge element of command responsibility will therefore be excluded only to the extent that he offers a legal conclusion that the element was met.

  3. <u>Failure to Prevent or Punish</u>. — With regard to Defendants' "failure to prevent or punish unlawful acts by subordinates," Mr. Borrelli focuses his analysis "on Defendants' 'failure to prevent.'" Id. ¶ 28. As with the previous two elements, Mr. Borrelli offers opinions on facts that, if found, would assist a jury in determining whether Defendants failed to prevent or punish criminal acts by troops under their effective control. These facts include unutilized aspects of the Bolivian military justice system, noncompliance with military doctrine and regulations contained in documents like the "Manual on the Use of Force," and the continued issuance of orders to engage the military against the civilian population, even after reports of civilian deaths became known. See id. ¶¶ 151-60, 162-67.

  But again, as with the previous two elements, Mr. Borrelli offers another legal conclusion:

> In the end, neither President Sánchez de Lozada nor Sánchez Berzaín, despite their knowledge of casualties in the civilian population, took any of the steps available to, [or] required of, them to ensure that civilian casualties would be *prevented or punished* when [they] did. Both had the power to instantly demand investigations into alleged criminal activity by their subordinates. Not only did the Defendants not do anything about it, they continued issuing orders for the use of the Armed Forces in the same type of operations that led to previous unlawful deaths. This repeated pattern of deployment of the Armed Forces in light of knowledge of unlawful behavior shows intent to incite violence against the civilian population rather than *preventing* crimes against them. *This is a complete failure in their obligations to prevent and punish these sorts of activities.*

15

Id. ¶ 161 (emphasis added); see also, e.g., id. ¶¶ 10, 147-49, 190, 192.  And as with the previous two elements, the Court will permit Mr. Borrelli to testify as to certain facts that, if found, would suggest a conclusion that Defendants failed to prevent or punish criminal conduct, but not to offer an ultimate legal conclusion that Defendants actually failed to do so.

### B. Mr. Borrelli Does Not Offer Prejudicial Testimony About Command Responsibility

Defendants raise an additional reason for excluding Mr. Borrelli's command responsibility opinions.  They argue that Mr. Borrelli erroneously imports the non-legal principles of "command and control" and "non-delegation of responsibility" into his analysis of the superior-subordinate element of the command responsibility doctrine.  Defendants also assert that, in his analysis of the second and third elements—knowledge and failure to prevent or punish—Mr. Borrelli "interchangeably refers to unlawful conduct and the fact that there were civilian casualties, without assessing whether the civilian casualties were unlawful."  DE 362-1 at 12.  In Defendants' view, in light of Mr. Borrelli's apparent misinterpretation and misapplication of the command responsibility doctrine, permitting him to testify on the issue would be prejudicial and confusing to the jury.

Exclusion of testimony under Rule 403 is appropriate "if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury."  Frazier, 387 F.3d at 1263.  "It is recognized, however, that Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility."  United States v. Nerey, 877 F.3d 956, 957 (11th Cir. 2017) (internal quotation marks omitted).  Even assuming that Mr.

Borrelli misinterprets and misapplies the command responsibility doctrine as Defendants suggest, it appears to this Court as inconsequential, and any prejudice that may result does not substantially outweigh the probative value of Mr. Borrelli's opinions on that issue.

## **CONCLUSION**

For the reasons stated, Allen Borrelli may not offer opinions about the specific circumstances of decedents' deaths. He also may not mention or reference Philip P. Hayden's report or the opinions contained therein, including whether decedents were intentionally shot by the Bolivian military. Finally, while Mr. Borrelli may provide his command responsibility analysis, he may offer no opinion on the ultimate legal question whether the elements of the command responsibility doctrine have been satisfied in these cases. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion [DE 362 in Case No. 07-22459; DE 339 in Case No. 08-21063] is **GRANTED in part and DENIED in part** consistent with the above analysis.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 28th day of February, 2018.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF