# REPORT FROM THE ORGANIZATION OF AMERICAN STATES (OAS) ON THE EVENTS OF FEBRUARY 2003 IN BOLIVIA*

### Report prepared by the General Secretariat of the OAS

### May 2003

## 1. Introduction

February 12 and 13, 2003, marked a tragic moment in Bolivia's history; a moment that is also of the utmost importance for determining its future.  The country experienced a serious breakdown in terms of its government's responsibility to ensure the safety of its citizens, respect for their rights, and protection of their lives.  Armed conflicts between the police and the armed forces, close to thirty people dead, vandalism and looting in the streets, civilians, soldiers, and police wounded and dead, and arson attacks on public, private, and political party offices characterized two days marked by widespread fear, violence, and anarchy.

## 2. Background

In a letter addressed to the Secretary General of the Organization of American States (OAS) on February 14, 2003, the Minister of Foreign Relations of the Republic of Bolivia requested the urgent cooperation of the OAS given the "...violent acts in my country, many of them aimed at destabilizing the democratic process in Bolivia.  Our greatest concern has been actions of unidentified snipers, who have fired on the civilian population, causing several deaths.... The seriousness of the situation and the need to have an impartial, objective investigation that will shed light on these terrorist acts, which are undermining people's safety and the rule of law itself, have compelled the Bolivian government to request that the Secretary General of the OAS send an investigative committee as soon as possible to cooperate in casting light on these terrorists attacks that have led to the loss of human life."

That very day, after hearing the Minister of Foreign Relations, the Permanent Council of the OAS issued Resolution CP/RES. 838 (1355/03), which resolved:

1. To express its full and decisive support for the constitutional government of the President of the Republic of Bolivia, Gonzalo Sánchez de Lozada, and for its democratic institutions.
2. To condemn the use of violence and other undemocratic acts that disrupt democracy and good governance in Bolivia.
3. To reaffirm that the constitutional subordination of all State institutions to the legally constituted civilian authority and respect for the rule of law on the part of all institutions and sectors of society are essential elements of democracy.
4. To reaffirm the firm resolve of the Member States to apply the mechanisms provided in the Inter-American Democratic Charter for preserving democracy.
5. To urge all sectors of Bolivian society to strengthen channels of dialogue and tolerance and to refrain from promoting political violence.

*Note:  This document is a translation of the original Spanish document.

Case No. 08-21063-CV-COHN
Case No. 07-22459-CV-COHN

**Exhibit 1001**

DEF-0000078
Ex. 1001.1

6. To reiterate that the promotion and observance of economic, social, and cultural rights are inherently linked to integral development, equitable economic growth, and the consolidation of democracy in the States of the Hemisphere.

7. To support the efforts of the Government of the Republic of Bolivia to reach, with due urgency, agreements with the international financial institutions that will contribute to the democratic, social and financial stability in that country.

**3.  Scope of the OAS Mission**

With the aim of fulfilling the Bolivian government's request, a working meeting was held on March 6 in La Paz, Bolivia, with the President of the Republic of Bolivia and his closest aides, the Chief Prosecutor of the Republic [Fiscal General de la República], and the Secretary General of the OAS.  This meeting determined the framework for the organization's efforts.

It was concluded at this meeting that the OAS would assist in carrying out two specific tasks:

a.      Assisting the Office of the Chief Prosecutor of the Republic [Fiscalía General de la República] in fulfilling its legal and constitutional responsibilities, through technical assistance provided by international experts in areas related to criminal investigation, who would support prosecutors in investigating the incidents that occurred on February 12 and 13, 2003.  It was likewise agreed that the OAS' support to this Office should not undermine in any way the independence of the Office of the Public Prosecutor [Ministerio Público] in Bolivia, or replace it in its constitutional duties.

b.      Assisting the national government in drawing up and presenting a report to give a version of the incidents of February 12 and 13, which would allow for further discussion to be held on institutional failures during these events and make recommendations to the government and the country on possible measures to strengthen democracy.  It would further allow for decisions to be made regarding political accountability, beyond the process of resolving the problems arising in the judicial investigation.

This report does not compromise the Office of the Public Prosecutor, the Office of the Chief Prosecutor of the Republic, or the judicial branch in carrying out its adjudicatory duties, nor does it express the opinion of the competent agencies regarding the investigation.  Inasmuch as the OAS does not have such duties, the objective of the report is not to identify any individual who may have participated in committing crimes.  Accordingly, the report shall be limited to describing the events that took place, giving its conclusions in this regard, helping the Executive Branch determine the political accountability of its officials, and, lastly, making recommendations to avoid repetition of incidents of this nature.

The OAS acknowledges in particular the enormous workload that the Office of the Public Prosecutor has taken on.  It further acknowledges the incredible difficulties and challenges this investigation presents. They are unprecedented for an investigation of this nature, and make it special and different from all others ever conducted in the country.

**4.  Brief description of the current situation in Bolivia**

[2]

DEF-0000079
Ex. 1001.2

Low levels of economic growth since the end of the 1990s have been one of the biggest challenges for democracy in the hemisphere, and the case of Bolivia is no exception. Undoubtedly, excessive optimism was created in this country and throughout the Americas regarding the possibilities of economic growth once the Cold War ended and structural changes were adopted. Indeed, this did have a direct impact on democratic governance in the hemisphere.

External situations—like the fact that in the last seven years Bolivia has had to confront three global crises that have severely affected its growth rate, due to the so-called "contagion effect"—have significantly contributed to its difficult situation. Bolivia was actually able to overcome the Mexican crisis without too much trauma. This was not the case with the following crisis of instability, which began in Russia and then went on to numerous Asian countries, spreading to many Latin American economies, particularly those of the Andean Region, as well as Brazil, which is an import trading partner for Bolivia. Furthermore, there is no doubt that the last crisis that originated in Argentina, which has had a significant impact on South American countries, has put enormous pressure on Bolivia's economy and political system.

In many Latin American countries, including Bolivia, there were also several domestic causes that exacerbated and facilitated said crises, such as ineffective economic management, inadequate performance of public institutions, and a deterioration in the region's political systems. This, in turn, has shaken public confidence and undermined political and social stability, as well as the rule and supremacy of law.

Although some of these phenomena apply to Bolivia, it is recognized that macroeconomic management over the last decade has been effective[1]. The outcomes of the structural reform process of the 1990s were relatively positive. The average growth rate was 4%, GDP per capita in Bolivia tended to rise slightly, albeit steadily, and inflation rates progressively decreased while the public deficit was kept under control[2]. Advancements in implementing universal education, as well as in life expectancy, were the predominant highlights of the last decade.

Economic growth fuelled by public investment, however, as it depends to a large extent on external resources, is exposed to the risk that such resources might not be available under circumstances like the current ones. Furthermore, levels of poverty and inequality have not decreased in recent years, and the concentration of wealth has worsened.

It can be said that a large part of the most disadvantaged segments of Bolivian society have not been able to benefit from the fruits of growth or have been hurt by low growth.

The current economic situation in Bolivia is marked by a contraction in aggregate demand (household consumption, which represents 75% of GDP, public consumption, investment, and net imports) and a decrease in credit in the financial sector.

It is likely that such results are a consequence of a series of factors, such as the war on drugs, the decrease of foreign direct investment at the end of the 1990s and its effects on aggregate demand, low growth rates over the last 5-year period, and the uneven impact of further integration into the world economy, with the enormous wage disparity that it creates to the benefit of skilled labor.

[3]

The draft budget initially submitted by the Administration to the Congress sought to close the approximately US$240 million gap between its revenues and expenditures. The drastic reduction in public spending and a freeze on wages was not enough for this purpose. The government did not want to decrease public investment, nor order an increase in the price of hydrocarbons that would have affected the most vulnerable segments of society. Therefore, it decided to propose to Congress, when submitting the budget, an increase in the tax burden on salaried workers who earn more than double the minimum wage. Said proposal, even though it had just been submitted before Congress for negotiation and processing, gave rise to a protest organized by the police union, under the banner of labor demands for all Bolivians.

In another regard, Bolivian democracy—after a long period of dictatorial regimes—has undoubtedly made strides since 1982 in an important process of democratization and institution-building. The five national elections that have taken place have led to peaceful and constitutional changes of government. In Bolivia, in contrast to what occurs in many other countries in the region, politics are essentially in the hands of political parties. The country has a combination of traditional and non-traditional parties that use firmly entrenched institutional mechanisms to elect their respective candidates.

In the last 20 years, political governance has been built on political agreements entered into in order to make decisions that have allowed for consistent, significant support from the Congress and, in particular, for instituting the reforms that have impacted institutional and economic structures. Bolivia was a pioneer in these kinds of reforms, which, like the first- and second-generation reforms, have served as examples.

The appearance of new players on the political scene—new parties and social organizations that are legitimate manifestations of an active civil society—is a positive factor that demonstrates that the majority of Bolivian society, in all its social and ethnic diversity, believes in the possibility of social change through its political institutions. The new indigenous political leadership, which has close to 40 representatives in parliament, is evidence of the involvement of a segment of Bolivian society that until now had been practically isolated from the political process. Moreover, the creation of the Ombudsman [Defensoría del Pueblo] has resulted in progress in fostering and protecting human rights.

When taking stock of democracy after 20 years of existence, the overriding problem is that despite significant progress made in strengthening institutions—the most significant evidence being the democratic institutionalization of the armed forces, which was put to the test by the events of February—the political system has not be capable of resolving many of its citizens' social demands, which is not uncommon in Latin American democracies, nor has it opened enough forums where all segments of society may participate. As a result, despite the democratic conviction of the great majority of the people, there is constant discontent in the exercise of Bolivian democracy. There is radicalized polarization between "establishment" and "anti-establishment" parties, which creates an environment of permanent conflict.

**5. The events of February 12 and 13**

[4]

DEF-0000081
Ex. 1001.4

The following account of the incidents of February was prepared with the assistance of experts and specialists from Brazil, Colombia, and the United States, who are from organizations of recognized integrity, such as the National Criminalistic Institute of the Federal Police of Brazil [Instituto Nacional de Criminalística de la Policía Federal de Brasil], the Office of the Chief Prosecutor of the Nation [Fiscalía General de la Nación] of Colombia, and the Federal Bureau of Investigation (FBI) of the United States. Said specialists, together with OAS staff, conducted interviews, fieldwork, evaluations, and expert assessments from March 5 to 21, from March 31 to April 4, and from April 21 to 24 of 2003. The Office of the Chief Prosecutor is responsible for evaluating this work in light of the Bolivian judicial system, and eventually, comparing it to other witness accounts and evidence.

a. February 12, 2003

At approximately 6 a.m., police officers of the Special Security Group [Grupo Especial de Seguridad] (GES) of the National Police, who had been in revolt since the previous day, began to welcome police from different units who were congregating at their headquarters. The GES is a special riot-control police unit whose mission consists of rapidly responding when such disturbances occur. It is important to highlight that the main GES barracks are half a block from Plaza Murillo, where the Presidential Palace is located.

Other police officers dressed in uniform and civilian clothes began to gather close to Plaza Murillo and at GES headquarters. The uniformed police were armed with handguns, assault rifles, shotguns, 37mm and .12 caliber gas grenade launchers, and .30 caliber rifles. Several hours later, during the morning, a police officer was seen standing on the roof of a building with a machine gun.

At approximately 9 a.m. buses arrived from the National Police Academy with individuals who appeared to be third-year cadets (according to film footage). It is not known whether other higher or lower-ranking police cadets also arrived.

National Police (NP), both uniformed and in civilian clothes, as well as retired officers, gathered and began to march around the Plaza, condemning the government income tax plan and inadequate wages. The demonstration circled the Plaza without incident while the Bolivian Army's Presidential Escort maintained security positions around the Presidential Palace.

At this point there was a large contingent of NP officers from different units, including firemen. Some members of the NP positioned themselves on the roof of GES headquarters and on the building of the Ministry of Foreign Relations, immediately adjacent to the GES building. The Ministry building is located at the northern corner of the Plaza. The front of the building is at a right angle to the Presidential Palace and the Congress. The Plaza's change in elevation means that the Ministry of Foreign Relations building is on a higher plane than the Presidential Palace, which gives a tactical advantage to anyone on the roof of the Ministry.

Between 10 and 11 a.m., students from Colegio Ayacucho left their school to go to the Plaza to demonstrate, but were driven back by NP control units (Police Academy). The confrontation between the NP and students occurred close to the corner of Ayacucho and Comercio streets, while members of the NP used tear gas. The students gathered anew to march one more time on the Presidential Palace.

[5]

DEF-0000082

Ex. 1001.5

At approximately 11 a.m., the students were able to make their way to the Plaza and advance towards the Presidential Palace, taking advantage of the fact that the police who were holding them back withdrew into the Legislative Palace. Faced with this situation, a small number of soldiers with shields came out to try and disperse the students. NP troops launched tear gas at the soldiers, forcing them to withdraw inside the Presidential Palace and secure the entryways, as they had no gas masks.

As there was no security in the street at the front or the side of the Palace, the students began to throw rocks at the Palace, which presumably they had had in their backpacks, breaking windows on the ground floor and the two floors above. Film footage taken suggests that there were at least four shots fired that hit the second and third floors of the Palace. Through all this, students continued attacking the Palace, shouting "Ayacucho," and the police fired numerous gas rounds at the Palace.

A few minutes afterwards, military personnel appeared on the balconies of the Palace throwing tear-gas-filled hand grenades to disperse the students. When the students withdrew, the army threw more tear gas from the very same balconies, but this time using grenade launchers aimed at the Plaza. The students fell back, positioning themselves together with members of the NP who were located opposite the Ministry of Foreign Relations.

Military personnel retook positions on the streets running in front and on the sides of the Presidential Palace. Additional units arrived from the Army Military Police (MPs) and took positions opposite the Congress and the Cathedral (east and west, respectively), which is adjacent to the Palace to its right. MP reinforcements continued to arrive, taking positions close to the intersection of Socabaya and Comercio streets, and Comercio and Ayacucho streets. Military units were equipped with riot shields, gas masks (not all soldiers had them), FAL [light automatic] assault rifles and gas grenade launchers.

While additional army units arrived and positioned themselves near the Palace and the Plaza, members of the NP sprayed tear gas on them. Another army unit advanced and took position on the corner of Comercio and Socabaya streets, near the Cathedral. Its troops were confronted by members of the NP who were approximately 30 meters in front, yelling and insulting the military personnel. The army units maintained formation and held their positions without advancing.

NP officers dressed in uniform and civilian clothes, as well as civilians, gathered at different intersections of the Plaza or close by, proffering obscene and derogatory words at the army units. The army units did not respond and maintained formation. When one of the army units advanced northward on Bolivar street toward Ballivián street, where a crowd of demonstrators was gathered, the army units were met by tear gas fired by NP members approaching from the north side of Ballivián street. The army unit withdrew to the south, firing tear gas on the way, and took defensive positions near the Congress.

A NP fireman wearing a gas mask was shot in the face or in one eye, apparently from a rubber bullet fired by a soldier positioned near the Congress. It is unknown at what point this occurred, but at the time he was with other NP officers and firemen who were armed with 9 mm machine gun pistols. The police and firemen had been firing tear gas from the intersection on Bolivar street. The fireman injured in the face was able to walk away, although he was bleeding profusely.

DEF-0000083
Ex. 1001.6

NP Major David Vargas, an official of the Police Mutual Insurance and Credit Union [Mutual y Cooperativa Policial] (MUCOPOL) who had positioned himself in the GES, was interviewed by the local press and publicly stated that the NP was executing "Plan Red", advising citizens that they remain in their homes.  After his statement, police officers of different ranks continue arriving at the Plaza.

Brigadier General Hugo Tellería, the head of the presidential security team [Casa Militar], met with NP Major David Vargas, accompanied by Mr. Sacha Llorenti from the Human Rights Assembly, to assess the possibility of a cease-fire.  Dialogue was later reinitiated with the Minister of Defense, Freddy Teodovich.  Having agreed to a withdrawal of the NP officers, it was determined that army units would fall back to the edge of the Plaza, opposite the Palace, and that the police would take no action, which guaranteed the absence of demonstrators and thus facilitated dialogue.

As the military withdrawal began, police units continued arriving, taking up positions at different intersections in the area surrounding the military units in the Presidential Palace and the Plaza.

This is when a contingent of NP officers arrived from the east on Comercio street in several vehicles with the sign "Radio Patrol 110," with sirens blaring.  They immediately took out and brandished their weapons as they exited their vehicles, confronting army units located in the same street.  The soldiers did not fire, but rather fell back by turning the corner and entering Ayacucho street. They did, however, launch tear gas at the police units.  Shots were fired.

Police units positioned at the Ministry of Foreign Relations began to fire tear gas and their guns at the military units located directly opposite them on Socabaya and Comercio streets.  The military responded with tear gas and bullets (it is not known whether rubber bullets or lethal ammunition were used at this point).  The exchange of fire continued and an NP officer who was walking in front of the Ministry was hit in the leg. In the hail of bullets, NP officers withdrew by turning the corner and entering the GES headquarters.  They began to fire hand guns and assault rifles at the military personnel on the Plaza.

Major Vargas complained about the numerous NP casualties.  It was heard that Vargas, when approaching other NP units, made derogatory comments about the military forces and said that he wouldn't surrender so easily.

NP officers were seen on the roof of the guard house located at the entrance of GES headquarters, firing assault rifles at military forces.  Moments later, a NP member standing in the guard house was hit by a bullet in the head and died instantly.

Members of the NP Immediate Action Group [Grupo de Acción Inmediata] (GAI) arrived at GES headquarters.  The GAI is recognized by its characteristic uniform, its insignia, and its rifles (M4s).  They took two long, narrow black plastic boxes, approximately 8 inches wide, from the vehicle, taking one into the building belonging to the National Institute of Agrarian Reform of Bolivia (INRA) (the dimensions and characteristics of said boxes match those used to store and protect precision rifles).  A group of GAI officers was seen entering the INRA building, while another group made its way to the roof of the GES, from where there is easy access to the roof of the Ministry of Foreign Relations building.

Members of the NP made an incursion into the headquarters of Regional Military Justice of Bolivia, located on Bolivar street.  Members of the NP and individuals dressed

[7]

DEF-0000084
Ex. 1001.7

in civilian clothes burst into a parking lot, pushing cars into the street and setting the vehicles and building on fire.

During an inspection of the INRA building afterwards, prosecutors in charge of the investigation found several spent cartridges of 5.56 mm and 7.62 mm ammunition, broken windows, used plastic silverware and a tray with food, as well as an empty box of 7.62 ammunition, in a bank of elevators located on the roof of the building.  Said elevator bank has a window that looks onto the Plaza, with an unobstructed view of the Presidential Palace, including the front door and the roof over the top floor.  Two holes found in the metal window frame in the bank of elevators seemed to have been caused by bullets from one or more firearms.

Unidentified NP officers forced their way into the building known as New American Radio [Radio Nueva América] (RNA) and managed to penetrate the apartments and/or offices located between the 6th and 10th floors of the building.  Television crews that accompanied the NP members do not have film recordings of these officers firing from this position, but did film the military units that were fired upon as they withdrew into the Palace.  During one of the withdrawals a soldier is seen being hit by gunfire before entering the Palace and being helped by others while under fire.

Witness accounts indicate that at approximately 14:15 hours, the President of the Republic abandoned the Presidential Palace via Ayacucho street in an armored van, and headed towards his residence in the Obrajes neighborhood in order to ensure his safety.

At approximately 17:00, an infantry captain who was on the Palace roof was hit by a bullet, despite taking refuge behind a wall, and died as a result. A soldier who tried to help the captain by carrying him into the dining room on the Palace roof also died from a bullet to the head.

The night after the events at Plaza Murillo in the afternoon of February 12, several stores and public offices were burned and/or looted in the city of La Paz, as were the headquarters of the three political parties that make up the government coalition, and the offices of the Vice-President of the Republic.  There was also looting and arson at the Town Hall and other public and private offices in the city of El Alto.

b.  February 13, 2003

During the early hours of the morning and in the afternoon, the riots and looting continued all over La Paz and El Alto. Other cities affected by looting were Cochabamba and Santa Cruz.  Two additional incidents in La Paz and its surrounding areas led to the deaths of individuals caught up in the mob.

That same morning, civilians and looters attacked the Coca-Cola plant located in El Alto (on the outskirts of La Paz).  A security force consisting of approximately eight NP officers and several employees of the company tried to fight them off, but the looters managed to knock down the brick walls of the plant's front entrance.  Bolivian Air Force troops were transported to the factory on two helicopter flights.  Some time later, an undetermined number of Air Force troops arrived at the factory by truck.  These troops fired on some of the looters, killing four and injuring several others (the number of injured is unknown).

Looters also attacked the security guard station of the Bolivian Customs Service, overpowering the guards and looting the offices, containers, and trucks full of merchandise.  An unidentified individual shot and killed one person.

[8]

In La Paz, anti-government demonstrations were organized by some leaders who called for the President and Vice-President to resign, but few people attended and the demonstrators were kept at a distance from Plaza Murillo. A large number of troops from military units were deployed all over the capital to maintain security, as the police continued to strike.

A home video submitted by representatives of the Human Rights Assembly shows a small unit of Bolivian Army troops, on the afternoon of February 13, 2003, taking positions on the corner of the intersection of Genaro Sanjinés and Comercio streets. The unit is made up of approximately six or seven soldiers and officers and is shown to be firing tear gas and assault rifles at a crowd gathered some 150 meters to the south, on Mercado street.

A man who is hiding behind a telephone both some 20 to 30 meters from the intersection is hit by a bullet in the leg.

Moments later the soldiers identify a man located on the roof of a building on Mercado and Sanjinés streets, and they are heard saying, "he is armed." An unidentified soldier fires on him and wounds him. The man turns out to be a construction worker who it seems was fixing the roof tiles with a glue gun. A nursing student in the same building comes to give the construction worker first aid and is hit by a bullet that enters through a window looking north (towards where the soldiers are located). She later dies as a result of her injuries. A doctor tries to help the construction worker and opens a panel that opens onto the roof. She is also injured, but survives the wounds to her jaw.

In the afternoon, after the NP and government authorities signed an agreement, NP units returned to work and begin to deploy around the city of La Paz and surrounding areas, attempting to recover control and put an end to the looting.

### 6. Preliminary conclusions of the OAS investigation

This report, and the OAS' support in general, is intended to help the Office of the Chief Prosecutor of the Republic, so it may have a somewhat independent investigation of the events that occurred over these two days. It has drawn the conclusions and put forward the recommendations it has deemed appropriate.

The report is supported not only by the request from the government and the Chief Prosecutor to the OAS to aid in the investigation, but also by the very fact that it is necessary to have information so that the government, as well as the Congress, may make decisions to correct serious flaws in the State's functioning, and thus ensure the supremacy of the rule of law and the strengthening of democratic institutions, so seriously threatened by the events of February 12 and 13, 2003.

a. The actions against the Palace and the President of the Republic

Technical ballistic information that has been gathered to date indicates that the Presidential Palace was hit by multiple firearms projectiles. The presidential office was hit several times by gunfire coming from the corner of the Kodak house, the corner of Hotel Paris, the Ministry of Foreign Relations, and from Comercio street; the vestibule of the dining room was hit by a shot from the INRA building; the presidential dining room was hit by a shot from the corner of the Ministry of Foreign Relations; the vestibule of the bedroom was hit by a shot from the roof of the Ministry of Foreign Relations; in the Salón Rojo [Red Room] there was cross-fire with the roof of the Ministry of Foreign

[9]

DEF-0000086
Ex. 1001.9

Relations; and in the Salón de los Espejos [Hall of Mirrors], a shot came from the street near DP-2 [Police District 2]. The roof of the Presidential Palace was hit by several shots from the INRA building and from the roof of the Foreign Ministry Building, there was cross-fire with the DP-2; shots were fired on the Caja de Salud, the Foreign Ministry and other corners of the Plaza. It seems that shots were fired from the INRA building at the army captain who was killed on the roof of the Presidential building and at the soldier who came to his rescue and also perished.

The shots fired at the Presidential palace undoubtedly targeted places and areas in which the President carries out most of his duties (Presidential Office, meetings room, vestibule of his bedroom). It is obvious that the life of the President was at risk; however, there is insufficient evidence heretofore to categorically affirm that the above shots were part of a premeditated plan to assassinate the President of the Republic of Bolivia.

This is nevertheless very serious. Such actions not only could have killed and wounded, but the shots, at the very least, reflect a grievous call to violence and abuses of power on the part of some NP members. The contempt for Bolivian democratic institutions, and particularly the institution of the Presidency, on the part of NP officers is extremely worrisome. Indeed, the NP is obliged to respect the law and authorities like the rest of the citizens.

What we have stated does not mean that the life of the President was not in danger. It is precisely the professionalism and loyalty shown to the institutions and democracy by the Presidential security team, who are at the same time members of the NP—and who undoubtedly were under enormous pressure from the NP itself—that helped prevent a catastrophe of even greater magnitude. The life of the President of Bolivia was indeed in danger, as was the stability of Bolivian institutions and democracy in this country.

This fact should be a wake-up call for Bolivian citizens and the international community regarding the safety of the President, the Vice-President, their ministers, and other high-level government authorities, who are essential elements in the maintenance of a democratic institutional framework.

Finally, in our opinion, there was no general insurrection in Bolivia over these days. There were protests, a significant number of people were present who challenged the constitutional order, there were skirmishes, but no insurrection. To the contrary, the overwhelming majority of Bolivians were astonished by these incidents, fearing for the fate of the country and its democratic institutions, and did not show support for solutions that ran counter to the constitutional order.

b. The actions of the military

On February 12 and 13, 2003, the armed forces acted to defend democracy and the rule of law against an attack by police, and their response was controlled and proportional, the large number of victims notwithstanding. In this regard, however, it is urgent that a prompt review be done of the procedures to be followed, particularly as they pertain to controlling protests that might seriously disrupt law and order, as such incidents have become commonplace in Bolivia.

Nonetheless, the conduct of some uniformed personnel and their involvement in some of the events of February 13 should be investigated and clarified so that, if there are

[10]

cases of unlawful conduct, the appropriate sanctions may be applied.

c. The actions of the police
This report concludes that the events of February 12 and 13 constitute a violation—insubordination—of Bolivia's law and Constitution by members of the police. This insubordination posed a threat to Bolivia's political institutions and the Inter-American Democratic Charter, which, under Article 4, unequivocally states that:
 "The constitutional subordination of all state institutions to the legally constituted civilian authority and respect for the rule of law on the part of all institutions and sectors of society are equally essential to democracy."
What is even more serious is the fact that the Bolivian Constitution—specifically Article 215—establishes the applicable rules and principles, to wit:
"I.  The National Police, as a public force, have the specific mission to defend society, preserve law and order, and enforce the law throughout the national territory.  It polices in an integrated manner and under a single command, pursuant to its Organic Law and the Laws of the Republic.
 II.  As an institution, it neither debates nor engages in partisan politics, though as individuals, the members of the force both enjoy and exercise their rights as citizens in accordance with the law."
The lack of involvement in [political] debate on the part of public law enforcement is an unequivocal democratic principle.  A free, democratic, and open society is not compatible with uniformed forces that issue political judgments and have the weapons to back them.  The power to order the use of force is conferred, by the will of the people, on their popularly elected President, and not on the police.  The police are charged with the operative, tactical, and logistical management of the force, but the political decision about when to use the police is, in a democracy, the prerogative of the country's leader.  And a country's leader does not need to hold a criminal trial to determine whether or not the crime of insubordination was committed.  This is an immediate political judgment that is intrinsic to the office of the President.
The conduct of members of the NP and their involvement in some of the events of February 12 and 13 should be investigated and clarified and, if unlawful conduct occurred, the appropriate sanctions should be applied.

 d.  Impunity
In terms of consolidating and strengthening Bolivian democracy, it is essential to ensure that an exhaustive investigation into the tragic events of February 12 and 13 is conducted by the appropriate government authorities.  When appropriate, the competent judicial authority should determine the existence of any criminal liability and the Executive should make the administrative decisions.  The Congress should hold a debate about the incidents and draw lessons from the failure of State institutions; it should also provide the Office of the Chief Prosecutor with the information it has in a timely manner.
We categorically affirm that the NP officers who took part in the incidents described had the ability and power to determine the course of action they would take, and this requires them to assume responsibility for their decisions regardless of the country's historical backdrop.
In this regard, the events of February 12 and 13, in which civilians, servicemen, and

DEF-0000088
Ex. 1001.11

police lost their lives, warrant careful attention. The murder of and injuries suffered by innocent citizens have deeply affected Bolivian society. Accordingly, the investigation and possible shedding of light on these events merit thorough and meticulous actions to be taken by authorities of both the Office of the Chief Prosecutor and the Bolivian courts, whether they dispense civilian or military justice. They also deserve the most fervent resolve and support of the citizens. Bolivia should accept nothing less.

## 7. Recommendations

The objective of this report is none other than to strengthen democratic institutions and the rule of law in Bolivia.

Democracy is the center of political gravity in the Americas. As the Inter-American Democratic Charter states, the citizens of the hemisphere live under a political system that not only guarantees their rights and freedoms, but also grants them the right to democracy. Democracy today is a necessary, but not sufficient, condition for tackling complex economic, social, and political problems and challenges and securing development for our peoples and nations.

For this reason, the solutions needed to prevent incidents such as the ones of February 12 and 13 from recurring must emerge from within the democratic system, and only those solutions established in the Constitution and laws can offer democratic and just ways out. It will likely be necessary to follow a difficult path to ensure that all public authorities do what they need to in Bolivia and that the checks and balances essential to democracy are operating. It is also crucial that all of the leading public figures in Bolivia commit to not using violence for political ends and that they never veer from the rule of law in order to secure their social and political demands.

Based on how clearly difficult it was to preserve the lives of the Bolivian people during the events of that February 12 and 13, and given that some State institutions that we have already discussed were responsible for performing a government function and did not fully do so, the OAS is presenting Bolivia with a series of recommendations for strengthening its institutions, to wit:

 a. All of Bolivia's political, social, religious, and economic players

When the political reality of a country so demands, political parties and social actors may sign explicit agreements about the minimum ground rules for transparent participation in democracy that capture the commitment to political and social action of all civic-minded organizations without exception, even if their aim is to exercise their right to oppose and critique the democratic system itself. For growth, well-being, and the fulfillment of basic government functions to be possible, there must be an agreement on the fundamentals.

It is true that Bolivia is a pioneer in terms of agreements on democratic governance, and there are plenty of examples to that effect. But perhaps the times have changed. A first generation of political agreements, for the purposes of good governance, were concluded exclusively between political parties and their peers. A second generation—on public policy decisions—went further and included both political parties and social organizations.

It is clear that Bolivia now requires a third generation of agreements that go back to

DEF-0000089
Ex. 1001.12

the roots and seek not only arrangements and negotiation with respect to what divides the members of a coalition, but also outline the principles that unite all political and social stakeholders, perhaps even with some international participation.  The basic consensuses are undoubtedly being broken, and this is a point from which a way back must be found.  The Church and other social organizations have proposed a social pact or a national agreement.

An example that may be useful is the case of Peru, with the signing of the National Agreement on Governance [Acuerdo Nacional de Gobernabilidad] of July 22, 2002, which is binding on all the signatories until July 28, 2021, that is, for nearly 20 years.  In it, the main sectors of the public sphere in Peru agreed on a series of policies designed to meet four major objectives:  1. Democracy and the Rule of Law; 2. Equity and Social Justice; 3. The Country's Competitiveness; and 4. An Efficient, Transparent, and Decentralized State.

As a point of reference, those political, religious, civil society, and government organizations, without prejudice to their legitimate differences, agreed, with respect to the issue of democracy and the rule of law: "1.4 To preserve public order and citizen safety, by ensuring that the expression of our differences does not adversely affect the peace, justice, integrity, and liberty of individuals and respect for public and private property."

b. The President and the Congress

1. We believe that the responsibility for the process extends beyond the Technical Judicial Police's investigators, specialists from the Forensic Investigation Institute [Instituto de Investigaciones Forenses] (IDIF), or the prosecutors assigned to the case; it lies with competent officials.  The OAS supports what each has done in their respective area, and international experts have also attested to this.

There are, however, serious substantive problems that may give rise in the future to a failed investigation or impunity for those who are responsible for these incidents.  It is therefore essential that decisions be made immediately by the competent authorities.

The first substantive issue has to do with the fact that the Office of the Chief Prosecutor of the Republic must determine, based on the specifics of each case, which incidents should be tried in regular courts and which should be subject to military justice.

Additionally, as long as there is a problem of interpretation and consistency amongst the Organic Law of the Judiciary, the new Code of Criminal Procedure, and the Organic Law of the National Police with respect to the conduct of investigations and the authorities to whom employees of the Technical Judicial Police, the IDIF, and the Office of the Chief Prosecutor report, investigations might not be successful because of internal conflicts or procedures.

In our opinion, the most sensitive issue has to do with the role of Technical Judicial Police investigators, each of whom has enormous ability and commitment.  It is, however, risky and rather unreasonable to ask that, as members of the police, they investigate and incriminate other members of their own institution—their classmates, those who decide on their promotions, their superiors and commanders—particularly as members of a hierarchically structured uniformed force with very strong institutional values and principles.

Bolivia, hopefully sooner rather than later, must separate police security functions from investigative functions, and accordingly, the functions of the judicial police, with

[13]

DEF-0000090
Ex. 1001.13

their human, technical, and budgetary resources, must be fully transferred to the Office of the Public Prosecutor. Bearing in mind the objectives of the investigation, a mechanism should be temporarily implemented that would allow the Office of the Chief Prosecutor of the Republic to hire, under its Organic Law, specialized advisors or investigators, allowing it to have a team of investigators who are attached organically, functionally, and operationally to this single institution. For this to become a reality, the political and financial support of the Executive is essential.

In the meantime, those currently working as investigators should continue their efforts, under the protection of the Bolivian authorities and the international community, so that they may conduct their work free from pressure.

Lastly, the OAS can only agree with the remarks made by the Chief Prosecutor of the Nation before the House of Representatives: "…shedding light on these events requires the commitment of not only the Office of the Public Prosecutor of the Nation, but also of those entities that have the human and financial means, as well as the mechanisms in place, that enable them to gather accurate information. Criminal investigations, especially if they are of the magnitude and complexity of the ones discussed in this report, should be conducted under the aegis of a real system for integrating and joining efforts, supervised by the Office of the Public Prosecutor, and capable of obtaining responsible results that lead to true legal certainty. Such certainty is consistently being demanded by society, and is an incalculable and essential component of the Rule of Law."

2. The OAS believes that, because of the specifics of this case, and because there is a great deal of sensitivity surrounding it in Bolivia, the State must compensate and provide reparations to victims. As an exceptional measure, and only for this particular case, the Executive should create an authority to conduct an evaluation of all of the personal harm suffered as a direct result of the violence on February 12 and 13, 2003.

Once the victims or their survivors accept the compensation offered by the government, they waive the right to legal action in this regard. If they refuse compensation, they may pursue their claims through legal channels.

The Bolivian authorities will cooperate and lend full assistance and support to this authority for its work. This authority will submit a report to the government prior to August 6, 2003, that contains recommendations about compensation to individuals or their survivors for personal injury suffered as a direct result of the violence of February 12 and 13, 2003.

3. The OAS also holds that until cautionary measures are taken against those who spearheaded the events of February 12 and 13 to hold them accountable for their actions, Bolivia will continue to be subjected to collective extortion by those who use force abusively.

While the February uprising is the most recent and most significant in terms of its collective impact and the impact it has had on government institutions, it is not the only one; rather, it is part of a systematic and progressive chain of instances of unnecessary use of force by the police. Insubordination by the members of the GES on April 8, 2000, when they were demanding a 50% pay raise and increases in their food allowance, uniforms, and equipment, is the most immediate precedent we know of, though some investigations cite nearly 30 cases since 1982[3].

In the opinion of the OAS, the immediate removal from positions of command in

[14]

the police force of those who led the February 12 and 13 revolt—for having violated Art. 215 of the National Constitution—until the corresponding criminal investigation concludes is a *sine qua non* for strengthening both the police force as an institution and peoples' belief in justice.

The "agreement" that emerged out of the heat of the events of February 12 and 13, which some allege absolves [the perpetrators] of responsibility, is not enough.[4]  A pact like this cannot supersede the Constitution or the law.  Moreover, the very fact that the agreement was reached under threats or by the use of force by one of the sides flatly invalidates the consent of the other side.

4.  Managing the government will always require a delicate balance to be struck between consensus and coercion.  Pure consensus is a utopian concept and leads to inertia.  Force alone equals authoritarianism.  The more consensus there is surrounding the use of force, the more legitimate that use of force will be.  The government must therefore urgently advocate the development of a National Citizen Safety Strategy that should constitute an institutionalized State policy rather than just a policy of the current administration.

The government's presentation of the Comprehensive National Citizen Safety Plan is a good beginning.  This Plan was approved by the National Security Council and contains 100 basic actions, all of them well underway.

The Strategy being proposed is perhaps less ambitious, but longer term.  And whether it is within the framework of the aforementioned agreement, or via working groups in the mayors' offices and prefectures during a specified amount of time, citizen participation is a *sine qua non*.  Such Strategy may establish State policies in the following areas:[5]

a. The State and citizen participation:  National Council of Citizen Security; decentralization and involvement of local authorities; crime prevention; methods of punishment from traditional peoples;

b. The fight against drug trafficking;

c. Police reform: command structure and organization; no political debate or participation; salary and promotion structure; community policing; a separation of investigative police from preventive police; surveillance and data systems; police code;

d. Penal system: legalization and penalization of conducts;

e. Relationship between the armed forces and the police: delimitation of functions;

f. Prison and jails system;

g. National Observatory of Violence and Crime Studies;

h. Disarmament and arms control.

5.  Lastly, and as the President has repeatedly stated to the OAS, the government is committed to fully supporting the Office of the Chief Prosecutor's investigation.  The OAS harbors no doubts about the administration's intentions and thus expects this political will to continue.

c. The political parties and the Bolivian Congress

To speak of democracy, particularly representative democracy in the context of the Americas, is necessarily a discussion about political parties.  It is essential that these parties be structured and have the human and financial resources they need to articulate

DEF-0000092
Ex. 1001.15

the needs and aspirations of the Bolivian society.

The Inter-American Democratic Charter recognizes the fundamental importance of having multiple political parties as well as the need to strengthen them.  It is necessary to ensure that Bolivian political parties are not only able to express different social, economic, or political interests, but that they also be able to channel and articulate such interests, and propose appropriate policies to address them that are legally and economically viable and consistent with the positions or policies of other parties or movements.

Because Bolivia's society is so diverse, it is necessary to encourage mechanisms that allow the interests of a people as diverse as the Bolivian people to be articulated without losing sight of the general welfare.  In Bolivia, the opinion that has been taking root throughout the Americas—that in the spectrum of leading public figures, political parties have the worst image—must be reversed.[6]  Such an opinion seriously undermines democratic values.

Bolivia, as a signatory to the Inter-American Democratic Charter and vis-à-vis its involvement in the Summits of the Americas, has committed to strengthening its political parties as a *sine qua non* for improving democracy.  The Organization of American States, the Inter-American Development Bank (IDB), the Andean Development Corporation (CAF), and many other hemispheric institutions must work with the government of Bolivia to undertake this task in all its magnitude.  The different aspects of this task include registering political parties, political parties' access to financing and the media, campaign financing, oversight of elections and reporting of election results, and the relationship between political parties and other segments of society.  Political reform, within the framework of the Governance Agreement, is particularly important to Bolivia's future.

The involvement of indigenous peoples in the political process is particularly important in Bolivia, in keeping with efforts in the hemisphere to ensure that such participation is continuous, ethical, responsible, and constitutional.  It should also be consistent with Article 9 of the Inter-American Democratic Charter, which discusses "the elimination of all forms of discrimination, especially gender, ethnic, and race discrimination, as well as diverse forms of intolerance, the promotion and protection of human rights of indigenous peoples and migrants, and respect for ethnic, cultural and religious diversity in the Americas contribute to strengthening democracy and citizen participation".

For this reason it is necessary to secure a social pact or national agreement that makes it possible to achieve convergence on national issues.  This would be good for Bolivia's democracy.  One must acknowledge that such a tool might be relatively useless for resolving the differences and major disagreements that have emerged between the government and the opposition—e.g. both the Movement Toward Socialism [Movimiento al Socialismo] (MAS) and the New Republican Force [Nueva Fuerza Republicana] (NFR)—with respect to the economic model or anti-drug policy.  It is, however, important to establish national consensuses in order to open up channels of participation and seek tools that make it possible to undertake political reform in the country, as well as establish agreements on economic issues that make it easier to extricate Bolivia from its current situation.

[16]

DEF-0000093
Ex. 1001.16

d. The international community

What happened in Bolivia has had a major impact on the region and, as has already been stated, largely grew out of specific regional situations of political instability, social upheaval, and an adverse international environment.   As a result, it is both relevant and important to frame these events in a broader international context, in order to fully understand them, so that the international community may take all precautions necessary to ensure that Bolivia has the cooperation and solidarity it requires under these circumstances.   To this end, we have highlighted the most relevant economic events for Bolivia in the context of globalization and capital volatility, as well as the difficulties Bolivia faces in terms of penetrating the world economy because of transportation and infrastructure problems, and because it lacks a vigorous private sector.

Bolivia has wide varying and serious problems and, as the OAS can attest, is especially grateful to the international community for its involvement in finding solutions.   We have already seen how critical the issue of external financing is for public investment and spending.   It is essential that the international community remain highly committed to Bolivia as it navigates a difficult time in which both concessional and non-concessional resources are urgent.   It is also urgent that support be given to Bolivia to ensure continued trust in its democratic institutions via programs that make certain that those most disadvantaged receive tangible government benefits, with the support of the international community.

It is also very important to note that, as the government has manifested with the support of the international financial community, support must given to the productive and banking sectors, which have been appreciably weakened by sluggish economic growth over the past four years.   The necessary legal and regulatory measures must be implemented in order to ensure that these sectors grow and are profitable.   The export sector must also be strengthened, specifically in order to better take advantage of the benefits of the Andean Trade Program and Drug Eradication Act (ATPDEA).   Bolivia has set a plan in motion to capitalize on the potential of this preferential access to the North American market, but the results are yet to come.

It also bears mention that Bolivia's development strategy to ensure there is enough growth to guarantee a substantial reduction in poverty and to once again improve human development indices, makes it essential that a timely decision be made to move forward with projects aimed at making use of the vast gas and petroleum reserves—particularly the LNG project—based on reasonable economic and financial criteria.   This process, however, given the high degree of scrutiny to which it is subject, must be governed by an intensive process of consultation and citizen participation; it should also be highly transparent and, when it comes time to make a decision, should be very persuasive and have a high degree of citizen support.

In order to support Bolivia under its current circumstances, it is very important to obtain sufficient and timely support from the International Monetary Fund (IMF).   On this occasion, the problems had to do not only with conditionality, but with timing.   Negotiations with the IMF aimed at reaching a triennial agreement within the framework of the Poverty Reduction and Growth Facility (PRGF) were unduly prolonged and even included consideration of a matrix that contained 39 conditions precedent, which were, in any case, excessive.   Proof of this is the fact that the events of February 12 and 13 changed the terms of the agreement.   The approval, a few weeks ago, of a Stand-by

[17]

DEF-0000094
Ex. 1001.17

Agreement for US$118 million is hopeful for Bolivia.

The events of February 12 and 13 should, however, also open the eyes of the international development community to other issues. A program to strengthen the judiciary and, specifically, the Office of the Public Prosecutor, is an absolute priority in Bolivia. The same is true with respect to the creation of a national program to protect and promote human rights with the support of the Inter-American Human Rights Commission and international financing. It is also imperative that Bolivia be provided with the "know how" that exists in the world and in the Americas with respect to local conflict resolution. Another issue of the utmost importance is that Bolivia be offered advisory assistance and support as it takes on the major task of reforming the police force in order to prepare it for the countless number of new tasks, responsibilities, and problems the country must tackle.

### 8. Final reflection

This report is framed within a new relationship between the OAS and the governments or States that is based on the premise that, without undermining respect for the principle of non-intervention, countries may ask the OAS and its political bodies for the advice and support they need to defend their democracies when certain situations place them in jeopardy.

The OAS, inspired by Bolivia's commitment to the principles and values enshrined in the Inter-American Democratic Charter, is taking part in this process with the aim of strengthening democracy in Bolivia.

In this exercise, we have found ourselves in a new role that enriches us and, at the same time, bestows on us many responsibilities. In the case at hand, we have found that Bolivia is reverting to a certain type of determinism and historical pessimism, according to which the country always seems worse, gloomier, and more unjust. There is undoubtedly a very adverse international environment that has exacerbated the difficulties inherent to the task of development. Similarly, globalization has brought with it capital volatility, as well as fears, traps, and dangers because of a much more competitive international environment in which, on occasion, preferential access is not given to markets, but rather, more often than not, the markets are closed to us.

Today, Bolivia is affected much more by the situation in Latin America, particularly because at the slightest sign of difficulties in nearby countries, there is extraordinary capital flight.

It has also been difficult for the judiciary and law enforcement authorities to take on criminal organizations that are far more powerful and better organized, especially when it comes to drug trafficking.

During our stay in Bolivia, a country with enormous human potential and an indisputable richness that comes from its diverse, multicultural society, we encountered a level of self-criticism that bordered on self-flagellation. We are of the opinion that Bolivia has enormous capacity to change course and rise above the current adverse situation in order to take a leap forward in its development and achieve greater well-being for all. We are certain that although the Bolivian experience is unique, in these times of greater interdependence, Bolivia will find useful lessons in the experiences of other countries in the Inter-American system, and a great degree of solidarity from both the

[18]

DEF-0000095
Ex. 1001.18

hemisphere and from the rest of the community of nations.

There are countless signs of hope for the Bolivian nation.

There is a free, diverse, and independent press, which is fundamental for preserving the rule of law. Where other countries have seen a concentration and monopolization of the media, or in some cases, arbitrary government intervention in the media, Bolivia has media institutions that are characteristic of a truly open society.

The OAS emphasizes how important it is for Bolivia to have rich and copious literature about its problems and the solutions to those problems that comes from different perspectives and knowledge bases, which are indicative of a society that is giving due priority to public and collective issues.

The trust placed in multilateral institutions such as the OAS, the IDB, the World Bank, and the CAF in a situation as sensitive as the one analyzed herein, the international community's commitment to provide support to Bolivia during these difficult times, the active involvement of Bolivia in the community of nations, and the enormous political will to seek creative alternatives to crises that are widespread throughout the region are all a source of great hope for Bolivia.

For this, there is enormous responsibility on the shoulders of all Bolivians, with no distinction between race, gender, or social class. As a recent editorial so clearly expressed, "the country is experiencing a sort of collective schizophrenia that must be treated with a spirit of grandeur and in the context of the frameworks established by the democratic system. Any other direction, to be sure, will result in authoritarianism, under which not only will the current problems worsen, but the human rights situation will also deteriorate. The history of Bolivia—and of Latin America—is very illustrative in this respect, and it would inexcusable for the elite to repeat the error of opting for a path that is not consistent with the Constitution."[7]

Lastly, the OAS is not presuming to find solutions to the exclusion of the Bolivian people. Only they will find the solutions. This report seeks to facilitate the process with a document that includes several initiatives by Bolivians for Bolivians.

This document should be analyzed as a vehicle to bolster Bolivia's good governance and should be debated, discussed, and even disputed, provided that this serves to find a common path for all Bolivians, based on the natural plurality of opinions.

[1] J. A. Morales, "Economic Vulnerability in Bolivia," L. Whitehead and J. Crabtree, editors. "Towards Democratic Viability: The Bolivian Experience" (Oxford, 2001).

[2] UNDP, 2002, Human Development Report in Bolivia, La Paz, p.18.

[3] Weekly report, "La Policía tiene líos desde 1982 and hoy hay dos grupos de rebeldes" [The Police have had problems since 1982 and nowadays there are two groups of rebels], pp. A8-A12, La Razón newspaper, Sunday, March 16, 2003.

[4] Interview with National Police Commander Edgar Pardo, in La Razón, Sunday, March 16, 2003.

[5] An extensive analysis can be seen in the "Informe del Defensor del Pueblo sobre Seguridad Ciudadana en Bolivia" [Report by the Ombudsman on Citizen Security in Bolivia], La Paz, Bolivia, 2002.

[6] The Economist, August 15, 2002.

[7] Editorial in La Razón, Monday, March 17, 2003

DEF-0000096
Ex. 1001.19



Organización de los
Estados Americanos      Estructura      | Sectores y Temas ... ▼ |      Idioma | Español |

Acerca de la OEA  |  Países  |  Noticias  |  Multimedia  | Publicaciones | Documentos |  Divulgación  |  Rec

(Spanish version only)


APUNTES DEL INFORME DE LA OEA SOBRE LOS HECHOS DE FEBRERO DEL 2003 EN
BOLIVIA


**INFORME DE LA ORGANIZACIÓN DE LOS ESTADOS AMERICANOS (OEA) SOBRE
LOS HECHOS DE FEBRERO DEL 2003 EN BOLIVIA**



Informe preparado por la Secretaría General de la OEA

Mayo del 2003

DEF-0000097
Ex. 1001.20

## 1. Introducción

Los días 12 y 13 de Febrero de 2003, Bolivia vivió un momento trágico de su historia, así como uno de los más determinantes y definitivos para su futuro. El país sufrió un grave quebrantamiento del cumplimiento de la función del Estado de garantizar a los ciudadanos seguridad, respeto a sus derechos y protección para su vida; enfrentamientos armados entre la Policía y las Fuerzas Armadas; cerca de treinta personas muertas, vandalismo y saqueos en las calles; civiles, soldados y policías heridos y muertos; incendios provocados de oficinas públicas, privadas y de partidos políticos, fueron los hechos dominantes de unas jornadas de miedo, violencia y anarquía generalizados.

## 2. Antecedentes

En comunicación dirigida al Secretario General de la Organización de Estados Americanos (OEA) el 14 de febrero de 2003, el Canciller de la República de Bolivia solicitó la urgente cooperación de la OEA ante los "... hechos de violencia en mi país, muchos de los cuales han estado dirigidos a desestabilizar el proceso democrático en Bolivia. El hecho más preocupante ha sido la actuación de francotiradores no identificados, que han disparado contra la población civil provocando varias muertes... La gravedad de la situación y la necesidad de contar con una investigación imparcial y objetiva que permita aclarar estos hechos de terrorismo, que afectan la seguridad de la población y al propio estado de derecho, han llevado al gobierno de Bolivia a solicitar que la Secretaría General de la OEA envíe, a la brevedad posible, una comisión investigadora que coopere en el esclarecimiento de estos atentados terroristas que han causado la pérdida de vidas humanas".

En la misma fecha, el Consejo Permanente de la OEA, luego de oír al señor Canciller, emitió la Resolución CP/RES. 838 (1355/03) que determinó:

"1. Expresar su pleno y decidido respaldo al gobierno constitucional del Presidente de la República de Bolivia, Gonzalo Sánchez de Lozada y a las instituciones democráticas.
2. Condenar la utilización de la violencia y demás actos no democráticos que afectan la democracia y la gobernabilidad de Bolivia.
3. Reafirmar que la subordinación constitucional de todas las instituciones del Estado a la autoridad civil legalmente constituida y el respeto al estado de derecho de todas las entidades y sectores de la sociedad, son componentes fundamentales de la democracia.
4. Ratificar la firme determinación de los Estados Miembros para aplicar los mecanismos previstos por la Carta Democrática Interamericana para la preservación de la democracia.
5. Instar a todos los sectores de la sociedad boliviana a reforzar los canales de diálogo y la tolerancia y a que se abstengan de estimular la violencia política.
6. Reiterar que la promoción y observancia de los derechos económicos, sociales y culturales son consustanciales al desarrollo integral, al crecimiento económico con equidad y a la consolidación de la democracia en los Estados del Hemisferio.
7. Apoyar los esfuerzos que realice el Gobierno de la República de Bolivia para lograr, con la urgencia que el caso requiere, acuerdos con las instituciones financieras internacionales, que contribuyan a la estabilidad democrática, social y financiera en ese país".

## 3. Alcance de la Misión de la OEA

Con el propósito de cumplir con la solicitud del Gobierno Boliviano, se realizó una

DEF-0000098
Ex. 1001.21

reunión de trabajo el 6 de Marzo en La Paz, Bolivia, entre el Presidente de la República de Bolivia y sus principales colaboradores, el Fiscal General de la República y el Secretario General de la OEA, en la cual se definió el marco de referencia de las labores de la Organización.

En aquella sesión se concluyó que la OEA colaboraría en dos tareas específicas:

a. Con la Fiscalía General de la República en el cumplimiento de sus funciones constitucionales y legales, mediante cooperación técnica, a través de expertos internacionales en áreas afines a la investigación criminal, quienes apoyarían a los fiscales del proceso en la investigación de los hechos ocurridos el 12 y 13 de febrero de 2003. Se acordó, igualmente, que el apoyo de la OEA a la Fiscalía en nada podría menoscabar la autonomía del Ministerio Público en Bolivia, ni suplantarla en sus funciones constitucionales.

b. Con el Gobierno Nacional, en la elaboración y presentación de un informe para dar una versión de los hechos ocurridos el 12 y 13 de febrero, que permitiera avanzar en la discusión sobre las fallas institucionales durante esos sucesos y que recomendara al Gobierno y al país posibles acciones para fortalecer la democracia, así como para tomar decisiones sobre responsabilidades políticas, mas allá del proceso de resolver los problemas que se interponen en la investigación judicial.

Este Informe no compromete al Ministerio Público, ni a la Fiscalía General de la República, ni al poder judicial en sus funciones jurisdiccionales, ni expresa la opinión de los organismos competentes sobre la investigación. Como quiera que a la OEA no le asisten funciones jurisdiccionales, tampoco corresponde a este informe señalar a persona alguna que pudiese haber intervenido en la comisión de delitos, por lo que se limitará a describir los hechos ocurridos, a dar sus conclusiones al respecto y a ayudar al poder ejecutivo a establecer responsabilidades políticas sobre sus funcionarios y, finalmente, a realizar recomendaciones para evitar la recurrencia de hechos de esta naturaleza.

La OEA reconoce muy especialmente la ingente labor que está realizando el Ministerio Público, así como las enormes dificultades y retos, sin precedentes para una investigación de esta naturaleza, lo cual la hace especial y diferente de todas cuantas se hayan realizado en el país.

## 4. Breve contexto de la situación actual de Bolivia

Los bajos niveles de crecimiento económico, desde fines de la década de los noventa, han sido uno de los más mayores desafíos para la democracia en el Hemisferio, y el caso de Bolivia no constituye una excepción. Sin duda fue excesivo el optimismo que se generó en ese país y a todo lo ancho de América sobre las posibilidades de crecimiento económico una vez concluido el enfrentamiento bipolar y adoptadas las medidas de cambio estructural, y desde luego, ello ha tenido un efecto directo sobre la gobernabilidad democrática del hemisferio.

Situaciones externas como el hecho de que en los últimos siete años Bolivia ha tenido que afrontar tres crisis de orden global que han afectado de manera severa su tasa de crecimiento por el denominado "efecto contagio", han sido causas importantes de su situación difícil. Bolivia pudo superar, en realidad sin gran traumatismo, la crisis mexicana. No ocurrió lo mismo con la siguiente crisis de inestabilidad que comenzó en Rusia y luego pasó a numerosos países asiáticos, la cual se extendió a muchas economías latinoamericanas, pero en especial a aquellas de la región Andina y Brasil, importante socio comercial de Bolivia. Tampoco hay duda en que la última crisis originada en Argentina, que ha tenido un impacto significativo en los países

DEF-0000099

Ex. 1001.22

suramericanos, ha puesto una enorme presión sobre la economía y el sistema político boliviano.

En muchos países latinoamericanos, incluido Bolivia, se encuentran también múltiples razones de orden interno que acentuaron y facilitaron dichas crisis, tales como una inadecuada gestión económica, inapropiado desempeño de las instituciones públicas y deterioro de los sistemas políticos de la región, que a su vez han socavado la confianza pública y han perturbado la estabilidad social y política, el respeto al estado de derecho y el imperio de la ley.

Aunque en Bolivia se dan algunos de estos fenómenos, existe el reconocimiento de que a lo largo de la última década se ha realizado una eficaz gestión macroeconómica[1]. Los resultados del proceso de reformas estructurales de los 90's fueron relativamente positivos. La tasa de crecimiento medio fue del 4%, el PIB per cápita de Bolivia tendió a incrementarse leve pero sostenidamente y las tasas de inflación presentaron un descenso progresivo mientras que el déficit público se mantuvo controlado[2]. Avances en la universalización educativa, así como en la expectativa de vida, fueron las notas predominantes de las últimas décadas.

Pero un crecimiento económico, sin embargo, jalonado por una inversión pública que depende en gran medida de los recursos externos, está expuesto a que, en coyunturas como la actual, esos recursos no estén disponibles. Además de ello, los niveles de pobreza y desigualdad no han disminuido en los últimos años y la concentración del ingreso ha empeorado.

Es posible afirmar que una buena parte de los sectores menos favorecidos de la sociedad boliviana no han podido beneficiarse de los frutos del crecimiento o han salido damnificados por el bajo crecimiento.

La situación actual de la economía boliviana presenta una contracción en la demanda agregada (el consumo de hogares el cual representa un 75% del PIB, consumo público, inversión e importaciones netas) y una reducción del crédito en el sector financiero.

Es probable que tal resultado sea una consecuencia de una serie de factores tales como la lucha contra las drogas y la reducción de la inversión extranjera directa de finales de los 90s que han afectado la demanda agregada,  las bajas tasas de crecimiento del último quinquenio y del sesgo que tiene la mayor incorporación a la economía mundial con la enorme disparidad de salarios que se crea a favor de la mano de obra calificada.

El proyecto de presupuesto presentado inicialmente por el gobierno ante el Congreso buscaba cerrar una brecha entre ingresos y gastos de la Administración de alrededor de US$240 millones. La reducción drástica del gasto público y la congelación de los salarios no era suficiente para ese efecto; el gobierno no quería reducir la inversión pública, ni disponer un alza en el precio de los hidrocarburos que hubiera afectado a los sectores más vulnerables de la sociedad, y por lo tanto se decide por proponer al Congreso, de manera simultánea con la presentación del presupuesto, un incremento de la carga impositiva a los asalariados por encima de dos salarios mínimos. Tal propuesta, aún cuando apenas era presentada al Congreso para su negociación y trámite, facilitó la organización de la protesta gremial de la Policía,  bajo la bandera de reivindicaciones laborales para todos los bolivianos .

En otro sentido, la democracia boliviana, desde 1982 y luego de un largo período de regímenes dictatoriales, ha avanzado, sin duda, en un proceso importante de democratización y de construcción institucional. Las cinco elecciones nacionales que

DEF-0000100

Ex. 1001.23

han tenido lugar han resultado en un cambio pacífico y constitucional de gobierno. En Bolivia, a diferencia de lo que ocurre en muchos otros países de la región, la política es, esencialmente, una política de partidos. El país tiene una combinación de partidos tradicionales y no tradicionales que utilizan mecanismos institucionales firmemente establecidos para elegir a sus respectivos candidatos.

En los últimos veinte años la gobernabilidad del sistema político se ha edificado sobre pactos políticos celebrados para tomar decisiones que han permitido tener de manera permanente un significativo apoyo en el Congreso y en especial aprobar las reformas que afectaron las estructuras económicas e institucionales, en las cuales Bolivia fue pionera y que son un ejemplo, como fueron las reformas económicas de primera y segunda generación.

La irrupción de nuevos actores en el escenario político -nuevos partidos así como organizaciones sociales que son expresión legítima de una sociedad civil actuante- es un elemento positivo que demuestra que la sociedad boliviana, en toda su diversidad étnica y social, cree en su mayoría en la posibilidad de cambio social a través de sus instituciones políticas. El nuevo liderazgo político indígena, que cuenta con cerca de cuarenta representantes en el parlamento, es evidencia de la participación de un sector de la sociedad boliviana que hasta ahora estaba prácticamente aislado del proceso político. Así mismo, con la creación de la Defensoría del Pueblo se ha avanzado la promoción y protección de los derechos humanos.

El gran problema del balance democrático, luego de veinte años de vigencia, es que si bien ha logrado un avance importante en el fortalecimiento de las Instituciones –la mayor prueba de ellas es la institucionalización democrática de las Fuerzas Militares que se puso a prueba en los hechos de Febrero- el sistema político no ha sido capaz aún de resolver muchas de las demandas sociales de los bolivianos, lo cual no es ajeno a las democracias latinoamericanas, ni tampoco ha abierto los suficientes canales de participación para todos los sectores de la sociedad. Como consecuencia de esto, y a pesar de la convicción democrática de la gran mayoría de la población, existe un continuo descontento con el ejercicio de la democracia boliviana. Se presenta una polarización radicalizada entre partidos "sistémicos" y "asistémicos", lo que crea un ambiente de permanente confrontación.


**5. Los Hechos del 12 y 13 de Febrero**

La presente relación de los hechos del mes de febrero fue realizada con la colaboración de expertos y técnicos de Brasil, Colombia y Estados Unidos, provenientes de organismos de reconocida solvencia como son el Instituto Nacional de Criminalística de la Policía Federal del Brasil, la Fiscalía General de la Nación de Colombia y el Federal Bureau of Investigation (FBI) de los Estados Unidos. Dichos técnicos, así como el personal de la OEA, realizaron entrevistas, trabajo de campo, evaluaciones y peritajes entre el 5 y el 21 de marzo, del 31 de marzo al 4 de abril y entre el 21 y el 24 de Abril de 2003. A la Fiscalía le corresponde valorar ese trabajo a la luz del sistema judicial boliviano y, eventualmente, cotejarlo en relación con otros testimonios o pruebas.


a. El 12 de Febrero 2003

Los efectivos policiales del Grupo Especial de Seguridad (GES) de la Policía Nacional (PN), que se encontraban amotinados desde el día anterior, aproximadamente a las 06:00 a.m., empiezan a recibir policías de diversas unidades que se congregan en su sede. El GES es una unidad policial de control de motines cuya misión consiste en

DEF-0000101
Ex. 1001.24

responder rápidamente cuando los mismas se produzcan. Es importante resaltar que la sede del cuartel del GES se encuentra a media cuadra de la Plaza Murillo, donde está ubicado el Palacio Presidencial.

Otros policías uniformados y vestidos de civil comienzan a congregarse cerca de la Plaza Murillo y en la sede del GES. Los policías uniformados se encuentran armados con armas de puño, fusiles de asalto, escopetas, lanzagranadas de gas de 37 mm, carabinas de calibre .30 y lanzagranadas de gas de calibre .12. Horas después, durante la mañana, se ve a un Policía parado en el tejado de un edificio con una ametralladora.

Aproximadamente a las 09:00 a.m. llegan autobuses de la Academia de la PN con los que al parecer son cadetes de tercer año (según filmaciones). Se ignora si también llegan cadetes de policía de menor o mayor graduación.

Efectivos de la PN de civil y uniformados, así como algunos jubilados, se reúnen y comienzan a marchar en torno a la Plaza denunciando el plan gubernamental sobre el impuesto a la renta y la falta de salarios adecuados. La manifestación dio vuelta a la Plaza sin incidentes mientras la Escolta Presidencial del Ejército boliviano mantenía posiciones de seguridad en torno al Palacio Presidencial.

A esa altura había un gran contingente de efectivos de la PN de diversas unidades, incluidos bomberos. Algunos miembros de la PN se posicionaron en el tejado de la sede del GES y en el edificio del Ministerio de Relaciones Exteriores (MRE), inmediatamente adyacente al del GES. El edificio del MRE está ubicado en la esquina Norte de la Plaza. El frente del edificio está en ángulo recto con el Palacio Presidencial y el edificio del Congreso. El cambio de elevación de la Plaza hace que el edificio del MRE esté ubicado en un nivel más alto que el Palacio Presidencial, lo que ofrece una ventaja táctica a cualquier persona que se encuentre en el tejado de dicho ministerio.

Entre las 10:00 a.m. y las 11:00 a.m., alumnos del Colegio Ayacucho salieron de su unidad educativa para dirigirse a la Plaza con el propósito de protestar, pero fueron repelidos por unidades de control de la PN (Academia de Policía). El choque entre la PN y los estudiantes se produjo cerca de la esquina de las calles Ayacucho y Comercio, al tiempo que los miembros de la PN utilizaron gas lacrimógeno. Los estudiantes volvieron a reunirse para marchar una vez más contra el Palacio Presidencial.

Aproximadamente a las 11:00 a.m., los estudiantes se abrieron paso hasta la Plaza y avanzaron hacia el Palacio Presidencial, aprovechando que los policías que los contenían se replegaron a instalaciones del Palacio Legislativo. Ante ésta situación, un número reducido de soldados con escudos, salieron a intentar dispersar a los estudiantes. Efectivos de la PN lanzan gases lacrimógenos a los soldados, los que los obligó a replegarse al interior del Palacio Presidencial, asegurando las puertas de ingreso, dado que carecían de máscaras antigas.

Al no existir custodia en la calle del frente y del costado del Palacio, los estudiantes comenzaron a arrojar contra Palacio piedras que tenían presumiblemente en sus mochilas, rompiendo ventanas de la planta baja, y del primer y segundo piso. Las filmaciones realizadas sugieren la existencia de por lo menos cuatro disparos de armas de fuego que impactaron contra el primer y segundo piso del Palacio. A todas estas, los estudiantes seguían atacando el Palacio al grito de "Ayacucho". Los policías efectuaron disparos profusos de gases a Palacio.

Pocos minutos después apareció personal militar en los balcones del Palacio arrojando granadas de mano de gas lacrimógeno para dispersar a los estudiantes. Cuando éstos se retiraron, el Ejército arrojó más gas lacrimógeno desde los mismos balcones, pero

DEF-0000102

Ex. 1001.25

en esta oportunidad utilizando lanzagranadas apuntadas hacia la Plaza. Los estudiantes se retiraron ubicándose junto a los miembros de la PN estacionados frente al edificio del MRE.

El personal militar retoma posición en las calles delantera y lateral del Palacio Presidencial. Llegan unidades adicionales de la Policía Militar (PM) del Ejército y toman posición frente al edificio del Congreso y a la Catedral (este y oeste, respectivamente), que está ubicada a la derecha del Palacio y junto a éste.
Siguen arribando refuerzos de la PM, que toman posición cerca de la intersección de las calles Socabaya y Comercio, y Comercio y Ayacucho.  Las unidades militares están equipadas con escudos antimotines, máscaras antigás (no todos los soldados las tienen), fusiles de asalto FAL y lanzagranadas de gas.

Mientras llegan unidades adicionales del Ejército y toman posición cerca del Palacio y de la Plaza, miembros de la PN les arrojan gas lacrimógeno.  Otra unidad del Ejército se desplaza y toma posición en la esquina de las calles Comercio y Socabaya, cerca de la Catedral.  Sus efectivos son confrontados por miembros de la PN, que están aproximadamente a 30 metros al frente y gritan e insultan a los militares.  Las unidades del Ejército se mantienen en formación y conservan su posición sin avanzar.

Efectivos uniformados y de civil de la PN, así como civiles, se congregan en diferentes intersecciones en la Plaza o en sus proximidades, y se escucha que gritan palabras obscenas y despectivas hacia las unidades del Ejército.  Las unidades del Ejército no responden y mantienen sus formaciones.  Cuando una de las unidades del Ejército avanza hacia el Norte por la calle Bolívar hacia la calle Ballivián, en la que estaba reunida una multitud de manifestantes, las unidades del Ejército reciben gas lacrimógeno disparado por miembros de la PN que se aproximan desde el lado norte de la calle Ballivián. La unidad del Ejército se retiró hacia el Sur y disparó gas lacrimógeno al desplazarse, tomando posiciones defensivas cerca del edificio del Congreso.

Se ignora cuándo ocurrió, pero un bombero de la PN que utilizaba una máscara antigás y que estaba junto a otros miembros de la PN y bomberos armados con pistolas ametralladoras de 9 mm, recibió un disparo en el rostro o en un ojo, causado por una bala aparentemente de goma disparada por un soldado ubicado cerca del edificio del Congreso.  La Policía y los bomberos habían venido disparando gas lacrimógeno desde una intersección sobre la calle Bolívar.  El bombero herido en el rostro puede alejarse a pie, pero sangrando profusamente.

El Mayor David Vargas de la PN, funcionario de MUCOPOL que se había instalado en el GES es entrevistado por la prensa local y declara públicamente que la PN está ejecutando el "Plan Rojo", advirtiendo a los ciudadanos que permanezcan en sus hogares. Luego de la declaración, continúan llegando a la Plaza policías de diversa graduación.

El Jefe de la Casa Militar y General de Brigada Hugo Tellería, se reunió con el Mayor David Vargas de la PN acompañado por el señor Sacha Llorenti de la Asamblea de Derechos Humanos, para analizar la posibilidad de un cese del fuego. Con posterioridad se reinició el diálogo con el Ministro de Defensa Freddy Teodovich.  Habiéndose acordado el repliegue de los miembros de la PN, se establece que las unidades del Ejército retrocedan hasta el borde de la Plaza frente a Palacio y que la policía no realice ninguna acción, lo cual garantizaba la ausencia de manifestantes y de tal manera se facilitaba el diálogo.

Al iniciarse el repliegue militar, continúan llegando al lugar unidades de la Policía, que toman posiciones en diversas intersecciones de la zona que rodea a las unidades militares en el Palacio Presidencial y en la Plaza.

DEF-0000103

Ex. 1001.26

Es en ese momento en que un contingente de integrantes de la PN llega en varios vehículos con el rótulo "Radio Patrulla 110" desde el Este, por la calle Comercio, con sonido de sirenas, e inmediatamente sacan y empuñan sus armas al bajar de sus vehículos, enfrentando a unidades del Ejército ubicadas en la misma calle. Los soldados no efectúan disparos, sino que se retiran dando vuelta a la esquina y penetrando en la calle Ayacucho, pero lanzan gas lacrimógeno a las unidades policiales. Se producen disparos.

Unidades policiales posicionadas en el MRE comenzaron a disparar gas lacrimógeno y a efectuar disparos con armas de fuego a unidades militares ubicadas directamente en frente de ellas, en la calle Socabaya y Comercio. Los militares responden con gas lacrimógeno y con armas de fuego (no se sabe si en esta oportunidad utilizaron balas de goma o munición letal). Prosigue el intercambio de disparos y un efectivo de la PN que caminaba frente al MRE es alcanzado por un disparo en la pierna. Al proseguir los disparos, miembros de la PN se retiran dando vuelta a la esquina y penetran en la sede del GES, y comienzan a disparar con armas cortas y fusiles de asalto al personal militar que está en la Plaza.

El Mayor Vargas se quejó de las muchas bajas sufridas por la PN. Se escuchó que Vargas, al acercarse a otras unidades de la PN formuló expresiones despectivas contra los militares, y dijo que no se rendiría tan fácilmente.

Miembros de la PN son vistos en el techo de la caseta de la guardia ubicada a la entrada de la sede del GES, disparando con fusiles de asalto contra los militares. Momentos después un efectivo de la PN que está parado dentro de la caseta es herido de bala en la cabeza y muere instantáneamente.

Integrantes del Grupo de Acción Inmediata (GAI) de la PN llegan a la sede del GES. El GAI es reconocible por su uniforme característico, sus emblemas y sus fusiles (M4). Extraen de un vehículo dos cajas de plástico negro largas y angostas, de aproximadamente ocho pulgadas de ancho, y una es llevada al interior de un edificio perteneciente al Instituto Nacional de Reforma Agraria (INRA) de Bolivia, (las dimensiones y características de las cajas coinciden con las utilizadas para guardar y proteger fusiles de precisión). Se observa a un grupo de efectivos del GAI que entra en el edificio del INRA en tanto que otro grupo se abre paso hacia el tejado del GES, desde donde hay fácil acceso al tejado del edificio del MRE.

Integrantes de la PN hicieron una incursión en la sede de la Justicia Militar Regional de Bolivia, ubicada en la calle Bolívar. Miembros de la PN y personas que vestían de civil irrumpieron en un lugar de estacionamiento, empujando los autos hasta la calle y prendiendo fuego al edificio y a los vehículos.

En una revisión posterior del edificio del INRA, los fiscales encargados de la investigación encontraron varias vainas servidas de munición de 5.56 mm y 7.62 mm, vidrios rotos, utensilios de plástico utilizados y una bandeja con comida, así como una caja vacía de munición de 7.62, en una sala de los ascensores ubicada en el tejado del edificio. Dicha sala tiene una ventana que da a la Plaza y desde la que se ve sin obstáculos el Palacio Presidencial, incluidos la puerta delantera y el tejado del piso superior. Dos orificios encontrados en el marco de metal de la ventana de la sala de los ascensores parecen haber sido causados por el disparo de una o más armas de fuego.

Integrantes de la PN no identificados se abrieron paso por la fuerza al interior del edificio conocido como Radio Nueva América (RNA) y lograron penetrar en apartamentos y/o oficinas ubicadas entre los pisos 6º y 10º del edificio. Equipos de

DEF-0000104

Ex. 1001.27

televisión que acompañaban a los miembros de la PN no tienen registros de filmación cuando disparaban desde esa posición, pero filmaron a unidades militares que eran blanco de disparos cuando se retiraban y penetraban en el Palacio. Durante una de las retiradas se ve que un soldado es alcanzado por disparos de armas de fuego antes de ingresar en el Palacio y debe ser ayudado por otros cuando es blanco del ataque.

Testimonios indican que aproximadamente a horas 14:15 el Presidente de la República, en una vagoneta blindada, abandona el Palacio Presidencial por la calle Ayacucho, dirigiéndose a su residencia en la zona de Obrajes, a objeto de precautelar su seguridad.

A las 17:00 aproximadamente, un capitán de infantería que se encontraba en el techo del Palacio recibe un impacto de bala, a pesar de que se encontraba refugiado detrás de una pared, el cual le produce su muerte. Un soldado que trata de ayudarlo llevándolo al comedor que se encuentra ubicado en el techo del Palacio es muerto también por un disparo en la cabeza.

Tras los hechos de la Plaza Murillo de la tarde del 12 de febrero fueron saqueadas y/o quemadas por la noche en la ciudad de La Paz varias tiendas y oficinas públicas, las sedes de los tres partidos políticos que conforman la coalición de gobierno, y las oficinas de la Vicepresidencia de la República, así como en la ciudad del Alto, la Alcaldía y otras oficinas públicas y privadas.

b. El 13 de febrero de 2003

En las primeras horas de la mañana y durante la tarde continuaron los motines y saqueos en todas partes de La Paz y El Alto. Otras ciudades afectadas por saqueos fueron Cochabamba y Santa Cruz. Dos incidentes adicionales en La Paz y sus alrededores provocaron la muerte de personas que se encontraban en la turba.

También en la mañana, civiles y saqueadores atacaron la planta de Coca Cola ubicada en El Alto (en las afueras de La Paz). Una fuerza de seguridad de aproximadamente ocho efectivos de la PN y varios empleados de la compañía trataron de repelerlos, pero los saqueadores lograron derribar las paredes de ladrillo ubicadas en la entrada delantera de la planta. Un helicóptero llevó a la fábrica a miembros de la Fuerza Aérea Boliviana (FAB) en dos vuelos. Tiempo después tropas de la FAB, cuyo número se desconoce, llegaron a la fábrica en camión. Esas tropas dispararon contra algunos de los saqueadores, matando a cuatro e hiriendo a otros varios (se desconoce el número de heridos).

Los saqueadores también atacaron a la estación de la guardia de seguridad del Servicio de Aduanas de Bolivia, avasallando a los guardias y saqueando oficinas y contenedores y camiones llenos de mercancías. Un individuo no identificado disparó y mató a una persona.

En La Paz fueron convocadas manifestaciones antigubernamentales por algunos líderes que pedían la renuncia del Presidente y del Vicepresidente, pero la convocatoria fue mínima y los manifestantes fueron mantenidos a distancia de la Plaza Murillo. Se desplegaron unidades militares con gran número de efectivos en toda la capital para mantener el control, ya que los policías mantenían la huelga.

En la tarde del 13 de febrero de 2003, en un video casero presentado por representantes de la Asamblea de Derechos Humanos, aparece una pequeña unidad de efectivos del Ejército boliviano, tomando posición en la esquina de las calles intersección de Genaro Sanjinés y Comercio. La unidad está formada por aproximadamente seis o siete soldados y oficiales y aparece disparando gas

DEF-0000105

Ex. 1001.28

lacrimógeno y efectuando disparos con sus fusiles de asalto contra una multitud
reunida a unos 150 metros al Sur, en calle Mercado.

Un hombre que se esconde detrás de una cabina telefónica a unos 20 o 30 metros de la
intersección es herido de bala en la pierna.

Momentos más tarde los soldados identifican a un hombre ubicado en el tejado de un
edificio, en la calle Mercado y Sanjinés, y se escucha a los soldados decir: "esta
armado." Un soldado no identificado dispara contra él y lo hiere; el hombre resulta ser
un obrero de la construcción que al parecer estaba arreglando tejas con una pistola de
adhesivo. Dentro del mismo edificio, una estudiante de enfermería que acude a
socorrerlo recibe un impacto de bala que entra por una ventana que da al Norte (hacia
donde se encuentran los soldados) y más tarde muere como consecuencia de las
heridas. Una doctora en medicina trata de asistir al obrero de la construcción y abrir un
panel que da al tejado. La doctora también es herida, en la mandíbula, pero sobrevive
a las heridas.

En horas de la tarde, y luego de la firma de un acuerdo entre la PN y autoridades de
gobierno, unidades de la PN vuelven al trabajo y comienzan desplegarse por la ciudad
de La Paz y zonas circundantes, intentando recuperar el control y sofocar los saqueos.


## 6. Conclusiones Preliminares de la Investigación de la OEA

El presente informe, y en forma más general la labor de apoyo de la OEA está
destinada a ayudar a la Fiscalía General de la República, con la realización de una
investigación de alguna manera independiente de los hechos ocurridos durante esos
dos días, y ha extraido las conclusiones y formulando las recomendaciones que ha
considerado apropiadas.

El Informe se respalda no sólo en la solicitud del Gobierno y del Fiscal a la OEA para
apoyar la investigación, sino en el hecho mismo de que es necesario contar con
elementos de juicio para que tanto el Gobierno como el Congreso tomen decisiones que
puedan corregir pronto algunas fallas graves en el funcionamiento del Estado, y
asegurar así la prevalencia del estado de derecho y el fortalecimiento de las
instituciones democráticas, tan seriamente amenazadas por los hechos del 12 y 13 de
febrero de 2003.


### a. Con respecto a los actos contra Palacio v el Presidente de la República

La información técnica balística que se ha recopilado hasta la fecha muestra que el
Palacio Presidencial fue objeto de múltiples impactos por proyectil de arma de fuego:
en el despacho presidencial hay varios impactos provenientes de la esquina de la casa
Kodak, otros de la esquina del Hotel Paris, otros desde la Cancillería y otros de la calle
Comercio; en la antesala del comedor, un impacto proveniente del edificio INRA; en el
comedor presidencial, un impacto desde la esquina de la Cancillería; en la antesala del
dormitorio, un impacto desde el techo del edificio de la Cancillería; en el Salón Rojo
hay fuego cruzado con el techo del edificio de la Cancillería; y en el Salón de los
Espejos hay un impacto originado desde la calle a la altura del DP-2. El techo del
Palacio Presidencial recibió varios impactos desde el edificio INRA y desde el techo del
Edificio de la Cancillería, hubo fuego cruzado con el DP-2, se disparó hacia la Caja de
Salud, a la Cancillería y demás esquinas de la plaza. Al parecer desde el edificio INRA
se dispara contra el capitán del Ejército que es muerto en el techo del edificio
Presidencial y contra el soldado que lo auxilia que igualmente fallece.

DEF-0000106
Ex. 1001.29

Sin duda, los disparos realizados contra el Palacio Presidencial han estado dirigidos a los lugares o ambientes en los cuales el Presidente realiza la mayor parte de sus funciones (Despacho Presidencial, Sala de Reuniones, Antesala del dormitorio). Si bien es evidente que la vida del Primer Mandatario estuvo amenazada, no existen por el momento suficientes evidencias para afirmar de manera categórica que dichos disparos respondieron a un plan preestablecido para asesinar al Presidente de la República de Bolivia.

Lo cual es, de cualquier modo, muy grave. No solo tales actos pudieron generar muertos y heridos, sino que los disparos cuando menos reflejan una gravísima apelación a la violencia y actos de abuso de poder de parte de algunos integrantes de la PN. Preocupa seriamente el desprecio de las instituciones democráticas bolivianas, y en particular de la institución presidencial por miembros de la PN, obligados a respetar las leyes y a las autoridades como el resto de los ciudadanos.

Lo que hemos señalado no quiere decir que la vida del Sr. Presidente no corriera peligro. Es precisamente el profesionalismo y la lealtad con las instituciones y con la democracia del cuerpo de seguridad del Presidente, que a su vez son miembros de la PN, y que con seguridad tenían una enorme presión de la propia PN, el que pudo evitar una catástrofe de mayores dimensiones. La vida del Presidente de la República si corrió peligro, así como la estabilidad de las instituciones bolivianas y la democracia en este país.

Este hecho debe llamar la atención  de los ciudadanos Bolivianos y de la comunidad internacional respecto a la seguridad del Presidente, el Vicepresidente, sus ministros y de otros altos funcionarios del estado, elemento primordial para el mantenimiento de la institucionalidad democrática.

Finalmente, a nuestro juicio, en esos días no hubo una insurrección generalizada en Bolivia. Hubo marchas, estuvieron presentes un número significativo de personas desafiando el orden constitucional, se presentaron escaramuzas, pero no una insurrección. Por el contrario, la inmensa mayoría de bolivianos permaneció atónita frente al desarrollo de estos hechos, temió por la suerte del país y de sus instituciones democráticas y no respaldó salidas inconstitucionales.

b. Con respecto a la Acción Militar

El 12 y 13 de Febrero de 2003 las Fuerzas Militares actuaron en defensa de la democracia y del estado de derecho ante el ataque policial,  y actuaron de  forma contenida y proporcional, así se haya dado tan alto número de víctimas. En este aspecto, sin embargo, es urgente hacer una pronta revisión de los procedimientos a usar particularmente en lo que tiene que ver con el control de situaciones de protesta que puedan derivar en hechos graves de orden público, ya que ellas se han vuelto de común ocurrencia en Bolivia.

Sin embargo, las conductas de algunos uniformados y su participación en algunos hechos del 13 de febrero,  deben ser investigadas y aclaradas para, en caso de existir conductas antijurídicas, aplicar las sanciones correspondientes.

c. Con respecto a la Acción Policial

Este Informe considera que lo ocurrido el 12 y 13 de Febrero es una insubordinación de miembros de la Policía contra la Constitución y las leyes bolivianas. Una

DEF-0000107

Ex. 1001.30

insubordinación que amenazó las instituciones políticas bolivianas y la Carta
Democrática Interamericana que establece inequívocamente, en su Artículo 4:

"La subordinación constitucional de todas las instituciones del Estado a la autoridad
civil legalmente constituida y el respeto al estado de derecho de todas las entidades y
sectores de la sociedad son igualmente fundamentales para la democracia".

Lo que es aún más grave, en la Constitución boliviana están consignados las normas y
principios aplicables, en particular el Art. 215 de la Constitución Política del Estado, que
dice:

"I. La Policía Nacional, como fuerza pública, tiene la misión específica de la defensa de
la sociedad y la conservación del orden público y el cumplimiento de las leyes en todo
el territorio nacional. Ejerce la función policial de manera integral y bajo mando único,
en conformidad con su Ley Orgánica y las Leyes de la República.

II. Como institución no delibera ni participa en acción política partidaria, pero
individualmente sus miembros gozan y ejercen sus derechos ciudadanos de acuerdo a
ley".

La no deliberación de la fuerza pública es un principio inequívoco de la democracia. Una
sociedad abierta, libre y democrática es incompatible con fuerzas uniformadas que
emiten juicios políticos y que tienen las armas para respaldarlas. La disposición del uso
de la fuerza está depositada por voluntad de los ciudadanos, en su Presidente, electo
popularmente, y no en las fuerzas uniformadas. A estas les corresponde la conducción
operativa, táctica, logística de las fuerzas, pero la decisión política sobre su uso es una
prerrogativa, en una democracia, del primer mandatario. Y este no tiene que hacer un
juicio penal para determinar la existencia del delito de insubordinación. Es una
evaluación política inmediata inherente a su investidura.

Las conductas de miembros de la PN y su participación en algunos hechos del 12 y 13
de febrero,  deben ser investigadas y aclaradas para, en caso de existir conductas
antijurídicas, aplicar las sanciones correspondientes.


d. Con respecto a la impunidad

Es fundamental para la democracia boliviana, con miras a su consolidación y
fortalecimiento, asegurar que los hechos trágicos del 12 y 13 de Febrero sean
investigados exhaustivamente por los poderes públicos que correspondan. En su
momento la autoridad judicial competente debe establecer las responsabilidades
penales a que hubiere lugar y el Ejecutivo debe tomar las decisiones de carácter
administrativo. El Congreso debe hacer un debate sobre lo ocurrido y derivar
enseñanzas sobre las fallas en las instituciones del estado, así como poner en
conocimiento oportuno de la Fiscalía General la información que posea.

Somos contundentes en afirmar que los efectivos de la PN que participaron de los
hechos narrados tuvieron la capacidad y el poder de decidir el curso de acción que
tomarían, lo que los obliga a asumir la responsabilidad por sus decisiones, en forma
independiente de los contextos históricos del país.

A este respecto, los hechos del 12 y el 13 de febrero, en que perdieron las vidas civiles,
militares y policías,  justifican una escrupulosa atención. El asesinato y las lesiones
sufridas en este caso por ciudadanos  inocentes, han afectado agudamente a la
sociedad boliviana.  En consecuencia, la investigación y el eventual esclarecimiento de
esos hechos merece una acción detenida y meticulosa por parte de las autoridades de

DEF-0000108
Ex. 1001.31

la Fiscalía General y de la justicia boliviana, sean ellas de la justicia civil o militar. También merece la más ferviente determinación y apoyo de sus ciudadanos. Bolivia no debe aceptar nada menos.

**7. Recomendaciones**

El objetivo del presente Informe no es otro que el fortalecimiento de las instituciones democráticas en Bolivia y la prevalencia del estado de derecho en el país.

El centro de gravedad política del hemisferio americano es la democracia. Como lo expresa la Carta Democrática de las Américas, los ciudadanos del hemisferio no sólo viven bajo un sistema político que garantiza sus derechos y libertades, sino que les asiste a ellos un derecho a la democracia. La democracia es hoy una condición necesaria, aunque no suficiente, para enfrentar los complejos problemas y desafíos en los terrenos económico, social y político, y para lograr el desarrollo de nuestros pueblos y de nuestras naciones

Por eso las soluciones que se demanden para evitar que vuelvan a ocurrir hechos como los del 12 y 13 de Febrero deben darse dentro del sistema democrático y solo aplicando soluciones previstas en la Constitución y las leyes pueden encontrarse salidas democráticas y justas. Es probable que sea necesario seguir un difícil camino para asegurar que todos los poderes públicos hagan lo que les corresponde en Bolivia y que funcionen los contrapesos esenciales en una democracia. Y es esencial que todos los protagonistas de la vida pública Boliviana se comprometan a no usar la violencia para obtener fines políticos y no se salgan del Estado de derecho para tramitar sus reivindicaciones sociales o políticas.

Frente a la evidente dificultad para preservar la vida de los bolivianos tal como aconteció ese 12 y 13 de Febrero, y ante el hecho de que algunas instituciones del estado, a las cuales ya nos hemos referido, les correspondía cumplir una función pública y no lo hicieron en forma cabal, la OEA presenta al país una serie de recomendaciones para el fortalecimiento de las instituciones en Bolivia, así:

a. A todos los actores políticos, sociales, religiosos y económicos de Bolivia

Cuando la realidad política de un país así lo hace necesario, los partidos políticos y actores sociales pueden suscribir acuerdos explícitos sobre las reglas de juego mínimas para participar en forma transparente de la democracia, que comprometan la acción política y social de todas las organizaciones con vocación pública, sin excepción alguna, así su propósito sea el ejercer el derecho a la oposición y crítica al sistema democrático mismo. Para que sea posible el crecimiento, el bienestar, el cumplimiento de las funciones esenciales del estado debe haber un acuerdo sobre lo fundamental.

Es cierto que Bolivia es pionera, y le sobran ejemplos, en cuanto a pactos de gobernabilidad democrática. Pero quizás los tiempos han cambiado. Una primera generación de acuerdos políticos, para efectos de gobernabilidad, se daba exclusivamente entre partidos políticos y sus pares. Una segunda generación, relativa a decisiones de políticas públicas, fue más allá y cobijó partidos políticos y organizaciones sociales.

Es evidente que Bolivia requiere hoy de una tercera generación de acuerdos que vuelva a la raíz, y no solo busque acuerdos y transacciones sobre lo que separa a los miembros de una coalición, sino que defina los principios que unen a todos los actores

DEF-0000109

Ex. 1001.32

políticos y sociales, y que inclusive pueda tener alguna participación internacional. No hay duda de que los consensos básicos se están rompiendo y ese es un punto desde el cual hay que buscar un retorno. La Iglesia y otras organizaciones sociales han propuesto un pacto social o un acuerdo nacional.

Un ejemplo que puede ser útil es el caso peruano, con la firma del "Acuerdo Nacional de Gobernabilidad" del 22 de Julio de 2002, vinculante para los signatarios hasta el 28 de Julio del 2021, es decir por cerca de veinte años. En él, los principales sectores de la vida pública peruana acordaron una serie de políticas dirigidas a alcanzar cuatro grandes objetivos: 1. Democracia y Estado de Derecho; 2. Equidad y Justicia Social; 3. Competitividad del país; y 4. Estado Eficiente, Transparente y Descentralizado.

A manera de referencia, dichas organizaciones políticas, religiosas, de la sociedad civil y del gobierno, sin perjuicio de sus legítimas diferencias, acordaron en el tema democracia y estado de derecho: "1.4 Preservar el orden público y la seguridad ciudadana, garantizando que la expresión de nuestras diferencias no afecte la tranquilidad, justicia, integridad, libertad de las personas y el respeto de la propiedad pública y privada".


b. Al Presidente y al Congreso

1. Creemos que la responsabilidad del proceso va más allá de los investigadores de la Policía Técnica Judicial, los técnicos del Instituto de Investigaciones Forenses o los Fiscales asignados al caso. Se trata de funcionarios competentes. La OEA apoya lo que se han venido realizando, cada uno en su campo, y de ello también han dejado testimonio los expertos internacionales.

Pero hay graves problemas de fondo que pueden resultar más adelante en una investigación fracasada o en la impunidad de quienes son responsables de estos hechos, por lo cual es imprescindible tomar decisiones inmediatas por parte de las autoridades competentes.

La primera acción de fondo tiene que ver con que la Fiscalía General de la República, debe remitir en función a los casos específicos, los asuntos que deban ser conocidos por la jurisdicción ordinaria y los que deban ser tratados en la jurisdicción militar.

Por otro lado, mientras exista un problema de interpretación y adecuación entre la Ley Orgánica del Poder Judicial, el Nuevo Código de Procedimiento Penal y la Ley Orgánica de la Policía Nacional, con respecto a la dirección de las investigaciones y a las autoridades a quienes reportan los funcionarios de la PTJ, IDIF y Fiscalía, la investigación podría fracasar por procedimientos o por enfrentamientos internos.

A nuestro juicio, el papel más delicado tiene que ver con el rol de los funcionarios investigadores de la PTJ, todos ellos con enorme capacidad y compromiso. Pero es riesgoso y poco razonable pedir que, como miembros de la Policía que son, procesen e incriminen a miembros de su propia institución –a sus compañeros de curso, a quienes determinan sus ascensos profesionales, a quienes deben obediencia por su autoridad y mando-, en particular en un cuerpo uniformado, jerarquizado, con valores y principios institucionales muy fuertes.

El país, ojalá más temprano que tarde, debe separar las labores de policía de seguridad de las funciones de investigación, y en ese sentido tiene que hacerse realidad que las funciones de policía judicial, con sus recursos humanos, técnicos y presupuéstales, pasen en su totalidad al Ministerio Público. De manera transitoria, y con miras al propósito de la investigación, debería implementarse el  mecanismo para que la Fiscalía

DEF-0000110

Ex. 1001.33

General de la República pueda contratar, amparada en su Ley Orgánica, asesores o
investigadores especializados, lo que le permita contar con un cuerpo de investigadores
que dependan orgánica, funcional y operativamente de esa sola institución. Para que
ello sea una realidad, el apoyo político y financiero del Ejecutivo es indispensable.

Entre tanto es así, los actuales investigadores deberán continuar en sus labores,
protegidos por las autoridades nacionales y la comunidad internacional para que
puedan ejercer sin presiones su trabajo.

Por último, la OEA no puede sino coincidir con el Fiscal General de la Nación cuando
expuso ante la Cámara de Diputados que en "…el esclarecimiento de estos hechos
requiere el compromiso de no sólo el Ministerio Público de la Nación, sino también de
las entidades que cuentan con los medios humanos y financieros, así como los
mecanismos que les permiten recabar información fidedigna. Por cuanto las
investigaciones de hechos criminales, más aún si estos tienen la magnitud y
complejidad de los que este informe trata, deben ser realizadas bajo la égida de un
verdadero sistema integrador y asociativo de esfuerzos, controlado por el Ministerio
Público de la Nación, capaz de lograr resultados responsables y conducentes al
establecimiento de la verdadera seguridad jurídica. Esa seguridad está siendo
reclamada por la sociedad de manera permanente, y ahora sí incalculable, como
componente esencial del Estado de Derecho".


2. Considera la OEA que por las particularidades del caso en cuestión, y porque existe
una enorme sensibilidad nacional alrededor de él, es necesario que el Estado indemnice
y repare a las víctimas. Excepcionalmente y sólo para éste caso particular, el Poder
Ejecutivo debe constituir una Instancia que realizará una evaluación de todos los daños
personales sufridos como consecuencia directa de la violencia del 12 y 13 de Febrero
de 2003.

La víctima o sus sucesores, en caso de aceptar la indemnización ofrecida por el
Gobierno, renuncian a las acciones judiciales sobre este aspecto y, en caso de no
aceptarla, tienen abierta la vía judicial para la reclamación

Las autoridades bolivianas cooperarán y prestarán total ayuda y apoyo a esa Instancia
en su labor. La Instancia presentará un informe al Gobierno con anterioridad al 6 de
Agosto de 2003, con recomendaciones sobre indemnizaciones a individuos o herederos
por los daños personales como resultado directo de la violencia del 12 y 13 de
Febrero de 2002.


3. Por otro lado, la OEA considera que, mientras no se tomen medidas ejemplares
frente a quienes lideraron los hechos del 12 y 13 de Febrero para que respondan por
sus actos, Bolivia permanecerá sometida a una extorsión colectiva por quienes abusan
de la fuerza.

El amotinamiento de febrero, si bien es el más reciente y el más significativo por el
impacto colectivo y sobre las instituciones públicas, no es el único y, por el contrario,
es parte de una cadena sistemática y progresiva del uso indebido de la fuerza por parte
de la institución policial. La insubordinación de miembros del GES el 8 de Abril del 2000
reclamando aumento salarial del 50%, mejoras en el bono de alimentación, dotación de
uniformes y materiales de trabajo, es el antecedente más inmediato del que se tenga
conocimiento, pero algunas investigaciones hablan de cerca de 30 situaciones de hecho
desde 1982[3].

DEF-0000111
Ex. 1001.34

A juicio de la OEA, la separación inmediata de funciones de mando en la Policía a quienes lideraron el amotinamiento del 12 y 13 de febrero por violación del Art. 215 de la Constitución Política del Estado, mientras se llega a la conclusión de la investigación penal correspondiente, es una condición necesaria para el fortalecimiento no sólo de la institución policial, sino también para la credibilidad en la justicia.

No basta con el hecho de que exista un "convenio" surgido al calor de los hechos del 12 y 13 de Febrero, que algunos alegan como eximente de responsabilidad[4]. Un pacto como este no puede colocarse por encima de la Constitución o la ley. Por lo demás, el hecho mismo que sea convenido en medio de la amenaza o uso de la fuerza de una de las partes, vicia de plano el consentimiento de la otra.

4. El manejo del estado siempre va a ser un delicado equilibrio entre consenso y coerción. El consenso puro es sólo utópico y tiende al inmovilismo. La sola fuerza es autoritarismo. Entre más consensuado sea el uso de la fuerza, más legitimo será su uso. De ahí que el Gobierno debe avocar con urgencia la creación de una Estrategia Nacional de Seguridad Ciudadana, que sea una política de estado y no sólo de la actual administración.

Un buen principio de ello es la presentación por el Gobierno del Plan Nacional Integral de Seguridad Ciudadana, aprobado por el Consejo Nacional de Seguridad, con 100 acciones básicas, todas ellas bien encaminadas.

La Estrategia que se propone es, si se quiere, menos ambiciosa pero de más largo aliento. Bien sea dentro del marco del Acuerdo arriba mencionado, o a través de mesas de trabajo en las alcaldías y prefecturas durante un tiempo determinado, la participación ciudadana es una condición necesaria. Dicha Estrategia puede establecer políticas estatales en los siguientes campos[5]:

a. Estado y participación ciudadana: Consejo Nacional de Seguridad Ciudadana; descentralización y participación de autoridades locales; prevención del delito; métodos de sanción de los pueblos tradicionales.
b. Lucha contra el narcotráfico;
c. Reforma de la Policía: organización y estructura de mando; no-deliberación ni participación política; estructura salarial y de ascensos; policía comunitaria; separación de la policía de investigaciones de la policía de prevención; sistemas de vigilancia y de información; Código de Policía.
d. Sistema Penal: despenalización y penalización de conductas
e. Relaciones Fuerza Militares y de Policía: delimitación de funciones;
f. Sistema Penitenciario y Carcelario;
g. Observatorio Nacional de Violencia y Estudios de Criminalidad;
h. Desarme y control de armas

5.  Por último, y como se lo expresó en diversas oportunidades el Primer Mandatario a la OEA, existe el compromiso del Gobierno de apoyar decididamente la investigación de la Fiscalía. A esta organización no le asalta duda sobre la intención del Ejecutivo. Por lo tanto espera que esa voluntad política se mantenga.

c. A los partidos políticos y al Congreso Boliviano

Hablar de democracia, especialmente de democracia representativa en el contexto de las Américas, es necesariamente una discusión sobre los partidos políticos. Es

DEF-0000112
Ex. 1001.35

fundamental que ellos tengan la estructura y los recursos humanos y financieros que les permitan articular las necesidades y aspiraciones de la sociedad boliviana.

La Carta Democrática Interamericana, reconoce la importancia fundamental de mantener un régimen plural de partidos políticos y la necesidad de su fortalecimiento. Es necesario asegurar que los partidos políticos bolivianos no solo sean capaces de expresar diferentes intereses sociales económicos o políticos, sino que también sean capaces de canalizarlos, articularlos y proponer para su atención políticas apropiadas, viables desde el punto de vista jurídico, económico y de conciliación con las posiciones o políticas de los demás partidos o movimientos.

En el caso de Bolivia, y por la particular diversidad de su sociedad, es necesario estimular mecanismos que permitan la articulación de intereses de distintos grupos de una población diversa como la boliviana, sin perder de vista el bienestar general. Es fundamental que en Bolivia se logre remontar la opinión que se ha ido consolidando a todo lo ancho de América, en el sentido de que en el espectro de protagonistas públicos, los partidos políticos son los que tienen la peor imagen[6]. Tal opinión quebranta seriamente los valores democráticos.

Bolivia, en su carácter de país signatario de la Carta Democrática Interamericana y de su participación en el proceso de Cumbres de las Américas, se ha comprometido a fortalecer los partidos políticos como elemento necesario del mejoramiento de la democracia. La Organización de Estados Americanos, el BID, la CAF y muchas otras instituciones hemisféricas deben cooperar con el gobierno de Bolivia para acometer esta tarea en toda su magnitud, que implica aspectos tales como el registro de partidos políticos, el acceso de los partidos políticos al financiamiento y a los medios de comunicación, el financiamiento de campañas electorales, la fiscalización y difusión de los resultados electorales y las relaciones de los partidos políticos con otros sectores de la sociedad. La tarea de una reforma política en el marco del Acuerdo de Gobernabilidad es particularmente importante para el futuro de Bolivia.

En Bolivia es particularmente importante el tema de la participación de las poblaciones indígenas en el proceso político, en consonancia con el esfuerzo hemisférico por conseguir que esa participación sé de una manera permanente, ética y responsable y en el marco constitucional, y en línea con el artículo noveno de la Carta Democrática Interamericana que habla de "la eliminación de toda forma de discriminación, especialmente la discriminación de género, étnica y racial, y de las diversas formas de intolerancia, así como la promoción y protección de los derechos humanos de los pueblos indígenas y los migrantes y el respeto a la diversidad étnica, cultural y religiosa en las Américas, contribuyen al fortalecimiento de la democracia y la participación ciudadana".

Por eso es necesario conseguir un pacto social o acuerdo nacional que permita lograr convergencia en temas nacionales. De esa manera se le haría bien a la democracia boliviana. Es necesario reconocer que un instrumento como este puede ser poco útil para dirimir las diferencias y grandes desacuerdos que han surgido entre el Gobierno y la oposición, por ejemplo tanto MAS como NFR, sobre el modelo económico o la política antidrogas. Pero en cambio es importante para establecer los consensos nacionales; para abrir los canales de participación y para buscar los instrumentos que permitan realizar una reforma política en el país y establecer acuerdos sobre temas económicos que faciliten sacar a Bolivia de su actual situación.

DEF-0000113
Ex. 1001.36

d. A la Comunidad Internacional

Lo ocurrido en Bolivia ha tenido un gran impacto regional y está en gran medida originado en particulares circunstancias regionales de inestabilidad política, conmoción social  y un entorno internacional adverso, como ya se ha mencionado.  En consecuencia, resulta pertinente e importante enmarcar los hechos ocurridos en un contexto internacional más amplio, con miras a su cabal comprensión para que la comunidad internacional tome las providencias que aseguren la cooperación y la solidaridad que Bolivia demanda en estas circunstancias. Para este propósito, hemos puesto de relieve los eventos económicos más relevantes para Bolivia en el contexto de la globalización y de la volatilidad de capitales, así como las dificultades que tiene el país para insertarse en la economía mundial por los problemas de transporte, infraestructura y falta de un sector privado vigoroso.

Los problemas de Bolivia son de diversa índole y todos ellos de enorme magnitud, y el país, como le consta a la OEA, tiene un especial agradecimiento por la participación de la comunidad internacional en sus soluciones. Ya hemos visto como es de crítico el tema de la financiación externa para financiar el gasto y la inversión publica. Es fundamental que la comunidad internacional mantenga un elevado grado de compromiso con Bolivia que pasa por un momento difícil en el que son urgentes los recursos concesionales y no concesionales. Es urgente también apoyar a Bolivia para que mantenga la confianza  en sus instituciones democráticas con programas que aseguren que los menos favorecidos reciban beneficios palpables de la acción del estado, con el apoyo de la comunidad internacional.

Es muy importante también señalar que, como lo ha puesto de presente el Gobierno con el apoyo de la Comunidad Financiera Internacional, es preciso apoyar al sector productivo y bancario, sensiblemente debilitados por el débil crecimiento económico de los últimos cuatro años. Es necesario tomar las medidas legislativas y  regulatorias que garanticen su crecimiento y rentabilidad. Es necesario también fortalecer el sector de las exportaciones y en particular aprovechar mejor los beneficios del ATPDEA. Bolivia ha iniciado un plan para aprovechar  las posibilidades de ese acceso preferencial al mercado norteamericano pero aún no existen resultados.

Es bueno también señalar que la estrategia de desarrollo del país para asegurar que se logren niveles de crecimiento que aseguren una reducción sustancial de la pobreza y mejoren los índices de desarrollo humano de nuevo, hace  indispensable que se tome una decisión oportuna para el desarrollo de los proyectos dirigidos a explotar las vastas reservas de gas y petróleo, particularmente el proyecto LNG, basada en criterios económicos y financieros razonables. Tal proceso, sin embargo, dado el elevado grado de cuestionamiento al que esta sometido, debe estar regido por un intenso proceso de consultas y participación ciudadana, debe ser muy transparente y debe contar para su decisión  con mucha persuasión  y con un alto grado de apoyo ciudadano.

Para  apoyar a Bolivia en la presente circunstancia es muy importante conseguir un apoyo suficiente y oportuno del Fondo Monetario Internacional. En esta ocasión los problemas no fueron solo sobre condicionalidad sino sobre oportunidad. La negociación con el FMI tendiente a lograr un acuerdo trianual en el marco del PRGF fue excesivamente prolongado, que inclusive llegó a considerar una matriz con 39 exigencias previas que a todas luces resultaban excesivos. Prueba de ellos es que los hechos del 12 y 13 cambiaron los términos del acuerdo. La aprobación hace pocas semanas de un acuerdo "stand-by" por US$118 millones es esperanzador para el país.

Pero los hechos del 12 y 13 deben abrir los ojos también de la cooperación internacional en otras materias. Un programa de fortalecimiento de la justicia y del Ministerio Público en particular es absolutamente prioritario en Bolivia. También lo es la

DEF-0000114

Ex. 1001.37

creación de un Programa Nacional de Protección y Promoción de Derechos Humanos con el apoyo de la CIDH y financiación internacional. Es imperativo, igualmente, trasladar a Bolivia el "know how" que existe hoy en el mundo y en las Américas sobre solución de conflictos locales. Otro aspecto de la mayor trascendencia es ofrecer a Bolivia asesoría y apoyo para iniciar una vasta tarea de Reforma de la Policía que la prepare para el sinnúmero de nuevas tareas, responsabilidades y problemas que debe enfrentar el país

## 8. A manera de reflexión final

Este informe se enmarca en una nueva relación de la OEA con los gobiernos o los estados y que se basa en que, sin menoscabo del respeto al principio de no-intervención, los países pueden solicitar a la Organización y a sus cuerpos políticos la asesoría y el apoyo necesarios para defender la democracia cuando determinadas situaciones las puedan poner en peligro.

La OEA participa en este proceso con el ánimo de fortalecer la democracia boliviana, inspirado en el compromiso de este país con los principios y valores consagrados en la Carta Democrática Interamericana.

En ese ejercicio nos hemos encontrado con un nuevo rol que nos enriquece y que al mismo tiempo nos da muchas responsabilidades. En el caso que nos ocupa, nos hemos encontrado que el país está regresando a cierta forma de determinismo y de pesimismo histórico, según la cual la situación del país pareciera siempre peor, más lúgubre, más injusta. Sin duda existe un entorno internacional muy adverso que ha acentuado las dificultades propias de la tarea del desarrollo. También nos ha traído la globalización la volatilidad de capitales pero más allá de eso, temores, asechanzas, peligros por un entorno internacional mucho más competitivo, en el cual en ocasiones se no da acceso preferencial a los mercados pero las mas de las veces se nos cierran los mercados.

Bolivia depende hoy mucho más de la situación latinoamericana, particularmente porque al menor signo de dificultades en países cercanos de inmediato se dan extraordinarias fugas de capital.

Igualmente, ha sido muy difícil para el sistema judicial y para las autoridades de policía enfrentar organizaciones criminales mucho más poderosas y mejor organizadas, especialmente en lo que hace relación al narcotráfico.

Durante nuestra estadía en este país, con un gran potencial humano, con una riqueza indiscutible que se desprende de su diversidad y su multiculturalidad, hemos encontrado autocríticas que rayan en la flagelación. Somos de la opinión de que el país tiene una gran capacidad para dar la vuelta y elevarse sobre la actual coyuntura adversa para dar un salto adelante en su desarrollo y lograr un mayor bienestar para todos. Estamos seguros de que a pesar de que la experiencia boliviana es única e irrepetible, no lo es menos el hecho de que en estos tiempos de mucha mayor interdependencia Bolivia encontrará en las experiencias de otros países del sistema interamericano enseñanzas útiles y una gran solidaridad tanto hemisférica como del resto de la comunidad de naciones.

Son innumerables los signos de esperanza para la nación boliviana.

Existen medios de comunicaciones libres, pluralistas e independientes, fundamentales para la preservación del estado de derecho. Cuando otros países han tendido a la concentración y monopolización de los medios, o en otros casos a intervenciones

DEF-0000115

Ex. 1001.38

arbitrarias del gobierno en ellos, Bolivia cuenta con órganos informativos propios de una verdadera sociedad abierta.

La OEA destaca la importancia de que Bolivia posea una riquísima y abundante literatura sobre los problemas del país y sus soluciones, desde distintas ópticas y conocimientos, indicativos de una sociedad que le está dando la debida prioridad a los asuntos públicos y colectivos.

El hecho de confiar en instituciones multilaterales como la OEA, el BID, el Banco Mundial, la CAF para una situación tan delicada como la que aquí se ha analizado; el compromiso de la comunidad internacional para apoyar al país en estos momentos de dificultades; la participación activa de Bolivia en el concierto internacional; así como la enorme voluntad política para buscar alternativas creativas a crisis que son generalizadas en la región, abren una enorme esperanza para el país.

Para ello hay una enorme responsabilidad de todos los actores de la sociedad boliviana, sin distingos de raza, género o clase social. Como lo expresó en forma muy clara un reciente editorial, "el país vive una especie de esquizofrenia colectiva que debe ser atendida con espíritu de grandeza y a través de los marcos establecidos por el sistema democrático. Cualquier otro rumbo, hay que estar seguros, tendrá un desemboque autoritario, en el que no sólo se acentúan los problemas que ahora existen, sino que, además, se deteriorara la situación de  derechos humanos. La historia del país –y de América Latina- es muy ilustrativa al respecto, y sería imperdonable que las élites vuelvan a hacer en el error de optar por un camino diferente al constitucional"[7]

Finalmente, la OEA no pretende hallar las soluciones por encima de los bolivianos. Sólo a ellos corresponde encontrarlas. Este Informe busca facilitar ese proceso, a través de un documento que recoge varias iniciativas de bolivianos para bolivianos.

Este documento debe ser analizado como un vehículo para robustecer la gobernabilidad del país y espera que sea debatido, discutido e inclusive polemizado, siempre y cuando ello sirva para que, a partir de la pluralidad natural de opiniones, se encuentre un camino común para todos los bolivianos.

---

[1] J. A. Morales, "Economic Vulnerability in Bolivia", en L. Whitehead y J. Crabtree (directores de la publicación), Towards Democratic Viability: The Bolivian Experience (Oxford, 2001).

[2] UNDP, 2002, Informe de Desarrollo Humano en Bolivia, La Paz, p.18

[3] Informe de la Semana, "La Policía tiene líos desde 1982 y hoy hay dos grupos de rebeldes",  p. A8-A12, Diario La Razón, Domingo 16 de Marzo de 2003

[4] Entrevista con el Comandante de la Policía Nacional, Edgar Pardo, en el Diario La Razón, domingo 16 de Marzo de 2003

[5] Un extenso análisis puede verse en el Informe del Defensor del Pueblo sobre Seguridad Ciudadana en Bolivia, La Paz, Bolivia, 2002

[6] The Economist, 15 agosto 2002

[7] Editorial del Diario La Razón, Lunes 17 de Marzo de 2003

DEF-0000116
Ex. 1001.39

yndigo translations
709 Carroll Street
Brooklyn, NY 11215
Phone: 347-223-4334
yndigotranslations.com

STATE OF NEW YORK )
                   ) ss
COUNTY OF KINGS   )

## CERTIFICATE OF ACCURACY

I hereby certify that the attached is, to the best of my knowledge, ability and belief, a true and complete translation from Spanish to English of *REPORT FROM THE ORGANIZATION OF AMERICAN STATES (OAS) ON THE EVENTS OF FEBRUARY 2003 IN BOLIVIA; Report prepared by the General Secretariat of the OAS, May 2003.*

Glenn Cain
President
Yndigo Translations

Subscribed and sworn to before me this ___13___ day of ___SEPTEMBER___, 2013.

Notary Public
My Commission Expires:

PETER K. JACOB
NOTARY PUBLIC, STATE OF NY
NO. 01JA5053666
QUALIFIED IN KINGS COUNTY
COMMISSION EXP: DEC. 26, 20__13